*Frank Smart Intake Information*

# EXHIBIT "A"




# ALLEGHENY COUNTY JAIL
## *Offender Face Sheet*

**Today's Date:** *1/4/2015*



**DOC#:** *51831*    **BOOKING#:** *2015-00102*    **COMMIT DATE:** *1/4/2015  9:37:51AM*

**NAME AT BOOKING:** *SMART, FRANK JEROME*

**SID#:** *22223461*    **FBI#:**    **INS#:**

**Date of Birth:** 08/05/1975
**Age at Booking:** 39    **Current Age:** 39
**Sex:** M    **Race:** B    **SS#:** 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
**Marital Status:** S    **Religion:**
**US Citizen:** Y
**Place (State) of Birth:** PA
**Country of Birth:** UNITED STATES *(USA)*

**Admission Type:** NEW ARREST
**County Code:** ALLEGHENY *(02)*
**Committed By:** AC DISTRICT JUSTICE
**Transported By:** CITY OF PITTSBURGH
**Arrested By:** CITY OF PITTSBURGH
**ACJ Officer ID#:** C.O. PIERCE, C. L.
**Shift:** 1

## CHARACTERISTICS

**Height:** 509    **Weight:** 245
**Hair Color:** BLK    **Eye Color:** BRO
**Complexion:**    **Build:** MEDIUM
**Glasses:** N    **Facial Hair:** FULL B
**Scars/Marks/Tattoos:**
    BOTH ARMS
    TATTOO R ARM

**Highest Grade Completed:**
**Graduate of:** HIGH SCHOOL
**Graduation Date:**
**Alias(es):**

    SSN:    DOB:

**Enemies:**

**Alert(s):**
    LLB    LOW LEVEL BUNK    01/27/2012

## CONTACT INFORMATION

**Inmate's Legal Address**
    475 GARNER COURT  APARTMENT 405
    PITTSBURGH, PA  15219

**Emergency Contact**
    CHERICE NELSON
    (412) 292-1413

AC-10539





**DOC#:** 51831      **BOOKING#:** 2015-00102      **COMMIT DATE:** 1/4/2015  9:37:51AM

**NAME AT BOOKING:**  SMART, FRANK JEROME

**SID#:** 22223461      **FBI#:**                    **INS#:**

## CHARGE INFORMATION

**Charge**
**Offense Date:** 01/03/2015      **Case Number:** CR 85-2015          **Offender Tracking#:** G 699712-6
**Offense#:** 184101A1      **Offense Description:** FORGERY
**Grade:** F    **Degree:** 2      **Hearing Date:**                  **Disposition:** AWAITING PRELIMINARY
**Sentence Date:**                  **Minimum Date:**                  **Maximum Date:**
**Effective Date:**                  **Discharge Date:**                **Bond Amount:**  30,000.00
**Judge:** 05-0-03  PGH MAGISTRATE COURT

**Notes:**

**Charge**
**Offense Date:** 01/03/2015      **Case Number:** CR 85-2015          **Offender Tracking#:** G 699712-6
**Offense#:** 183922A1      **Offense Description:** THEFT BY DECEPTION
**Grade:** M    **Degree:** 2      **Hearing Date:**                  **Disposition:** AWAITING PRELIMINARY
**Sentence Date:**                  **Minimum Date:**                  **Maximum Date:**
**Effective Date:**                  **Discharge Date:**                **Bond Amount:**  30,000.00
**Judge:** 05-0-03  PGH MAGISTRATE COURT

**Notes:**

**Charge**
**Offense Date:** 01/03/2015      **Case Number:** CR 85-2015          **Offender Tracking#:** G 699712-6
**Offense#:** 183922A3      **Offense Description:** CRIMINAL CONSPIRACY
**Grade:** M    **Degree:** 2      **Hearing Date:**                  **Disposition:** AWAITING PRELIMINARY
**Sentence Date:**                  **Minimum Date:**                  **Maximum Date:**
**Effective Date:**                  **Discharge Date:**                **Bond Amount:**  30,000.00
**Judge:** 05-0-03  PGH MAGISTRATE COURT

**Notes:**

**Charge**
**Offense Date:** 01/03/2015      **Case Number:** CR 85-2015          **Offender Tracking#:** G 699712-6
**Offense#:** 35780-113A31      **Offense Description:** PROHIBITED ACTS
**Grade:** M    **Degree:**      **Hearing Date:**                  **Disposition:** AWAITING PRELIMINARY
**Sentence Date:**                  **Minimum Date:**                  **Maximum Date:**
**Effective Date:**                  **Discharge Date:**                **Bond Amount:**  30,000.00
**Judge:** 05-0-03  PGH MAGISTRATE COURT

**Notes:**

AC-10540



**DOC#:** *51831*   **BOOKING#:** *2015-00102*   **COMMIT DATE:** *1/4/2015  9:37:51AM*

**NAME AT BOOKING:** *SMART, FRANK JEROME*

**SID#:** *22223461*   **FBI#:**   **INS#:**

**Charge**

Offense Date: 01/04/2015   Case Number: FD 99-03131   Offender Tracking#:
Offense#: FD0001   Offense Description: DIRECT CRIMINAL CONTEMPT
Grade: M   Degree:   Hearing Date:   Disposition: AWAITING CONTEMPT
Sentence Date:   Minimum Date:   Maximum Date:
Effective Date:   Discharge Date:   Bond Amount:  1,000.00
Judge: BICKET, ALEXANDER

Notes:

**Charge**

Offense Date: 01/04/2015   Case Number: FD 94-05225   Offender Tracking#:
Offense#: FD0001   Offense Description: DIRECT CRIMINAL CONTEMPT
Grade: M   Degree:   Hearing Date:   Disposition: AWAITING CONTEMPT
Sentence Date:   Minimum Date:   Maximum Date:
Effective Date:   Discharge Date:   Bond Amount:  1,000.00
Judge: BICKET, ALEXANDER

Notes:

## DETAINER INFORMATION

**Detainer**

Docket #: CC 20110182   OTN: G 514762-3   Det Type: COUNTY PROB/PAROLE VIOLATION
Charges: VIO PROB/PAROLE   Date Lodged: 1/4/15  9:48 am   Judge: JUDGE TODD

Notes:

AC-10541

*Frank Smart Medical Intake*

# EXHIBIT "B"

# CORIZON™
*Promote a culture of safety*

*Deceased ~5-15*

## Intake and Receiving Screening

| Last Name: Smart | First: Frank | MI: | ID: 5831 |
|---|---|---|---|

| Date: 1-4-15 | Time: 1055 | X AM ○ PM | Sex: X Male ○ Female | DOB: 8-5-70 | Alias: N/A |
|---|---|---|---|---|---|

Most recent incarceration: ○ None  When: 9/2014  Where: ACJ | Intake refused: ○ Yes ○ No | Interpreter used: ○ Yes ○ No

Have you ever been incarcerated here: ○ No X Yes  When: 9/2014 | ○ Yes ○ No | Name:

Inmate transfer: ○ No ○ Yes: Records received: ○ Yes ○ No | | Service:

Private Insurance: ○ None ● Yes (Name): UPMC For You

### CRITICAL OBSERVATION

**Urgent/Emergent Medical Referral**
- X None identified     ○ Yes, check all that apply
- ☐ Severe Injury ☐ Life threatening illness
- ☐ Uncontrolled bleeding     ☐ Severe pain
- ☐ Head trauma with mental status changes
- ☐ Other:

**Responsiveness** (Choose one):
- X Alert          ○ Verbal Stimulus
- ○ Painful        ○ Unresponsive (Call 911)  Describe Unresponsiveness:

**Urgent/Emergent Mental Health Referral**
- X No ○ Yes, check all that apply
- ☐ Active hallucinations ☐ Active delusions
- ☐ Actively suicidal
- ☐ Other:

Oriented to Person & Place   X Yes ○ No
Describe:

**Communicable Diseases Suspected:**
| | | |
|---|---|---|
| MRSA | ○ Yes | X No |
| Varicella (Chicken pox) | ○ Yes | X No |
| Herpes Zoster (shingles) | ○ Yes | X No |
| Lice/Pediculosis | ○ Yes | X No |
| Jaundice | ○ Yes | X No |
| Needle Marks | ○ Yes | X No |

Other:

**Mobility Restrictions/Impairments** ○ No  ○ Yes (Check all that apply):
- ☐ Deformity ☐ Cast ☐ Paraplegic ☐ Wheelchair ☐ CPAP ☐ Brace ☐ Blind ☐ Deaf
- ☐ Amputation ☐ Splint ☐ Quadriplegic ☐ Crutches/Cane ☐ Other:

Comments:

### VITAL SIGNS  ☐ One or more vital signs refused

| Height | Weight | Temperature | Pulse ○ A ○ P | Respirations | Blood Pressure *Recheck if indicated | Pulse Ox (optional) |
|---|---|---|---|---|---|---|
| 5'9 | 250 | 98.2 | 58  Initial | 14  Initial | 158/101 Initial | 97/U Initial |
| ○ Act ○ Rptd | ○ Act ○ Rptd | ○ Not taken | *Recheck | *Recheck | *Recheck | *Recheck |

### HISTORY

Major surgery or medical hospitalization within past year: X No ○ Yes, check all that apply and include date
- ☐ Brain surgery _____ ☐ Heart Surgery _____ ☐ Abdominal Surgery _____ ☐ MI _____
- ☐ Stroke _____ ☐ Transplant _____ ☐ Due to tramatic injury _____ ☐ Other: _____

Female history: Date of last LMP: _____ ○ Unknown X N/A  Are you currently pregnant: ○ Yes ○ No ○ Maybe/Don't know

Pregnancy test: ○ Yes ○ No ○ Scheduled ○ Refused   Test result: ○ Positive ○ Negative  Fingerstick result (if pregnant)

☐ Hysterectomy ☐ Menopause

### MEDICATION REPORTED ○ None ○ Unknown ○ See below ○ See attached form

| Name/Dose | Frequency/Last Taken | Prescribed by or Provided by: | Verification Through |
|---|---|---|---|
| Tegretol 300mg | Freq: BID  Last: 1-3-15 | B Desousa | ○ Medication Container ○ Clinic  ○ Physician/Psychiatrist ○ VA  ○ Pharmacy ○ Unable to verify |
| Dialantin | Freq: daily  Last: 1-3-15 | Mercy Medical Center | ○ Medication Container ○ Clinic  ○ Physician/Psychiatrist ○ VA  ○ Pharmacy ○ Unable to verify |
| | Freq:  Last: | | ○ Medication Container ○ Clinic  ○ Physician/Psychiatrist ○ VA  ○ Pharmacy ○ Unable to verify |
| | Freq:  Last: | | ○ Medication Container ○ Clinic  ○ Physician/Psychiatrist ○ VA  ○ Pharmacy ○ Unable to verify |
| | Freq:  Last: | | ○ Medication Container ○ Clinic  ○ Physician/Psychiatrist ○ VA  ○ Pharmacy ○ Unable to verify |
| | Freq:  Last: | | ○ Medication Container ○ Clinic  ○ Physician/Psychiatrist ○ VA  ○ Pharmacy ○ Unable to verify |

AC-11606

Last Name: Smart   First: Frank   MI:   ID: 5183

Allergies: Do you have any allergies (food, medication, environmental)?  ☐ Yes ☒ No ☐ See attached

| Allergy | Reaction Type (Hives, rash, SOB, anaphylaxis, shock) | Allergy | Reaction Type (Hives, rash, SOB, anaphylaxis, shock) |
|---|---|---|---|
| | | | |
| | | | |

### SUBSTANCE ABUSE

Alcohol Use:   Do you drink alcohol?  ☐ Yes ☒ No

Type: _____   Last use: _____

How much: _____   How often: _____

Excessive drinker:  ☐ Yes (CIWA) ☐ No

Ever had alcohol withdrawals, tremors, seizures or DTs associated with stopping alcohol:  ☐ Yes (CIWA) ☐ No

If yes, when: _____

Substance/Drug Use/Rx   Do you use drugs:  ☐ Yes ☒ No

Do you use injectable drugs?  ☐ Yes ☐ No   Last injectable use:

|  | How often? | How much? | Last use? | |
|---|---|---|---|---|
| Heroin | | | | ☐ Hx of withdrawal |
| Narcotics | | | | ☐ Hx of withdrawal |
| Benzodiazepines | | | | ☐ Hx of withdrawal |

☐ Methamphetamines  ☐ Cocaine  ☐ Other:

### COMMUNICABLE DISEASES

HIV/AIDS  Do You have HIV infection or AIDS:  ☐ Yes ☒ No

Are you currently taking medications:  ☐ Yes ☐ No

TB Skin Test   Prior + PPD:  ☐ Yes ☒ No

Plant PPD now:  ☒ Yes ☐ No

Location of PPD:  ☒ LFA  ☐ RFA   Date Planted: 1-9-15

TB Symptoms  Do you have any of the following:

Weight loss ☐ Yes ☐ No  Night sweats ☐ Yes ☐ No  Fever ☐ Yes ☐ No

Appetite loss ☐ Yes ☐ No   Coughing blood ☐ Yes ☐ No

Persistent cough 2+ weeks ☐ Yes ☐ No  Weak/tired ☐ Yes ☐ No  ☒ None

Planter's initials: _____

### MEDICAL PROBLEMS

Do you have any ongoing medical problems we should know about?  ☒ Yes, complete applicable sections  ☐ No, proceed to Behavioral Health Section

☐ **Asthma**
How long:
Last asthma attack:

ER visit in last 90 days ☐ Yes ☐ No
If yes, when:
Hospitalization in last year ☐ Yes ☐ No
If yes, when:
Have you ever had a tube put down your throat so that a machine breathes for you:
☐ No ☐ Yes, when:
Currently on steroids: ☐ Yes ☐ No
Peak flow: ☐ Yes ☐ No  (   )
Reason not taken: _____

☐ **Cardiovascular - Ask each question**

| Angina | ☐ Yes ☐ No | Atrial fibrillation | ☐ Yes ☐ No |
| Stents | ☐ Yes ☐ No | Pacemaker | ☐ Yes ☐ No |
| Heart attack | ☐ Yes ☐ No | Internal defibrillation | ☐ Yes ☐ No |
| Bypass surgery | ☐ Yes ☐ No | Endocarditis | ☐ Yes ☐ No |
| CHF | ☐ Yes ☐ No | Blood clot in lungs or legs | ☐ Yes ☐ No |

Are you taking Warfarin, Coumadin, or Jantoven  ☐ Yes ☐ No
Date of onset:   Last episode:
Comments:

☐ **Diabetes**
How long:   Fingerstick:
Are you currently taking medication(s): ☐ Yes ☐ No
Are you currently taking insulin: ☐ Yes ☐ No
When was last hospitalization:

☐ **Cerebrovascular Disease.**
Last CVA:
Last TIA:
Comments:

☐ Not done  Reason:
If finger stick >300, ask the following:
Nausea: ☐ Yes ☐ No
Vomiting: ☐ Yes ☐ No
Excessive thirst: ☐ Yes ☐ No
Urine ketones (if taken)
☐ Not taken  Reason:

☐ **Hypertension**
How long:
Are you currently taking medication(s): ☐ Yes ☐ No
Three or more anti-hypertensives: ☐ Yes ☐ No

☒ **Epilepsy/Seizure**
Last seizure: October 2014
More than one seizure a month: ☒ Yes ☐ No
Two or more anticonvulsants: ☒ Yes ☐ No

☐ **Gastrointestinal**
Have you ever vomited blood: ☐ Yes ☐ No  Frequency: _____  Last: _____  Comments:
Ever had dark, black stools from bleeding: ☐ Yes ☐ No  Frequency: _____  Last: _____  Comments:
Comments:

Last Name: Smart   First: Frank   #: J   ID: 5183

## MEDICAL PROBLEMS (continued)

| | | |
|---|---|---|
| ☐ Cancer | ☐ Dialysis | ☐ COPD / Emphysema |
| Do you currently have cancer: ☐ Yes ☐ No | Type: ☐ Hemodialysis ☐ Peritoneal | O₂ dependent: ☐ Yes ☐ No |
| Are you currently being treated for cancer? ☐ Yes ☐ No | Number of times per week: | Peak flow: |
| Type: | Last dialyzed: | ☐ Not taken |
| ☐ HCV ☐ Yes ☒ No | ☐ Other: | |

### BEHAVIORAL HEALTH

Do you have any current mental health complaints? ☒ No ☐ Yes
Do you have a history of a mental health problem? ☐ Yes - Complete Section 1 ☒ No - Proceed to Section 2

**Section 1** Have you ever been diagnosed with a mental illness: ☐ No ☐ Yes, check which illness: ☐ Schizophrenia   ☐ Major Depression

History of outpatient therapy: ☐ No ☐ Yes   Within the last year: ☐ Yes ☐ No   ☐ Bipolar   ☐ Other:

History of psychotropic medication(s): ☐ Yes ☒ No   History of psych hospitalization: ☐ Yes ☐ No   Within the last year: ☐ Yes ☐ No

History of hearing things: ☐ Yes ☐ No   History of seeing things: ☐ Yes ☐ No

**Section 2** History of suicide attempt(s): ☒ No ☐ Yes   Last attempt: ___   Are you thinking of suicide now: ☐ Yes ☒ No

Family/friends history of suicide: ☐ Yes ☒ No   Recent significant loss: ☐ Yes ☒ No

Do you feel like there is nothing to look forward to (hopeless/helpless): ☐ Yes ☒ No   Have you ever hurt yourself on purpose: ☐ Yes ☒ No

Are you thinking of hurting yourself now: ☐ Yes ☒ No   Are you thinking of hurting others now: ☐ Yes ☒ No

**Section 3** Ever hospitalized for head trauma: ☒ Yes ☐ No   History of violent behavior: ☐ Yes ☒ No   History of victimization: ☐ Yes ☒ No

History of sex offenses: ☐ Yes ☒ No   History of: ☐ Special education placement ☐ Developmental disability ☐ Mental retardation

### EXAMINATION

General Appearance: ☒ NAD ☐ Appears hydrated   ☐ Other:

| Oral Screening | | Describe | Skin (visible) | | | Describe |
|---|---|---|---|---|---|---|
| ☒ Unremarkable | ☐ Missing teeth | | ☒ Unremarkable | ☐ Surgical scars | ☐ Jaundice | |
| ☐ Abscesses | ☐ Cavities | | ☐ Open | ☐ Rash | ☐ Pallor | |
| ☐ Lesions | ☐ Dentures | | ☐ Sores | ☐ Tracks | ☐ Lacerations | |
| ☐ Swelling | ☐ Dentures/Partials | | ☐ Tattoos | ☐ Other: | | |
| ☐ Other: | | | | | | |

### DISPOSITION

| Placement | | Referral | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ GP | ☐ Isolation reason: | ☒ H&P | ☐ Routine ☐ Expedited | ☐ Behavioral Health | ☐ Routine ☐ Expedited | | |
| ☐ Infirmary | ☐ Observation | ☐ Nursing Sick Call | ☐ Routine ☐ Expedited | ☒ Chronic Care Clinic | ☐ Routine ☐ Expedited | | |
| ☐ Suicide Watch | ☐ Other | ☐ Practitioner Sick | ☐ Routine ☐ Expedited | ☐ Dental referral | ☐ Routine ☐ Expedited | | |

Notification: ☐ Immediate supervisor ☐ Practitioner On Call ☐ ER for transport

Consent for treatment signed: ☒ Yes ☐ No   Reason:

Access to care reviewed: ☒ Yes ☐ No   Reason:

Grievance process explained: ☒ Yes ☐ No   Reason:

Implement (check that all apply): ☐ CIWA-Ar ☐ COWS ☐ BWS-C

### ADDITIONAL COMMENTS

My information is correct and I accept the provision of medical, dental and mental health care.

_Frank Smart_   _Rae-Ann Green - CN_   _Kelly_   ___
Patient Signature   Interviewer's Name (Printed)   Interviewer's Signature   Date

Secondary review
(if indicated)
___   ___   ___
Name (Print)   Signature   Date

CS1101   Page 3 of 3   © 2013 Corizon Health, Inc.   All rights reserved.

AC-11608



950 2nd ave, Pittsburgh, Pa 15219
412-350-2214 or 2277

To: Classification
    Via fax: 412-350-2240

From: Corizon

Subject: Housing Status per Medical Order

Inmate Name: Smart, Frank J          DOC#: 51831
Medical Order for Special Housing Status:

__ Lower Level

X Low Level/ Low Bunk

__ Cell for Handicapped

__ Single Cell

__ Medical Bed rest (Single celled or housed with another inmate on same status per medical- must remain in cell)

__ Other_____

Duration of Order: Length of Stay

Physician/Practitioner: _____

www.corizonhealth.com

AC-11609

*Excerpts from Rae Ann Green Deposition*

# EXHIBIT "C"

```
 1    if you know?

 2         A      The MA.

 3         Q      The MA?

 4         A      The medical assistant.

 5         Q      Oh, MA, okay.  So tell me in terms of

 6    when you come into work and you are working in

 7    intake, is that on the ground floor?

 8         A      Yes.

 9         Q      Okay.  And do you stay in that area

10    for the entire time of your shift --

11         A      Other than lunch, yes.

12         Q      -- so to speak.  And is there an area

13    with cells for the inmates?

14         A      There are cells, yes.

15         Q      There are like holding cells?

16         A      Yes.

17         Q      And then they could be roaming about

18    and that's when you give them their medication?

19         A      Yes.

20         Q      So when you do, take me through the

21    process from the time that an inmate is brought to

22    the jail in intake, what happens?

23                MS. KENYON:  I just want to caution

24         the witness, only if you know.

25         A      Yeah, I only know part of it.
```

```
 1      Q     I'm only asking you to tell me what
 2  you know here today.
 3      A     When they come in with the police
 4  officer, an RN assesses them at the door to make
 5  sure that they are okay medically to be in the
 6  facility.  If they are not, they are sent back
 7  out.
 8      Q     And that's prior to their arraignment;
 9  right?
10      A     Yes.
11      Q     Is that something that you were
12  involved in at any time?
13      A     I have done it, yes.
14      Q     Okay.  Did you -- are you the one who
15  assessed Mr. Smart at that time frame?
16      A     I don't know.
17      Q     Okay.  All right.  Okay.  So that's
18  what happens, and then tell me what happens after
19  that.
20      A     Then they take the inmate into a
21  holding cell, and I don't know what happens, I
22  believe they go in front of the judge, and at some
23  point they end up on the intake side, which is an
24  open area with some cells and TV's and vending
25  machines and stuff.
```

1      Q      He indicated to you that they were

2  prescribed by Mercy?

3      A      Yes.

4      Q      Okay.  All right.  And let's go to the

5  next page.  Down below it says you have checked

6  the condition of epilepsy or seizure, is that

7  something that Mr. Smart reported to you?

8      A      Yes.

9      Q      And he indicated that he last had a

10  seizure in October of 2014?

11      A      Yes.

12      Q      Okay.  And the next page, under

13  "Disposition," you checked "placement GP," is that

14  general population?

15      A      Yes.

16      Q      And then "referral H and P," what does

17  that mean?

18      A      History and physical; all inmates get

19  one.

20      Q      Okay.  And then what is the "Chronic

21  Care Clinic" that is checked?

22      A      Because he had a chronic condition of

23  seizure disorder, I referred him to follow-up with

24  the physician at the chronic care to manage it.

25      Q      How do would that happen?

Deposition of Rae Ann Green

```
1        A      We fill out a, what's called a
2   priority list, and we write down their name and
3   condition and what you are referring to.  I would
4   have written "chronic care seizure disorder," and
5   then it gets turned in at the end of each shift.
6        Q      And then when would he have or should
7   have seen a physician at the chronic care clinic?
8        A      I don't know.
9        Q      You don't know what the time frame is?
10       A      No.
11       Q      Do you know if he ever met with a
12  physician at the chronic care clinic?
13       A      I don't believe so.  He wasn't there
14  long enough.
15       Q      What's the purpose of him meeting with
16  a physician at the chronic care clinic?
17       A      They would probably, one of the things
18  was his medication was unable to be verified, and
19  the record that I had was a past record, so I was
20  going on his word and what I saw when I got his
21  medications ordered.  So he would have needed to
22  have met with the physician so that they can go
23  over his history, go over when his last seizure
24  was, how he was treated, those types of things.
25       Q      What do you mean his medication was
```

1    unable to be verified?

2        A     When an inmate tells us that they are

3    on medication, everything has to be verified,

4    whether you call the pharmacy, the physician

5    directly, whoever dispensed the medication, and he

6    disclosed that he got his medications from Mercy,

7    who wasn't open that day.

8        Q     So you couldn't verify the medication

9    because this was the weekend?

10       A     Right.

11       Q     And they were not open?

12       A     Right.

13       Q     So I'm assuming that at intake on the

14   weekends this happens a lot where you can't verify

15   the medications, that they are closed; correct?

16             MS. KENYON:  Object to form, go ahead.

17       A     No, because a lot of people don't use

18   these smaller clinics.  They use Giant Eagle,

19   Rite Aid, things like that, and I can call and

20   verify.

21       Q     What's the next step if you can't over

22   the weekend verify medication through the

23   pharmacy?

24       A     I go into his past record and look and

25   see the last time he was there and what

*Allegheny County Police*
*Initial Report*

# EXHIBIT "D"

# INITIAL REPORT

|  |  |
|---|---|
| CCR#: | 00090-15 |
| CASE#: | H-007-15 |

**DETECTIVES** : **TODD DOLFI**
**THOMAS FOLEY**

**CASE** : **DEATH INVESTIGATION- UNDETERMINED**

**VICTIM** : **FRANK SMART B/M/39**
**ACJ INMATE**

**LOCATION** : **ALLEGHENY COUNTY JAIL-POD 4A-CELL 121**

**DATE AND TIME
OF OCCURRENCE :** **JANUARY 4, 2015**
**2254 HOURS**

**WEATHER** : **30 DEGREES- LIGHT SNOW- INDOOR SCENE**

**SUMMARY** :

On January 5, 2015 at approximately 0040 hours Captain Bytner of the Allegheny County Bureau of Corrections requested the investigative assistance of the Allegheny County Police Homicide Unit in reference to a death investigation.

On January 3, 2015 at approximately 2100 hours Frank Smart was arrested by the City of Pittsburgh Police Department (OTN G699712-6). Smart was transported to the ACJ and was accepted into intake at approximately 2209 hours. Smart stayed in intake until he was assigned to POD 4A on January 4, 2015 at approximately 2023 hours. At that time, Smart was lodged on POD 4A cell# 121.

On January 4, 2015 at approximately 2254 hours CO Fleisner who was assigned to POD 4A was making his required rounds on the POD when he heard what he described as a very loud and abnormal "Snoring" sound coming from inside of cell # 121. CO Fleisner then called on inmate Edwin Williams who is the "Suicide Worker" on the POD.

AC-10191





**INITIAL REPORT- FRANK SMART**
**PAGE-2**

CCR# 00090-15
CASE# H-007-15

Williams came to cell #121 and Fleisner looked inside and noticed that Smart had blood coming from the corners of his mouth and was spitting saliva. Williams also said that he observed Smart hit his head on the steps to the bunk beds and then roll of the bed onto the floor striking his head again. CO Fleisner then called for a "Medical" on POD 4A.

Captain Bytner and several other CO's arrived to assist with care along with 4 nurses who were already on scene and assigned to the jail medical division. Captain Bytner stated that Smart was not fighting them, however, he was resisting care and was flailing his arms and legs. CO's restrained Smart with handcuffs and shackles after they received permission from the nurses.

It was Detectives understanding that the nurses administered two 2mg doses of Ativan in the process of care for Smart. At approximately 2325 hours 911 was called to respond to the jail. While awaiting the arrival of paramedics Smart stopped breathing. Nurses and CO's began CPR and attached an AED. CPR was conducted until the arrival of Pittsburgh EMS Medic 7 who then took over care. Smart was transported to Mercy Hospital where he was pronounced dead at 0022 hours by Dr. Tracy Moore.

Captain Bynter secured the cell/scene and kept it locked until the arrival of Detectives. Scientist Stanich of the Allegheny County Medical Examiner's Office along with Detectives Dolfi and Foley processed the scene.

POD 4A is considered a classification POD. Meaning, the inmate will stay on that POD until they are "Classified" and placed on a certain level pertaining to jail guidelines of their classification or they are released from custody. Smart, had just arrived on the POD and had not been classified yet.

On January 5, 2014 a post mortem examination was conducting on Frank Smart by Dr. Arboe and Dr. Luckasevic. Dr. Arboe stated that the results of the examination will be pending Histology and Neurology reports.

The following CO's and Jail Staff completed written reports as to their involvement in this incident. All reports have been turned over to the Allegheny County Police and are located in the file:

Captain Bytner
Captain Kengerski
Sgt. Michael Brown
CO Fleisner
CO Robert Dixon
CO John Mangis
CO Norman Martin
CO Jason Brown

AC-10192

**INITIAL REPORT**
**PAGE-3**

**CCR# 00090-15**
**CASE# H-007-15**

CO Michael Istik
CO Ryan Gorham
CO Holland
CO David Foriska
RN Logan Berger
RN Susan Leri
RN Darlene Wichryk
RN Alisia Hollingsworth

AC-10193

# SUPPLEMENTAL REPORT

| | |
|---|---|
| **CCR#:** | **00090-15** |
| **CASE#:** | **H-007-15** |
| **DATE:** | **1/5/15** |
| **TIME:** | **0145 HOURS** |

**DETECTIVES:**  **THOMAS FOLEY & TODD DOLFI**

**CASE:**        **DEATH INVESTIGATION UNDETERMINED  ACJ**

**VICTIM:**     **FRANK SMART B/M/39**

**IN REF TO:**   **INTERVIEW OF CAPTIAN ROBERT BYTNER ACJ SHIFT COMMANDER (412)350-2002**

**SUMMARY:**

We spoke with Allegheny County Corrections Captain Bytner the ACJ Shift Commander who met with Detective Dolfi and I on Pod 4A. He indicated that the incident occurred in cell 121 on the Pod and has been secured since the incident. He said that he responded to POD 4A approximately 2254 hours to assist with a medical emergency. Captain Bytner said that he replaced CO Bytner with CO Holland who was currently on watch. See interview of CO Holland.

Captain Bytner said that he arrived on the Pod a short time later and he observed the inmate lying on the floor. He said he ordered CO Fleisner to open the door. Captain Bytner said that he got in, the victim was lying on the cell floor snoring. The captain said that he took 2 pictures of the victim where he was lying on the ground when he first saw him (Captain Bytner took 4 photographs of the victim; 2 while in his cell and 2 as he was being transported by Medics.). Captain Bytner published the pictures to us and they will be made part of the file. Captain Bytner explained that he learned that CO Fleisner heard inmate Frank Smart making loud snoring noises when he made his round. He said that the Pod Trustee Edwin Williams Sr. B/M/49 was up and making rounds. He said that Trustee Williams was assisting the Pod CO and when he looked in; he observed blood coming from the victim's mouth.

Captain Bytner said that he entered the cell with Nurse Logan Berger and began working on the victim. He said that the victim was combative, but he didn't feel he was fighting on purpose. The Captain said that he and several COs restrained the victim so that the ACJ Medical staff could work on him. He said that they could not get vitals on the victim because of his combative state. He said that the Medical staff was able to give the victim an injection but he said that he continued to fight them. The Captain said that they continued to restrain the victim. He said that he ordered the COs to place a spit shield on the victim because of the blood coming from his mouth. The Captain said that CO Fleisner got his hand bit while trying to place the spit shield. The Captain emphasized

AC-10194



**SUPPLEMENTAL REPORT – PAGE**   **2**   CCR#:   00090-15
**IN REF:   DEATH INVESTIGATION UNDET  ACJ**   CASE#:   H-007-15
                                                DATE:   1/4/15

that he was reminding the crew working on the victim that he (victim) was not fighting maliciously. He said that the crew of Cos and the medical staff understood this.
Captain Bytner  said that his COs were tiring and injured, so he asked the medical staff if it would be OK to restrain/cuff the victim so that he didn't hurt himself of any additional staff. He said that Nurse Logan Berger said it would be OK.  The Captain said that he ordered that the victim be handcuffed; he explained that two sets of cuffs were used to cuff the victim and he was also shackled.  He said that this allowed the medical staff to give a second injection.  The Captain said very shortly after this CO Gorham alerted them that the victim had just gone motionless.  He said that the medical staff checked his vitals and they told him that they were going to begin CPR.  Captain Bytner said that he uncuffed the victim and rolled him back over.  He said that additional medical help was arriving.  He said that they utilized the defibrillator but did not believe that they shocked him.

Captain Bytner wrote a statement/report as is their internal protocol.  This statement and the other employees involved reports will be made part of this record.

END OF THIS REPORT
tgf

AC-10195



# SUPPLEMENTAL REPORT

**CCR  : 00090-15**
**CASE : H-007-15**
**DATE : 4/1/2015**
**TIME : 2340HRS**

**DETECTIVE: TODD DOLFI & THOMAS FOLEY**

**CASE**          : **DEATH INVESTIGATION- UNDETERMINED**

**VICTIM**     : **FRANK SMART B/M/39**

**IN REF TO** : **INTERVIEW OF DARLENE WICHRYK RN**

**SUMMARY :**

   On the listed date and time Detectives Dolfi and Foley spoke with RN Darlene Wichryk at the Allegheny County Jail about the incident involving inmate Frank Smart on January 5, 2015.

   Wichryk said that she remembered the incident and that she was working the midnight shift that night. She said that she was in the process of shift change and was counting medicine with the staff she was relieving.

   Wichryk said that a call for a medical emergency was received and she responded to it. She said RN Berger, RN Leri and RN Hollingsworth responded as well. Wichryk said that RN Berger was in the cell with the inmate and the CO's. Wichryk said that she remembered that the inmate appeared to be seizing and was thrashing around. She said that the CO's attempted to restrain the inmate and RN Berger administered Ativan to the inmate. Staff then wanted to check his blood sugar. She and RN Hollingsworth left the POD to get the "Glucometer." She said that they brought it back and checked the inmate's blood sugar.

   Wichryk said that the inmate became aggressive and began to yell so the inmate was restrained by CO's. She said that RN Berger gave him a second dose of Ativan. Wichryk said that a short time later the inmate became unresponsive and CPR was initiated.

   Wichryk said that she was in the inmate's cell for a short period of time and was outside the cell most of the time. She said that RN Berger was in the cell with the inmate and CO's. Wichryk continued that she became more involved when CPR was started and the inmate was taken out of the cell. Wichryk was asked if she saw anything that was inappropriate and seemed like excessive force and said "No." Wichryk said that she did

AC-10196





**CONTINUATION OF DARLENE WICHRYK INTERVIEW**
**PAGE 2.**                                          CCR# 00090-15
                                                     CASE# H-007-15

not observe anything that she felt was wrong or excessive. Wichryk was asked if she
would have done anything different and she added that she was always taught that when
someone is seizing that you just let the person and seize. She stated that she would have
just put a blanket under the inmates head and got everybody out of the cell. However, she
did add that she did not feel what was done was bad or wrong. The interview was then
concluded.

AC-10197

*Alisia Hollingsworth Statement*

# EXHIBIT "E"

# INVESTIGATIVE REPORT

|  |  |
|---|---|
| **DATE** | : MARCH 31, 2015 |
| **J#** | : 056-15 |

**INVESTIGATOR** : INSPECTOR WILLIAM J. PALMER

**CASE** : INMATE DEATH- FRANK SMART #51831

**IN REF TO** : INTERVIEW OF NURSE ALISIA HOLLINGSWORTH

**SUMMARY** :

On Saturday, March 28th, 2015, Corizon Attorney Katie Kenyon was interviewing nurses about an investigation into Physician's Assistant David Druski. During the interview of Registered Nurse Alisia J. Hollingsworth, Hollingsworth brought up the death of Inmate Frank Smart. Hollingsworth reported seeing Captain Robert Bytner performing a choke hold on Smart during the medical emergency. Hollingsworth was bothered by Bytner's actions that day, and was now reporting it. Attorney Kenyon notified the Assistant Director of Nursing Leslie Travis. Travis reported this to me and to the warden.

On March 31, 2015 at 10:00 a.m., I had the opportunity to interview Nurse Alisia Hollingsworth. The interview was conducted in the Internal Affairs Office at the jail. As to the Frank Smart medical emergency, Hollingsworth stated the following:

Hollingsworth was working in the Infirmary as an LPN. She was there with Logan Berger the R.N. of the infirmary. Logan was busy with a patient with chest pain at the time of the Smart emergency, so Hollingsworth responded by herself at first. When she arrived, Smart was alive but incoherent. She took his blood pressure, and recognized that Smart was in a postictal state. Because of his state, Smart was flailing around. Hollingsworth believed that Smart had already been put in handcuffs. Hollingsworth knew Smart needed Ativan, but there was none on her cart. Hollingsworth then responded to the infirmary to get the Ativan. When she returned, it was decided the medical team needed a glucometer. Hollingsworth then responded to the Intake area to retrieve a glucometer. When she returned to Smart's cell, Hollingsworth saw Nurse Logan Berger standing in the back corner of the cell. Four or five correctional officers were lying on top of Smart. The officers were lying perpendicularly to Smart's body. Captain (Robert) Bytner was down on his knees holding Frank Smart in a headlock. Hollingsworth described Bytner holding Smart around the neck, which Hollingsworth could see, was choking Smart. The inmate was struggling to breathe. Hollingsworth observed that Captain Bytner was red of face and sweating. Hollingsworth dropped off the glucometer and was told by Nurse Berger to respond back to the infirmary to be prepared to call for permission to give a second dose of Ativan. Hollingsworth did respond back to the infirmary. There, she called Rachel, who was the person to authorize a second shot of Ativan. Rachel did authorize a second dose. Rachel added to call 911 to have this patient sent to an outside hospital. Hollingsworth did call 911. Hollingsworth then

AC-10205

PAGE TWO: INTERVIEW OF NURSE ALISIA HOLLINGSWORTH                J-056-15

received a call from Smart's pod. She believes it was Nurse Sue Leary. The caller was telling Hollingsworth that CPR had been initiated and to notify 911 of such. She did. Hollingsworth then responded back to the medical emergency. When she arrived Logan was doing the chest compressions. The inmate was in the same position as when she last saw him. She did not remember if he was still handcuffed at this time. Logan was getting tired, so Hollingsworth took over chest compressions. When the paramedics arrived Smart was taken from his cell and CPR continued in the pod.

Hollingsworth informed me that seeing Captain Bytner holding the inmate in a chokehold bothered her ever since. When talking to the Corizon lawyer, Hollingsworth felt she needed to say something.

I asking Hollingsworth how long of a time period was she in the cell to see Capt. Bytner have the inmate in a headlock. Hollingsworth said she was in there for about ten seconds. She was there to drop off the glucometer, and then Logan sent her back to the infirmary.

I asked Hollingsworth if Nurse Logan Berger was saying anything to the captain or officers on top of the inmate. Hollingsworth said he was not, describing Logan as just standing in the corner. Hollingsworth also said nothing to the officers.

I asked if she talked about it later with Logan. Hollingsworth said she brought it up at the time, but Logan just said "That's corrections". He also said to just report what she did during the emergency.

Hollingsworth said that the next day, Captain Bytner came up to her and asked if she was okay, and if there was anything she wanted to talk about. Hollingsworth just responded with a "no".

Alisia Hollingsworth stated that she has been in the medical field for 12 to 14 years. She has been a Registered Nurse since November of 2014. Before that she was a LPN for about a year. Prior to the jail, Hollingsworth worked at Allegheny General Hospital.

As to other people in the cell, Hollingsworth did not know the names of the officers on top of the inmate. She knew that Nurse Sue Leary came to the area at some point, but she was not sure when.

When describing the officers on top of the inmate, Hollingsworth said they were putting all of their weight on the inmate, describing the officers lying on him in a way that the officers' feet were off the floor.

Hollingsworth was not familiar with the inmate prior to this medical emergency.

Hollingsworth was asked if she told any supervisor before this weekend. She said she had not.

Alisia Hollingsworth added nothing further at this time. This information will be forwarded to ACPD Homicide.

*Excerpts from Logan Berger Deposition*

# EXHIBIT "F"

62

1       chair?

2                       ATTORNEY KILLION:

3              Oh, I'm sorry.

4   BY ATTORNEY KILLION:

5   Q.       Sorry, he was seated on the

6   ground?

7   A.       Yes.

8   Q.       So he's seated on the ground.

9   What happens when you go into the

10  cell?

11  A.       I recommend that we place him

12  in the recovery position.

13  Q.       And did you, in fact, do that?

14  A.       I believe so.

15  Q.       What is the recovery position?

16  A.       Laying on the ground, typically

17  on the left side.

18  Q.       And then what happened after

19  you placed him on the ground?  Did

20  you, in fact, put him on his left

21  side?

22  A.       I believe so.  I can't remember

23  specifically.

24  Q.       And what happened then?

25  A.       He continued to seize.  Vital

63

1   signs were obtained.

2   Q.      Was anything placed under his

3   head, or is that a protocol, to place

4   something under their head?

5   A.      No.

6                   ATTORNEY KENYON:

7                   Another double question.

8   A.      There's ---.

9   BY ATTORNEY KILLION:

10  Q.      Is that no to ---?

11  A.      Yes.  No to both questions you

12  asked.

13  Q.      And you are the person who

14  obtained his vitals?

15  A.      It was myself and the other

16  nurses that were assisting.

17  Q.      Who were the other nurses?

18  A.      Alisia Hollingsworth, Darlene

19  Wichryk ---.  I believe Sue Leary

20  (phonetic) was present at that point.

21  Q.      How did you say Darlene's last

22  name?

23  A.      Wichryk.

24  Q.      Wichryk?  So Leary, Wichryk and

25  Hollingsworth?

64

1    A.     I believe so, yes.

2    Q.     And yourself?

3    A.     Yes.

                ATTORNEY DACHILLE:

5               And if you don't mind, I

6        know Wichryk is a spelling

7        nightmare for Jeremy.  It's

8        W-I-C-H-R-Y-K.  Does that sound

9        right?

10   A.     Yes.

                ATTORNEY KENYON:

12              And Alisia's with an S.

13   BRIEF INTERRUPTION

14   BY ATTORNEY KILLION:

15   Q.     When Alisia Hollingsworth

16   showed up, did she bring a medical

17   cart?

18   A.     Yes.

19   Q.     What's typically on a medical

20   cart?

                ATTORNEY KENYON:

22              Just a medical cart or a

23          CRASH cart, or ---?  I don't

24          know if you wanted to limit it.

25   A.     Are you referring to the cart

65

1    specifically at the jail?

2    BY ATTORNEY KILLION:

3    Q.    Is there a different cart

4    that's used for medical emergencies?

5    A.    Yes, there is an emergency

6    cart.

7    Q.    Is it called a CRASH cart?

8    A.    No, when you ---.

9    Q.    What's a CRASH cart?

10   A.    A CRASH cart is something in

11   HCOF-certified facilities.

12   Q.    So what do you want me to call

13   this, an emergency cart?

14   A.    An emergency cart is

15   sufficient.

16   Q.    What things are supposed to be

17   supplied or stocked in the emergency

18   cart?

19   A.    Items to take vital signs, a

20   glucometer, Glucomin or glucose for

21   diabetics who have low blood sugar.

22   Syringes, IV paraphernalia ---.

23   Q.    Well, what about Ativan?

24   A.    Ativan is kept refrigerated, so

25   it's brought separately.

66

1    Q.    What happened after you

2    assisted with taking the vitals?

3    A.    Mr. Smart became aggressive and

4    combative.

5    Q.    Do you believe that was part of

6    the seizure?

7    A.    No.

8    Q.    Do you believe that he became

9    aggressive and combative after the

10   seizure?

11   A.    Yeah, starting the postictal

12   period.

13   Q.    What happened after he became

14   aggressive and combative?

15   A.    An order was obtained for the

16   second dose to provide him Ativan.

17   Q.    When was the first dose given?

18   A.    During the seizure activity.

19   Q.    Well, tell me what else

20   happened during the seizure activity,

21   because the only thing that I know of

22   is that he was placed in a recovery

23   position and his vitals were obtained.

24   A.    I believe it was Alisia

25   Hollingsworth who called the on-call

67

1    practitioner and received an order for

2    IM Ativan.  That was given.  The

3    glucometer was not present on the

4    emergency cart, so glucagon, which is

5    an IM injection also, was given.  If

6    you're not diabetic, glucagon does

7    nothing to you.

8         If you are diabetic and your

9    blood sugar is low, glucagon will

10   raise it.  So a decision was made that

11   since it wouldn't hurt him if he

12   weren't diabetic to go ahead and give

13   him the glucagon.

14   Q.    Well, why wasn't the glucometer

15   on the emergency cart?

16   A.    I don't know why it wasn't.

17   Q.    But it should've been on the

18   emergency cart; right?

19   A.    Yes.

20   Q.    So after he became combative, a

21   second dose of Ativan was ordered?

22   A.    Yes.

23   Q.    And was it administered?

24   A.    Yes.

25   Q.    And then what happened after

68

1    that?

2    A.    Mr. Smart continued to be

3    aggressive and combative.  He had

4    actually bit one of the COs.  The CO

5    was removed from the cell immediately

6    to seek medical attention.  911 had

7    been called, and there was no order

8    obtained to call 911 for transport to

9    an outside facility.

10           Once Mr. Smart --- at the same

11   time the order for the second dose of

12   Ativan was obtained, the practitioner

13   also stated, call 911.  Get him

14   transferred to an outside facility.

15   So the IM Ativan was given, and the

16   call to 911 would've been made at

17   roughly the same point in time.

18   Q.    You didn't mention anything

19   about him being restrained or

20   handcuffed.  Was he restrained or

21   handcuffed?

22   A.    Not at that point in time.

23   Q.    Was that ---?

24   A.    I mean, there were correctional

25   officers maintaining control of his

69

1   limbs, but he wasn't restrained for an

2   extended period of time.

3   Q.     When, if at all, was he

4   retrained by handcuffs or foot

5   shackles?

6   A.     Once the phone call had been

7   made for 911 to come.  And Mr. Smart

8   was still aggressive and combative.

9   He was handcuffed in preparation of

10  transport by 911.

11  Q.    At some point after 911 was

12  called, he stopped breathing,

13  according to the records.  Do you

14  recall that?

15  A.     Yes.

16  Q.     How long after he was

17  handcuffed or had the foot shackles on

18  did he stop breathing?

19              ATTORNEY KENYON:

20              Objection.

21              ATTORNEY DACHILLE:

22              Same objection.

23  A.     I can't recall.

24  BY ATTORNEY KILLION:

25  Q.     Was he, in fact, still shackled

70

1    when he stopped breathing?

2    A.      Yes.

3    Q.      How long, from the time that

4    you responded to the emergency went by

5    before 911 was called?

6    A.      I can't recall the times I

7    wrote.

8    Q.      Well, according to the records

9    and the investigation, I have that the

10   event --- the seizure event occurred

11   around 9:54 p.m. on the 4th, and 911

12   was called around 11:30 that night.

13                   ATTORNEY KENYON:

14                   Objection.  I think that

15          is misstating the record.

16                   ATTORNEY DACHILLE:

17                   Same objection.

18   BY ATTORNEY KILLION:

19   Q.      Do you think it was more than

20   an hour that passed until 911 was

21   called?

22   A.      No.

23                   ATTORNEY DACHILLE:

24                   He passed away at 11:30.

25   BY ATTORNEY KILLION:

71

1    Q.    What happened after he stopped

2    breathing?

3                    ATTORNEY DACHILLE:

4                    Objection to the form.

5    BY ATTORNEY KILLION:

6    Q.    What happened after Mr. Smart

7    stopped breathing?

8    A.    I had him placed on his back,

9    checked for a pulse, took AED and

10   began CPR and resuscitative efforts.

11   Q.    Was he still handcuffed and

12   shackled when you began resuscitation

13   efforts?

14   A.    He was un-handcuffed and

15   unshackled as that process was going

16   on.  I was checking for a pulse while

17   he was still handcuffed, and the AED

18   pads were placed as Corrections was

19   working on removing the restraints.

20   Q.    At the point in time when he

21   was combative and was being

22   restrained, what position was he in on

23   the floor?

24   A.    He was laying on his stomach.

25   Q.    And how many officers were

72

1   restraining him?

2                   ATTORNEY DACHILLE:

3                   Objection to the form.

4   A.      I believe ---.

5   BY ATTORNEY KILLION:

6   Q.      And if it is varies at

7   different time frames you can tell me

8   that, as well.

9   A.      I mean, it did, but I would say

10  roughly four individuals, one on each

11  limb.  Mr. Smart was very strong.

12  Q.      How long did this combative

13  phase last where he was being

14  restrained by the corrections

15  officers?

16                  ATTORNEY DACHILLE:

17                  Objection to form.

18  A.      I honestly couldn't tell you.

19  Like I said, I dive right in an

20  emergency situation.

21  BY ATTORNEY KILLION:

22  Q.      Sure.  One of the things in

23  your statement on the first page

24  indicates that --- you said paramedics

25  were called and commented that it took

124

1    Q.    Did you have any Allegheny

2    County corrections officers interfere

3    with your efforts to respond to the

4    Frank Smart emergency?

5    A.    No, not that I can recall.

6    Q.    I think your testimony earlier,

7    at least in part, was that in a

8    postictal stage, medical patients are

9    typically calm?

10   A.    Typically, although some had

11   aggressive, combative reactions also.

12   I don't want to say common, but that's

13   one of the reactions that individuals

14   have.  Sometimes people become just

15   --- I don't want to say inconsolable,

16   because that sounds like you're

17   speaking about a child.  But they'll

18   cry or they'll laugh for no reason.  I

19   mean, those are things that can

20   happen.

21   Q.    And sometimes they become

22   combative; is that correct?

23   A.    Yes.

24   Q.    Does it appear to you that Mr.

25   Smart was becoming combative because

125

1    he was in a postictal state?

2    A.    Yes.

3    Q.    When you observed Mr. Smart,

4    that was in line with a postictal

5    phase; is that fair to say?

6    A.    Yes.

7    Q.    And we've been using --- or

8    maybe I have the term combative, what

9    did you see Mr. Smart doing during

10    this period in which he was combative?

11    A.    He was thrashing, attempting to

12    hit individuals.

13    Q.    Was he flailing his arms?

14    A.    Yes, sort of.

15    Q.    Was ---?

16    A.    His shirt was coming off.

17    Q.    Was he being attended at all?

18    A.    Yes.

19    Q.    Is it fair to say that the

20    people who are combative during

21    postictal phase can injure themselves?

22    A.    As well as others, yes.

23    Q.    Did it appear to you that Mr.

24    Smart could have injured himself if he

25    had not been secured by corrections

126

1    officers?

2    A.      Yes, that is a possibility.

3    Q.      One possibility is that he

4    could smack his head on the floor?

5    A.      Yes.

6    Q.      You have a building made out of

7    concrete?

8    A.      They are.

9    Q.      Can you give us just a ---

10   roughly about how big the jail cell

11   --- well, Mr. Smart's jail cell was?

12   A.      Maybe six feet by eight feet.

13   Q.      Some of that space is also

14   taken up by the bunk beds, isn't it?

15   A.      As well as a table and a

16   toilet.

17   Q.      So right, a toilet?

18   A.      Right.

19   Q.      You were in the medical

20   emergency room as far as a delay

21   in ---?

22   A.      No, I had been providing care

23   to another inmate, which is why Ms.

24   Hollingsworth went first. But I had

25   arrived very, very shortly after her.