*Medical Examiners Report*

# EXHIBIT "G"

**COUNTY OF**  **ALLEGHENY**

RICH FITZGERALD
COUNTY EXECUTIVE

FRANK J. SMART                                    JANUARY 05, 2015

CASE NO.:  15COR00145

FINAL PATHOLOGICAL DIAGNOSES:

I.    SEIZURE DISORDER
    A.  Found in Allegheny County jail cell on 1/4/2015 at 10:54 pm with seizure-like activity
        1.  Originally incarcerated on 1/4/2015 at 9:30 am
        2.  Found lying on back with saliva and blood coming out of mouth area and soiled clothing
        3.  Would not respond to medical personnel or officers and became combative
            a.  Manually restrained at the arms and legs in prone position
            b.  Given shot of Lorazepam
            c.  Spit mask placed
            d.  Handcuffed and ankles shackled
        4.  Given second shot of Lorazepam
        5.  Appeared unresponsive after unknown amount of time and CPR started
        6.  EMS arrived at 11:36 am
        7.  Transferred to UPMC Mercy in cardiac arrest at 12:20 on 1/5/2015
        8.  Pronounced at 12:22 am
    B.  History of seizure disorder
        1.  Multiple emergency department visits and hospitalizations at UPMC for seizures
            a.  5/24/2014: Required admission to the ICU
            b.  6/7/2014: Suboptimal drug levels
            c.  6/8/2014: Transferred to CDU; Noncompliance with prescription medications
            d.  7/13/2014: Tongue laceration
            e.  8/27/2014: Noncompliance with prescription medications
            f.  10/20/2014: Scalp laceration and suboptimal drug levels
        2.  History of noncompliance with medications
        3.  Prescribed home medications
            a.  Carbamazepine 300 mg twice daily
            b.  Levetiracetam 500 mg twice daily

AC-10342

AUTOPSY REPORT

Case No.:   15COR00145

Page 2 of 12

       c. Phenytoin 300 mg at bedtime
C. Neuropathology consultation shows a remote infarct of the left inferior temporal lobe (1.5 cm)
D. Postmortem toxicology is positive for
    1. Carbamazepine: 2.2 mcg/mL in the blood (normal: 1.4 to 12 mcg/mL)
      a. Carbamazepine-10,11-Epoxide: 0.21 mcg/mL in the blood (normal: 0.2 to 2.0 mcg/mL)
E. Contusion of the tongue

II.    BILATERAL LUNG CONGESTION AND EDEMA
    A. Combined lung weight, 1510 grams
    B. Areas of alveolar hemorrhage
    C. Respiratory bronchiolitis
      1. History of smoking

III.   CARDIOMEGALY, 520 GRAMS

IV.   DIFFUSE THYROID GOITER, 80 GRAMS

V.    HISTORY OF REMOTE GUNSHOT WOUND OF THE RIGHT UPPER ARM

VI.   OBESITY, BODY MASS INDEX = 37.1

OPINION:

    Frank J. Smart, a 39 year old African-American male, died as a result of a seizure disorder. Physical restraint in a prone position contributed to his death.

MANNER OF DEATH:   Undetermined

Todd Luckasevic, D.O., Associate Medical Examiner
alb

AC-10343

AUTOPSY REPORT

Case No.:   15COR00145

Page 3 of 12

NARRATIVE SUMMARY:

The autopsy was performed on January 05, 2015 at 10:35 A.M.

David Arboe, M.D., Fellow in Forensic Pathology and Todd Luckasevic, D.O.,

Associate Medical Examiner, Prosectors

Ammena Smith, Autopsy Room Technician

Endia Woods, Photographer

EXTERNAL EXAMINATION:

The body is that of a well-developed, well-nourished, obese African-American male, weighing 244 pounds, measuring 68 inches, and appearing to be consistent with the age of 39 years.

The body is unembalmed.

The body is clad in the following articles of wearing apparel:

1.  Red prison-issued shirt

2.  Red prison-issued pants

3.  White T-shirt

4.  White underwear soiled with urine and stool

5.  White socks

The clothing is intact and dry.

No jewelry, rings or watch are present on the body.

AC-10344

AUTOPSY REPORT

Case No.:   15COR00145

Page 4 of 12

The temperature of the body is cold to the touch.   Rigor mortis is well developed and present to an equal extent in all joints.   Pink, non-fixed, marked livor mortis is evident over the posterior parts of the body, except in areas exposed to pressure, where it is absent.

The skin is clean, dry and smooth.

The head is normocephalic.

The head and face exhibit no trauma.   The head hair is black and of a short length.   The eyes are brown with congested conjunctivae.   The corneae and lenses are transparent.   No petechial hemorrhages are noted in the conjunctivae.   The pupils are regular, round, equal, central and measure 0.3 cm in diameter.   The external ears and external auditory canals are unremarkable.   The skeleton of the nose is intact, and no foreign material is present in the nostrils.   No foreign material is present in the oral cavity.   The gums are normal.   The upper and lower teeth are natural and in a good state of dental repair.   The lips and oral mucosa reveal no evidence of trauma.   The tongue shows areas of hemorrhage.   A black short mustache and beard are present.

The neck is symmetrical and unremarkable.   No increased mobility on manipulation is detected.

The shoulders are symmetrical.

The chest is symmetrical and exhibits trauma which will be described below.

The abdomen is bulging and no masses can be palpated through the

AC-10345

AUTOPSY REPORT

Case No.:   15COR00145

Page 5 of 12

abdominal wall.

The back is symmetrical and unremarkable.

The external genitalia and the anus are unremarkable.   The testes are palpable in the scrotum.   No injuries of the upper thighs, perineum or anus are detected.  No foreign bodies or hemorrhages are noted in the anal canal.

The extremities are symmetrical and exhibit trauma which will be described below.   No broken or missing fingernails are noted.   No foreign debris under the fingernails is noted.  The fingernails are regular, dirty, short and unremarkable.  The toenails are clean, short and dystrophic.  Pitting edema is not present in the ankles or legs.  The soles of the feet are clean and unremarkable.

Manipulation of the neck, shoulders, elbows, wrists, fingers, hips, knees and ankles fails to elicit any bony crepitus or abnormal motion.

The body shows the following evidence of recent physical injury:

1.   Pink-purple contusion, left shoulder, 3.0 x 2.0 cm

2.   Red contusion, central chest, 5.0 x 3.0 cm

3.   Anterior fracture of the left 5th rib

4.   Brown contusion, right upper back, 1.6 x 1.5 cm

5.   Brown contusion, left upper arm, 1.5 x 1.0 cm

6.   Area of multiple red abrasions, left elbow, 1.0 x 0.5 cm

7.   Red contusion, left forearm, 1.5 x 1.0 cm

8.   Brown contusion, right forearm, 1.5 x 1.3 cm

AC-10346

AUTOPSY REPORT

Case No.:   15COR00145

Page 6 of 12

9.   Area of multiple red abrasions, right wrist, 2.0 x 0.5 cm

10.  Red abrasion, left knee, 0.3 x 0.3 cm

11.  Red abrasion, left knee, 0.5 x 0.4 cm

12.  Red contusion, left knee, 1.0 x 1.0 cm

13.  Red abrasion, right knee, 0.6 x 0.2 cm

14.  Brown contusion, right lower leg, 3.0 x 2.0 cm

Evidence of recent medical/surgical treatment:

1.   There is an endotracheal tube present, entering the oral cavity.

2.   There is an intraosseous catheter in the left lower leg.

3.   There are disposable defibrillator pads on the body.

4.   There is gauze over the eyes.

Other identifying features:

1.   Tattoo, left upper arm depicting  skulls and "Laugh now cry later"

2.   Tattoo, right upper arm depicting figures

3.   Tattoo, right forearm, depicting a bird and "D-Hawk Rest in peace"

4.   Scar, right upper arm, 1.5 x 0.3 cm

5.   Circular scar, left upper back, 1.0 x 0.3 cm

6.   Circular scar, left lower leg, 0.5 x 0.4 cm

7.   Scar, left ankle, 3.0 x 2.0 cm

An Allegheny County Medical Examiner's identification tag is present around the right wrist.

AC-10347

AUTOPSY REPORT

Case No.:   15COR00145

Page 7 of 12

A hospital identification tag is present around the left wrist.

A prison identification tag is present around the right wrist.

No fresh needle marks or punctiform scars are noted in either antecubital fossa, interphalangeal spaces of the hands or feet or under the tongue.

INTERNAL EXAMINATION:

BODY CAVITIES:

The body is opened by a "Y" shaped incision.  The abdominal fat pad is 5.1 cm thick at the umbilicus.  The muscles of the chest and abdominal wall are normal in color and consistency.  The ribs exhibit the trauma described above.  The sternum and spine exhibit no fractures.  The pleurae are smooth.  Each pleural cavity is moist.  The domes of the diaphragm are normally positioned.  The peritoneum is smooth and thin.  The peritoneal cavity is moist.  The liver and spleen do not extend below the costal margins.  The bladder lies below the symphysis pubis.  The organs of the pleural and peritoneal cavities are in their usual positions in situ.  The mesentery and omentum are unremarkable.  The pulmonary artery is opened in situ and no emboli are seen.

At this time representative samples of blood, bile and eye fluid are taken for toxicological examination.

CARDIOVASCULAR SYSTEM:

The heart weighs 520 grams.  The pericardium is thin, smooth and contains

AUTOPSY REPORT

Case No.:   15COR00145

Page 8 of 12

10 cc of serous liquid.  The epicardial surface is smooth.  There is a moderate amount of epicardial fat.  The external configuration of the heart is unremarkable. The chambers of the heart are dilated.   The right and left ventricles are unremarkable.  The endocardium and valve leaflets are smooth, transparent and exhibit no thrombi, vegetations or fibrosis.  The circumference of the valves are as follows: tricuspid: 13.0 cm; pulmonic: 8.1 cm; mitral: 12.0 cm and aortic: 7.3 cm. The trabeculae carneae and papillary muscles are unremarkable.  The chordae tendineae are usual.  The right ventricle is 0.3 cm thick, and the left ventricle is 1.3 cm thick.  The septum is 1.5 cm thick.  The coronary arteries have their usual distribution with a right predominance.  The right and left coronary ostia are normal in patency.  On sectioning, the coronary arteries display no significant degree of atherosclerosis or other pathological abnormality.  The myocardium is of the usual consistency, red-brown and grossly homogeneous.

The aorta is lined by a smooth, tannish-yellow endothelium and shows fatty streaking.

The bifurcation of the iliacs is patent.

The venae cavae are unremarkable.

RESPIRATORY SYSTEM:

The right lung weighs 880 grams, and the left lung weighs 630 grams.  The tracheal mucosa is unremarkable.  The pleurae are smooth, delicate and glistening. The lungs are not distended and are variegated pink-gray to dark purple.  The lung

AC-10349

AUTOPSY REPORT

Case No.:  15COR00145

Page 9 of 12

parenchyma is of the usual consistency and mottled with a moderate amount of anthracotic pigment.  The lung tissue is moderately congested and edematous.  No purulent exudate is expressed from the parenchyma on compression.  No nodularity and no focal or diffuse lesions are seen.

The extra and intra-pulmonary bronchi are opened longitudinally are patent and unremarkable.  The pulmonary arteries and veins exhibit no pathological change.  The hilar and mediastinal lymph nodes are unremarkable.

HEPATOBILIARY SYSTEM:

The liver weighs 2560 grams.  The capsule of Glisson is transparent.  The external surface is smooth, glistening and brown.  The borders are blunted.  The parenchyma is soft, congested and brown with the usual lobular architecture and no focal or diffuse lesions.

The gallbladder has delicate walls, contains 5 cc of green thin bile and has a smooth mucosa.  No stones are present.

The intra and extra-hepatic biliary ducts are patent.  The hepatic and portal veins and the hepatic artery are unremarkable.

HEMOLYMPHATIC SYSTEM:

The spleen weighs 150 grams and is of the usual consistency.  The capsule is glistening, thin and intact.  The internal architecture is blurred due to congestion. The parenchyma is homogeneous.

There are no enlarged lymph nodes identified.

AC-10350

AUTOPSY REPORT

Case No.:   15COR00145

Page 10 of 12

GASTROINTESTINAL SYSTEM:

The esophagus is empty and unremarkable.  The stomach is empty.  There are no drug-like residues, pills or capsules in the stomach.  The stomach mucosa is pale with the usual rugal folds.  The remainder of the gastrointestinal system is unremarkable.

The vermiform appendix is identified and contains no obstructions.

The retroperitoneum is unremarkable.

PANCREAS:

The pancreas weighs 200 grams.  The parenchyma is tan-white and homogeneous.

UROGENITAL SYSTEM:

The kidneys are in the usual position and without malformation.  The right kidney weighs 180 grams, and the left kidney weighs 190 grams.  The surfaces are slightly granular.  The capsules strip easily, revealing a red-brown surface.  The cortico-medullary junctions are well-defined.  The renal papillae have no hemorrhage or necrosis.  The calyceal and collecting systems are not remarkable.  The renal arteries and veins are unremarkable.

The ureters are not dilated or obstructed.

The bladder is empty.  The bladder exhibits the usual tannish-pink mucosa with no focal lesion.  The ureteral orifices are patent.

The prostate is not enlarged and does not impinge upon the urethra.  The

AUTOPSY REPORT

Case No.:   15COR00145

Page 11 of 12

tissue of the prostate is lobulated, tan and moderately firm.

ADRENALS:

Both adrenals are of the usual size and shape.  The cut surface shows a thin yellow cortex and brown-gray medulla.

MUSCULOSKELETAL SYSTEM:

There are no gross bony deformities.  The muscles are well-developed and of the usual color and consistency.   No fractures, dislocations, compressions or hemorrhages are noted upon examination of the spine.  The vertebral bodies are not remarkable.  No hemorrhages are noted in the paravertebral muscles.  The sternum, ribs and spine exhibit the usual bone density and marrow.

NECK:

The soft tissues of the neck, the thyroid and cricoid cartilages, larynx, and the hyoid bone show no hemorrhages or evidence of traumatic injury.  The thyroid gland weighs 80 grams.  The parenchyma is reddish-brown and homogeneous.   The laryngeal mucosa is smooth with no focal lesions.   There are no paratracheal hemorrhages or masses.  There is no food, vomitus or foreign material in the upper airway.   The epiglottis and vocal cords are unremarkable.  The neck has been examined at the conclusion of the autopsy, after the blood has drained and the tissues are dry.

CENTRAL NERVOUS SYSTEM:

The scalp is reflected from mastoid process to mastoid process, revealing no

AUTOPSY REPORT

Case No.:   15COR00145

Page 12 of 12

trauma.  The calvarium is intact and when removed, there is no evidence of epidural or subdural hemorrhages.  The dura mater is white, smooth and does not exhibit any stains or discolorations.  The leptomeninges are not remarkable.

The brain weighs 1400 grams and is of usual consistency.  The gyri occupy their usual position, and the sulci exhibit a normal depth.  The blood vessels at the base do not reveal any aneurysms or atherosclerosis.  The cerebral and cerebellar hemispheres are symmetrical.  The brain is saved for neuropathology consultation (See neuropathology report for full description).

The dura covering the vault and the base of the cranium is removed.

The basilar skull is intact.

The atlanto-occipital articulation is intact.  The odontoid process shows no fractures or dislocations.  The cervical spine appears to be intact.

MICROSCOPIC EXAMINATION:

The microscopic examination is consistent with the gross findings and the final pathological diagnoses.

*Excerpts from Stephanie Frank Deposition*

# EXHIBIT "H"

Deposition of Stephanie Frank
Conducted on March 16, 2016

18

1   It had to do with fraternization.  An employee was

2   terminated.  Well, it wasn't fraternization.  It was

3   institutional sexual assault, and then the woman

4   decided to sue and I had to testify that he was

5   trained that that kind of behavior is inappropriate.

6   Those are the big ones I can think of right off the

7   bat.

8        Q    Is that case ongoing?

9        A    I haven't heard anything since I think.

10  It's been -- and that was quite a while ago.  That was

11  at least a few years ago.

12       Q    That's not a matter involving Captain

13  Bittner, is it?

14       A    No.

15       Q    Have you been called to testify relating to

16  any of his issues with the jail?

17       A    No.

18       Q    What about in-courtroom testimony?  Have you

19  testified in court before?

20       A    I've testified preliminary hearings and

21  maybe once at big court a while ago.

22       Q    Okay.  Any civil trial situation involving a

23  claim against the jail?

24       A    No.

25       Q    Okay.  So in your capacity as the training

Deposition of Stephanie Frank
Conducted on March 16, 2016

19

1  coordinator, what kind of staff did you have?  Were

2  there people that, you know, were acting under you in

3  terms of the hierarchy or was it just you?

4       A    I was the main person in charge of training;

5  however, I did use a pool of instructors to teach

6  certain things.

7       Q    Okay.  And would those instructors be people

8  from inside the jail or would they be people that

9  would come in from other disciplines or --

10      A    They were mostly employees that worked for

11  the jail.  Some of them, even though they weren't our

12  employees at the time, may have worked for medical,

13  but they were actually employed at the jail in some

14  sort of capacity.

15      Q    Okay.  And then when you were in that

16  position of training sergeant, who did you answer to?

17  Who was above you, so to speak, if anybody?

18      A    Generally speaking, at the time, Deputy

19  Emmerich was the one who mostly oversaw the training

20  department.  At the time I was also working with

21  Captain Leon.  He was working in the office with me at

22  one point.  That was when I was a sergeant, though.

23      Q    Right.  And I've seen Captain Leon's name

24  on, for example, this is Louis J. Leon?

25      A    Yes.

Deposition of Stephanie Frank
Conducted on March 16, 2016

20

1       Q     Okay.  And Emmerich, can you give me that

2   person's full name?

3       A     William Emmerich.

4       Q     Is Captain Leon still with the jail?

5       A     Yes.

6       Q     What about Emmerich?

7       A     No, he retired.

8       Q     Is Leon still a captain?

9       A     Yes.

10      Q     Is he still involved in sort of overseeing

11   some of the training?

12      A     No, not any more.

13      Q     Who is?  Because I take it it's not you.

14   You talked about helping the transitional aspect, but

15   is there somebody that sort of took over that -- that

16   role for the person that's now holding what used to be

17   your position as training sergeant?

18      A     Yes, Sergeant is now in charge of training.

19      Q     I thought it was Kengerski?

20      A     Kengerski was in training.  He was promoted

21   to captain, and when he got promoted to captain, that

22   vacated the training sergeant bid and Sergeant Colter

23   was promoted -- was awarded the training bid.

24      Q     Who was the training sergeant in January of

25   2015, if you know?

Deposition of Stephanie Frank
Conducted on March 16, 2016

21

1       A    Probably it was Colter.  I can't -- yeah,

2   because Kengerski would have been promoted to captain

3   by then.

4       Q    Yeah.  I think he was.

5       A    So it would have been Colter.

6       Q    Okay.  What familiarity, if any, do you have

7   with the events that concern this lawsuit; in

8   particular, the death of Frank Smart and the seizure

9   event that occurred on January 3rd or 4th of 2015?

10      A    I don't know much about the surroundings,

11  other than the fact I know the gentleman who had a

12  seizure in the jail and he died.  I don't -- other

13  than that, I don't know --

14      Q    That was my question, yeah.  I wanted to

15  know if you for some reason were on-site that day,

16  might have actually witnessed anything or talked to

17  somebody that day about it or been involved in any way

18  with the events themselves?

19      A    No, I was not.

20      Q    What, if anything, did you review today or

21  before today in preparation for your deposition?

22           MR. BIONDO:  I can give you --

23      A    We -- we had gone over some of the lesson

24  plans.

25           MR. KONOTOS:  I thought we had a lot of

Deposition of Stephanie Frank
Conducted on March 16, 2016

22

1    things -- can we just go off for a second.

2            MR. BIONDO:  You know, it might be -- well,

3    there's this, and then it's just AC Bates numbers

4    10073 to 11588.

5            MR. KONOTOS:  You can put that on, I guess.

6    Okay.  So this is all sequential?

7            MR. BIONDO:  Yes.  And it was all -- the

8    training materials were all together I think as part

9    of the -- I think it was the initial disclosures

10   and --

11           MR. KONOTOS:  Yeah, and this is all stuff

12   that we've had.  Or we probably have it mixed up in

13   some of the ordering, meaning me.

14   BY MR. KONOTOS:

15      Q    Okay.  So again, sort of speaking generally,

16   we'll kind of get into some of the more specifics

17   about the training, what is the training policy as it

18   existed when you held that position as the training

19   sergeant in terms of new hires, there's some type of

20   requirement that the jail imposes that a new employee

21   go through a certain amount of training?  And let me

22   also say that some people have already testified that

23   they were hired part-time and that they would receive

24   training initially even as a part-time, so it would

25   cover that as well.

Deposition of Stephanie Frank
Conducted on March 16, 2016

23

1      A     Yes.  All of our correctional officers get

2   hired part-time.  We are required by the state to

3   offer all of our new hires training, because if we did

4   not offer it at the jail, they would have to go to the

5   state Department of Corrections because the PA

6   Department of Corrections requires certain criteria

7   and curriculum to be taught.  Our training academy at

8   the jail is, for lack of a better word, accredited

9   through the state Department of Corrections.  So,

10  therefore, we are permitted to teach all pre-service

11  correctional officers at the jail, because if we did

12  not have that certification or that approval they

13  would have to go to Elizabethtown.  So there's a set

14  curriculum that's approved by the state that we teach

15  all new hires, new correctional officers.

16      Q     Where would I look to find those

17  requirements in terms of what the Pennsylvania

18  Department of Corrections requires be taught to new

19  officers?

20      A     We -- we have it at the jail.  I mean, our

21  curriculum is approved by the state Department of

22  Corrections.

23      Q     Okay.  And when you say it's approved, is it

24  actually submitted and somebody has to approve it?

25      A     Yes.

Deposition of Stephanie Frank
Conducted on March 16, 2016

24

```
 1        Q    And where would I find that -- that -- well,
 2   let me ask you this before:  Is this done on some
 3   regularity, every year or five years or whatever?
 4        A    Every three.  We're actually up for it this
 5   year.  I do believe the sergeant who's working back
 6   there now is just preparing the lesson plans, making
 7   sure if there's any updates, and then he'll have to
 8   submit them to the state Department of Corrections for
 9   approval.
10        Q    So do you know where -- you said it's every
11   three years.  Is that pretty static?
12        A    Yes.
13        Q    Okay.  If these events happened concerning
14   Mr. Smart in January of 2015, when would the
15   curriculum have been submitted and approved, if you
16   can say?
17        A    It would have been in 2013, because if it's
18   due this year, that was three years ago.
19        Q    When is it typically submitted, do you know?
20        A    In the spring.  We had to submit it in the
21   spring the last time, so it's due right now.
22        Q    So the curriculum that would have been
23   involved in terms of training for the time period of
24   January 2015 actually would have been submitted
25   approximately three years before, because if this
```

Deposition of Stephanie Frank
Conducted on March 16, 2016

25

1    happens right at the beginning of January 2015, the

2    training curriculum would have been approved a few

3    years before that, if you understand what I'm saying.

4              MR. BIONDO:   I'm going to object to the

5    form.  Go ahead if you can answer that.

6         A    The way I'm understanding is, he's asking me

7    if -- in January of 2015 if that curriculum would have

8    been approved.  And the answer would be yes.

9         Q    But it would have been approved in --

10        A    Prior years.

11        Q    -- prior years or whatever?

12        A    Yes.  Yes.

13        Q    Okay.  All right.  Because you said it's

14   submitted in January, but I would think it

15   would think it would be submitted and approved January

16   1st or January 2nd?

17        A    Yes.

18        Q    Okay.  All right.  So that curriculum, does

19   that speak to all of the training that happens in the

20   jail or only the training new hire get?

21        A    That's specifically for new hires, but our

22   in-service training is pretty much based off of the

23   pre-service training.

24        Q    All right.  So you talked about two

25   different categories there, pre-service and

Deposition of Stephanie Frank
Conducted on March 16, 2016

26

1    in-service.  I think I know what those mean.

2    Pre-service, I believe it would be when somebody is a

3    new hire?

4        A    Correct.

5        Q    Okay.  And in-service would be the training

6    that happens while they're employed at the jail?

7        A    Yes.

8        Q    On some degree of regularity?

9        A    Yes.

10       Q    Any other category besides those two, or is

11   that pretty much it?

12       A.   We have volunteers that come in that are

13   required to do orientation.

14       Q    I just want to make sure I'm getting the

15   nomenclature correct, if there's some other category

16   or --

17       A    No.  Pretty much, I mean, if that's what

18   we're sticking to, pre-service and in-service, I think

19   that would be completely appropriate.

20       Q    Okay.  So the pre-service is some set number

21   of hours, I presume, 40 or 80 hours or whatever that a

22   new hire has to go through.  Correct?

23       A    Uh-huh.

24       Q    Is that a yes?  You have to say yes.

25       A    Yes.  I'm sorry.

Deposition of Stephanie Frank
Conducted on March 16, 2016

27

1       Q    That's okay.  Don't be sorry.  What is that

2   requirement from an hour standpoint, if you know?

3       A    They do roughly six weeks in the classroom

4   and they work 32 hours a week, so that's roughly

5   190-some -- because it's six weeks in class and six

6   weeks of on-the-job training.

7       Q    Is that training -- and I'm talking about

8   the pre-service training now.  Is that memorialized

9   somewhere in a document that the jail has, anything

10   that you've reviewed here today that you can say,

11   well, this is what a new hire, you know, in 2014 would

12   have been trained on during that pre-service?

13       A    Yes.  Some of this stuff that I looked at

14   that the attorney had showed me, the stuff with

15   Captain Leon's signature on it or his name on it that

16   you were referring to, a lot of that came from the

17   pre-service curriculum.

18       Q    So, just for an example, there is a document

19   here -- make sure we have that.  This is what has been

20   marked previously as Exhibit 1, and it's AC-11377

21   through AC-11398.  And I'm not suggesting to you that

22   this is the entirety of all of it, but this is what

23   you were referring to in terms of what that would

24   encompass.

25       A    Yes.  This is from one of our lesson plans,

Deposition of Stephanie Frank
Conducted on March 16, 2016

28

1    specifically use of security restraints, and that

2    would have been for pre-service specifically.

3        Q    Now, do you know it's for pre-service

4    because it says basic training in the course title?

5        A    Yes.

6        Q    If it was for in-service would it say

7    something else?

8        A    Not really.  I mean, it wouldn't be

9    formatted in a lesson plan such as that.  I know

10   specifically that lesson plan has been approved by the

11   state, because this is part of the documentation that

12   is sent to the state Department of Corrections for

13   approval.  So usually our in-service stuff is --

14   especially when it comes to -- it's just an overview.

15   It's not as in-depth.  They're not going to -- because

16   we don't have -- you know, it's 40 hours.  We don't --

17   how many hours is that class?

18       Q    Two hours.  I'm sorry.  In that time frame.

19       A    Yes.  So we may go over use of security

20   restraints, but we're not going to do it in two hours.

21   It will be a part of the overall defensive plan.

22       Q    Are you talking about when you do it

23   in-service?

24       A    Yes, when we do it in in-service.

25       Q    When you say -- and just from what you said,

Deposition of Stephanie Frank
Conducted on March 16, 2016

29

1    and you were jumping around a little bit, would this

2    particular lesson plan for the use of security

3    restraints be something that would be taught on an

4    in-service basis in addition to basic training or

5    pre-service?

6         A    I can't specifically remember the actual

7    lesson plan itself from the in-service training, but I

8    think there was a few slides about using security

9    restraints.  I was -- apologize I don't know that

10   100 percent.

11        Q    Understood.  Certainly you can say that what

12   we've marked as Exhibit 1 is part of the pre-service?

13        A    Correct.  Guaranteed, that is part of the

14   pre-service.

15        Q    And there could be parts of it, although

16   you're not sure exactly which ones, but that you

17   believe may have been used also and part of in-service

18   training as well?

19        A    Yes.

20        Q    When a correctional officer, a newly hired

21   correctional officer goes through the training, is

22   there any type of test or measure to determine whether

23   they actually understood the training and know what

24   the policies and procedures of the jail are?

25        A    Yes.  We test them weekly.

Deposition of Stephanie Frank
Conducted on March 16, 2016

30

1          Q     And how does that happen?

2          A     It's usually a multiple-choice question

3    based on the lesson plans that were taught that week.

4          Q     All right.  When you say you teach them

5    weekly, we're talking about pre-service training?

6          A     Yes.

7          Q     Okay.  You're not testing them weekly during

8    the course of the year, the entire work year?

9          A     Sometimes we do.

10          Q     Weekly?

11          A     Sometimes.  Not for every single -- yeah,

12    but I've been known to throw a test in there.

13          Q     Yeah, you might throw a test in now and

14    again during the year?

15          A     Yes.

16          Q     But certainly you're not testing them every

17    week during the 52 weeks of the year?

18          A     No, we didn't test every single class, no.

19          Q     Okay.  But during that in-service period,

20    whatever it is, six weeks, you're not exactly sure,

21    there would be weekly testing?

22               MS. KENYON:  Object to form.  You said

23    in-service.

24          Q     I meant pre-service.  I meant pre-service.

25          A     Okay.  Yes.  We test them weekly at the end

Deposition of Stephanie Frank
Conducted on March 16, 2016

51

1   think you've testified that this is something that

2   would have been in effect during pre-service training

3   based on the title basic training.  Correct?

4           (Exhibit 1, previously marked, and is

5   attached to the transcript.)

6       A    Yes.

7       Q    And this is entitled use of security

8   restraints, and it's been identified already on the

9   record today as Exhibit 1.  So the date of this is

10  January -- on the first page of it is January 1st,

11  2016, and it says it was prepared by Louis J. Leon.

12  And we talked about, I believe, the fact that he was

13  sort of the person from the captain level that would

14  oversee the sergeant trainer or the training sergeant.

15  Correct?

16      A    Yes.

17      Q    Did he actually prepare the document or was

18  it -- what's your understanding of that?

19      A    Honestly, all of our lesson plans we get

20  from the state Department of Corrections.  We really

21  don't make any changes to the nuts and the bolts.  The

22  only thing we may change is our policy language,

23  because different institutions use different language

24  to describe certain things.  That's the only real

25  changes that we would make to any of these policies.

Deposition of Stephanie Frank
Conducted on March 16, 2016

52

1   Because they would reflect our policies, not the state

2   Department of Corrections' policies.

3          Q    Okay.  This aspect of the policies, as I

4   indicated, dated January 1st, 2016, do you know if

5   this was in effect -- the training protocols that are

6   set forth in this document would have been in effect

7   in January of 2015?

8          A    Yes.  Because I wanted to say when he did

9   these, these were when they were due up for

10  reapproval.

11         Q    And this would be something that would be

12  dealt with in the basic training and to a certain

13  extent perhaps as part of in-service?

14         A    Yes.

15         Q    I want to you have turn to page 12 of the

16  document, which is Bates stamped AC-11392, and it's

17  entitled applying handcuffs to inmates.  And this

18  deals with -- and you can read it -- handcuffing an

19  inmate and some prohibitions about handcuffing an

20  inmate on his back and placing them in a prone

21  position.

22         A    Okay.

23         Q    The first question I have for you is the

24  second to the last paragraph.

25         A    Okay.

Deposition of Stephanie Frank
Conducted on March 16, 2016

53

1      Q     It says, the use of physical restraints for

2   medical/psychological reasons shall be in accordance

3   with 6.3.1 faculty security procedures manual,

4   Section 33-restraints.  My question to you is, what is

5   that?

6      A     That would have been a state Department of

7   Corrections policy, not our policy.

8      Q     When you say it's not your policy, you mean

9   not the policy of Allegheny County?

10     A     Correct.

11     Q     But it's -- is it adopting that, I mean, by

12  saying basically, our policy is that policy, see this?

13           MR. BIONDO:  Object to the form.  Go ahead.

14     A     No, not really.  I know that medical at one

15  point would have had a policy on the use of restraints

16  for psychological reasons.

17     Q     When you say medical, what do you mean by

18  that?

19     A     The medical provider.

20     Q     Is this something that you're saying that

21  that would apply only to medical?

22     A     Yes, the medical provider.

23     Q     Is that part of the state Department of

24  Corrections policy referenced there at 6.3.1?  Is that

25  something that the jail has a copy of?

Deposition of Stephanie Frank
Conducted on March 16, 2016

54

1    A    No, we don't have a copy of that.

2    Q    Do you know what it says?

3    A    No, I don't.  Not offhand.

4    Q    And that wouldn't be anything that -- that

5  from a training perspective the correctional people

6  would deal with; it would be only something that would

7  pertain only to the medical people?

8          MS. KENYON:  Objection.

9    A    I would think that -- you know, because the

10  use of restraints for medical or psych reasons

11  generally come from the medical provider.

12    Q    All right.  So when this training, this

13  two-hour training is instituted and actually being

14  taught, you can say that there's no discussion about

15  what 6.3.1 is?

16    A    Yeah.  We don't talk about that because it's

17  not our policy.

18    Q    What you do know and what is, in fact, the

19  policy of the jail and was the policy at the time of

20  the events involving Mr. Smart were the prohibitions

21  about and the cautions about placing an inmate face

22  down when they're handcuffed from behind.  Right?

23          MS. KENYON:  Objection to form.

24          MR. BIONDO:  Objection to form.

25    A    It states in here about an inmate being

*Positional Asphyxia Training*

# EXHIBIT "I"



**Applying Handcuffs To Inmates:  (continued)**

- While maintaining control of the handcuffs, staff shall apply the other restraint in the same manner to the other wrist.

- After ensuring both restraints are correctly applied, double lock the handcuffs with the key holes facing up the inmates arms

An inmate shall not be placed on his/her stomach while hands are cuffed behind his/her back. **If an inmate is placed on his/her stomach while handcuffed behind the back, all attempts must be made to move the inmate from this position. The officer(s) shall not apply weight or pressure to an inmate in this position.**

Positional Asphyxia or "Sudden Death" could occur when using restraints.  Be aware of breathing difficulties or loss of consciousness by continuing to verbally communicate.  If the inmate's speech becomes irrational or stops, evaluate the situation carefully.

The use of physical restraints for medical/psychological reasons shall be in accordance with 6.3.1, Facility Security Procedures Manual Section 33 – Restraints

To remove the handcuffs, stand to the side and remove the handcuff closest to you, and while holding this restraint, pull the other restraint to you and remove.

AC-11392

*Excerpts from Deposition of Susan Leri*

# EXHIBIT "J"

1    almost a year working for the agency.

2         Q     Okay.

3         A     To get my 1,200 hours in.

4         Q     So when you started officially for

5    Allegheny Correctional Health, you kind of already

6    sort of had been there, they just labeled you

7    differently for lack of a better term; correct?

8         A     Yeah.

9         Q     So going back then when you started

10   there with the temp agency, Stat Staffing, did you

11   receive any kind of that sort of orientation

12   training or, you know --

13        A     No.

14        Q     At some point Corizon ends up taking

15   over the provisional health care services at the

16   jail; correct?

17        A     Yes.

18        Q     I don't know if I asked you this

19   specifically, but your employment has been

20   continuous since that point in time?

21        A     Yes.

22        Q     When approximately do you remember

23   that happening?  I'm sure we have the actual date

24   somewhere, but just from your perspective.

25        A     September 1st or, wait, September 1st

Deposition of Susan Leri

1    when the county took over, two years prior to

2    September 1st of this year is when Corizon took

3    over.

4        Q      Okay.

5        A      Because they were there exactly two

6    years.

7        Q      So 2012.

8               MR. DACHILLE:  It was '13 when Corizon

9        took over.

10              MR. KONTOS:  I should ask you guys

11       the question.

12       Q      I wasn't so interested in the exact

13   date.  What I was interested in asking you about

14   is when that happened, when Corizon took over, was

15   there anything that happened with you in your

16   position as it related to training, you know, and

17   learning about any new policies or protocols

18   relative to your position?

19              MS. KENYON:  Objection to form.  Go

20       ahead.

21       A      Did they do anything for training, you

22   are asking if they trained us in anything?

23       Q      Yeah, when they took over, whenever

24   that time was.

25       A      They had a day that we went down and

Deposition of Susan Leri

```
 1    it was about, basically, about them, and some
 2    paperwork that we had to do.  I don't recall what
 3    all it was.
 4        Q    I think you have answered, but I'm
 5    going to ask a few more specific questions along
 6    these lines.
 7             So was there, for example, at the time
 8    Corizon took over, or any time thereafter, any
 9    sort of like orientation program where you were
10    given, you know, policies, procedures, protocols,
11    as to how Corizon was going to administer health
12    care at the jail?
13             MS. KENYON:  Objection to form.  Go
14        ahead.
15        A    They gave us paperwork, but it was
16    never really explained to us all their paperwork
17    that they gave us.  We never had a course on it.
18    Or, you know, okay, "Okay, this is what we have
19    here and this is how you do it."  They just, like,
20    basically threw it out there.
21        Q    What was the paperwork that they gave
22    you?  Do you know if it was entitled in any way?
23    Is there a number of different forms, a book, a
24    manual?
25        A    It was papers.  No, it wasn't a book.
```

Deposition of Susan Leri

1    It was just, like, you know, papers on how you do

2    this and how you do that.  How do I want to say

3    it?  Like, for instance, with the old company we

4    use the computer to do our three pages, and they

5    had, everything was on paper with them, so they

6    had paper, three pages, they had paper sick call

7    slips, and it was just all handed to us and never

8    reviewed, as far as I can remember.

9         Q     Just so that we are clear, there has

10   been some testimony already about three pages, are

11   you talking about that's part of the intake; is

12   that correct?

13        A     Yes.

14        Q     If I'm hearing you correctly, you are

15   saying that Allegheny Correctional Health Services

16   actually had a computerized system for that, but

17   Corizon had a paper system?

18        A     Yes.

19        Q     And some of those papers had to deal

20   with that issue?

21              MS. KENYON:  Objection to form.

22        Q     Or that area?

23        A     With what area?

24        Q     The three-page?

25        A     Some of the paper work?

Deposition of Susan Leri

1    Q    Yes.

2    A    Corizon gave us paperwork.  We

3    didn't -- it switched to paperwork, like papers,

4    three pages on paper instead of the computer.

5    Q    Okay.  Did you receive an employee

6    manual or handbook from Corizon?

7    A    I don't recall.

8    Q    Any of the paperwork that you may have

9    referred to just a minute ago, was that something

10   that you have retained and kept at home?

11   A    I believe I have some at home and

12   maybe in my locker at work.

13   Q    Okay.  When you received it, I assume

14   there might be times that you received updates or

15   memoranda from work, or Corizon, would you keep

16   that type of information in your locker?

17   A    No.

18   Q    All right.  But you do believe that

19   you have both at home and in your locker some of

20   the information that you have talked about here?

21   A    Yes.

22   Q    And you would be able to make that

23   available to counsel and let us take a look at

24   that; correct?

25   A    Yes.