IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIARA SMART, Administratrix of the Estate of FRANK J. SMART, JR., Deceased,<br>    Plaintiff,<br> v.<br><br>CORIZON, INC., CORIZON HEALTH, INC., ALLEGHENY COUNTY d/b/a ALLEGHENY COUNTY JAIL, and ORLANDO HARPER,<br><br>    Defendants. | CIVIL DIVISION<br><br>No. 2:15-cv-00953-CRE |

**PLAINTIFF'S COUNTER-STATEMENT TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AND PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS**

AND NOW, comes the Plaintiff, Tiara Smart, Administratrix of the Estate of Frank J. Smart, Jr., Deceased, by and through her attorneys, George M. Kontos, Esquire, Katie A. Killion, Esquire, and Kontos Mengine Law Group, files the following Counter-Statement to Defendant Allegheny County and Orlando Harper's Statement of Material Facts and Plaintiff's Concise Statement of Material Facts and avers as follows:

**I. Plaintiff's Counter-Statement to Defendants' Statement of Material Facts**

1. The averments contained in paragraph 1 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit A referenced in paragraph 1 is a document that speaks for itself.

1

2. The averments contained in paragraph 2 of Defendants' Statement of Material Facts wherein it states, "Upon entry into the jail, a medical intake screening of Mr. Smart was conducted by Rae Ann Green of Corizon" is admitted in part and denied in part. Rae Ann Green of Corizon testified that when an inmate comes into the jail with the police officer, the inmate is assessed by an RN at the door *only* to make sure they are okay medically to be in the facility. Thereafter, they are transferred to a holding cell. She further testified that at some point, the inmate is transferred back to the intake side and a three page assessment (medical intake screening) is performed. The averments in paragraph 2 are admitted to the extent that a medical intake screening is performed in intake. However, it is denied that the medical intake screening occurs upon entry to the jail, as it is performed at a later time. **Exhibit 1 at 28-29.**

3. The averment contained in paragraph 3 of Defendants' Statement of Material Facts wherein it states, "When an inmate is brought into the jail a nurse assesses all inmates" is admitted. By way of further response, Rae Ann Green testified that this limited assessment only involves seeing the inmate at the door to make sure that they are okay medically to be in the facility. **Exhibit 1 at 27-28.**

4. The averments contained in paragraph 4 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit C, referenced in paragraph 4, is a document that speaks for itself.

5. The averments contained in paragraph 5 of Defendants' Statement of Material Facts are admitted. By way of a further response, the Exhibit referenced in paragraph 5 is a document that speaks for itself and goes on to state specifically, "he heard what he described as a very loud and abnormal 'Snoring' sound coming from inside of cell #121". **Defendants' Exhibit D at AC-10191.**

6. The averments contained in paragraph 6 of Defendants' Statement of Material Facts are admitted. Although the Defendants' referenced Exhibit D does not specifically state that Fleisner found Frank Smart in his cell with seizure-like activity, the Exhibit does indicate that Fleisner looked inside the cell and noticed that Smart had blood coming from the corners of his mouth and was spitting saliva. Further, Fleisner witnessed Smart hit his head on the steps to the bunk beds and then roll onto the floor, striking his head once again. **Defendants' Exhibit D at AC-10192.**

7. The averments contained in paragraph 7 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit D referenced in paragraph 7 is a document that speaks for itself.

8. The averments contained in paragraph 8 of Defendants' Statement of Material Facts, wherein it states "Captain Bytner and other Corrections Officers responded along with 4 nurses from Corizon", is admitted in part and denied in part. It is admitted that Captain Bytner responded to the medical emergency. However it is denied that he responded at the same time as the 4 nurses. Contrarily, Captain Bytner responded with several other Correction Officers, but the nurses were already on scene. **Defendants' Exhibit D at AC-10192.**

9. The averment contained in paragraph 9 of Defendants' Statement of Material Facts, wherein it states "Officers believed that Smart was resisting medical assistance…" is denied. The averment mischaracterizes the statements contained in Defendants' Exhibit D at AC-10192. The report, in verbatim, states, "Captain Bytner stated that Smart was not fighting them, however, he was resisting care and was flailing his arms and legs". **Defendants' Exhibit D at AC-10192.**

10. The averments contained in paragraph 10 of Defendants' Statement of Material Facts are admitted. By way of a further response, Defendants' Exhibit E at AC-10205 specifically states that Bytner was holding Smart around the neck and she (Hollingsworth) could see that Bytner was choking Smart and Smart was struggling to breathe. **Defendants' Exhibit E at AC-10205.**

11. The averments contained in paragraph 11 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit F, referenced in paragraph 11, is a document that speaks for itself.

12. The averments contained in paragraph 12 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit F, referenced in paragraph 12, is a document that speaks for itself.

13. The averment contained in paragraph 13 of Defendants' Statement of Material Facts wherein it states, "Nurse Berger stated that it appeared to him that Smart was thrashing around and attempting to hit individuals…" is admitted, but, without further elaboration, mischaracterizes the testimony. Nurse Logan Berger stated that he believed Smart was becoming combative because he was in the postictal state. Smart was thrashing around and flailing his arms during the postictal state and those movements could be involuntary. **Defendants' Exhibit F at 124-125.**

14. The averments contained in paragraph 14 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit F, referenced in paragraph 14, is a document that speaks for itself.

4

15. The averments contained in paragraph 15 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit F, referenced in paragraph 15, is a document that speaks for itself.

16. The averments contained in paragraph 16 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit F, referenced in paragraph 16, is a document that speaks for itself.

17. The averment contained in paragraph 17 of Defendants' Statement of Material Facts wherein it states, "Plaintiff eventually Smart stopped breathing and Nurse Berger made efforts to resuscitate Smart" does not make sense and, therefore, is denied. Nurse Berger stated that Smart stopped breathing after he was handcuffed and had the foot shackles on, but he could not recall exactly when he stopped breathing. **Defendants' Exhibit F at 70.**

18. The averments contained in paragraph 18 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit G, referenced in paragraph 18, is a document that speaks for itself.

19. The averments contained in paragraph 19 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit D, referenced in paragraph 19, is a document that speaks for itself.

20. The averments contained in paragraph 20 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit G, referenced in paragraph 20, is a document that speaks for itself.

21. The averments contained in paragraph 21 of Defendants' Statement of Material Facts wherein it states, "Corrections Officers at the ACJ received training approved by the Pennsylvania Department of corrections which requires a certain criteria and curriculum to be

taught" is denied as stated. The averment mischaracterizes the testimony of Stephanie Frank. Ms. Frank, who was the director of training for the ACJ, testified, "We are required by the state to offer all of our new hires training…there's a set curriculum that's approved by the state that we teach all new hires, new correctional officers". Ms. Frank's testimony only spoke to new hires and Defendants chose to omit this critical fact. **Defendants' Exhibit H at 23.**

22. The averments contained in paragraph 22 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit H, referenced in paragraph 22, is a document that speaks for itself.

23. The averments contained in paragraph 23 of Defendants' Statement of Material Facts wherein it states, "Working Corrections officers receive 40 hours of training per year" is denied as stated. Stephanie Frank testified in a limited capacity regarding yearly training, only stating that "in-service stuff" was just an overview and it is 40 hours but not in depth. She never testified as to whether the in-service training did in fact occur on a yearly basis. If she had testified to this fact it would be contrary to the numerous working corrections officers who stated they did NOT receive in-service training on a yearly basis. See below for specific supporting testimony:

    a. Corrections Officer Frank Lubawy testified that in the past five years, training was not consistent and he may have been trained three or four years out of five. **Exhibit 2 at 10-11.**

    b. Corrections Officer Jaison Brown testified that he recalled yearly training in 2015, but didn't receive training in 2016 and cannot recall if he had yearly training in 2014. **Exhibit 3 at 15.**

6

      c.      Corrections Officer Robert Dickson, Jr. testified that he can only recall 3 years of training during the entire seven years he has been employed by the ACJ. **Exhibit 4 at 11-12.**

      d.      Corrections Officer John Mangis testified that corrections officers are supposed to have training once a year, but, in his entire 22 year tenure, he may have undergone yearly training 6 or 7 of the years. **Exhibit 5 at 12-13.**

      e.      Corrections Officer Norman Martin testified that they are supposed to have a week of training on a yearly basis. However, they stopped the training because of overtime aspects with forcing officers to work overtime. "They decided to stop training, in-service training." **Exhibit 6 at 11-12.**

      f.      Corrections Officer Michael Istik testified that since he was hired in 2008 it was NOT a normal protocal to go for training on a yearly basis. **Exhibit 7 at 16.**

24.    The averment contained in paragraph 24 of Defendants' Statement of Material Facts wherein it states, "All newly hired corrections officers are trained in the use of security restraints" is strongly denied and mischaracterizes the testimony of Stephanie Frank. Ms. Frank testified, in regard to in-service training, we **may** go over use of security restraints, but, it will not be covered over two hours and it would be part of the overall defensive plan taught. **Defendant's Exhibit H at 28.**

25.    The averment contained in paragraph 25 of Defendants' Statement of Material Facts wherein it states, "All corrections officers also received training on positional asphyxia" is denied as stated. This averment cites Exhibit H, which is a written policy on "Positional Asphyxia or Sudden Death". Exhibit H does NOT state that all corrections officers received training on positional asphyxia. To the contrary, corrections officers testified that they did not

receive training nor were they even aware of the policy on positional asphyxia. **Exhibit 8 at 30-31; Exhibit 22 at 31-32.**

26. The averments contained in paragraph 26 of the Defendants' Statement of Material Facts wherein it states, "The ACJ training on positional asphyxia comes from the training that is approved by the Pennsylvania Department of Corrections" is denied because it mischaracterizes the testimony of Stephanie Frank. Ms. Frank testified that the positional asphyxia policy would have been a state Department of Correction's policy, not the policy of the ACJ and not a policy that was necessarily adopted by the ACJ. She never stated it was an ACJ policy or that it was affirmatively adopted and taught. To the contrary, Jeffrey M. Kengerski, who was a captain at the time, testified that he was not even familiar with the policy on Positional asphyxia and if they did any type of training on it, it was covered vaguely. **Exhibit 8 at 30-31.**

27. The averments contained in paragraph 27 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit J, referenced in paragraph 27, is a document that speaks for itself.

28. The averments contained in paragraph 28 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit K, referenced in paragraph 28, is a document that speaks for itself.

29. The averments contained in paragraph 29 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit L, referenced in paragraph 29, is a document that speaks for itself.

30. Paragraph 30 of Defendants' Statement of Material Facts is Defendants' summary of Plaintiff's Claims against Defendant Orlando Harper. This summary is an inadequate

depiction of Plaintiff's actual averments contained in the filed Amended Complaint and, as such, Defendants' averments in paragraph 30 are denied. Exhibit K is Plaintiff's Amended Complaint and the document speaks for itself and fully describes Plaintiff's claims against Defendant Orlando Harper.

31. Paragraph 30 of Defendants' Statement of Material Facts is Defendants' summary of Plaintiff's Claims against Defendant ACJ. This summary is an inadequate depiction of Plaintiff's actual averments contained in the filed Amended Complaint and, as such, Defendants' averments in paragraph 30 are denied. Exhibit K is Plaintiff's Amended Complaint and the document speaks for itself and fully describes Plaintiff's claims against Defendant ACJ.

32. The averments contained in paragraph 32 of Defendants' Statement of Material Facts are admitted. By way of a further response, Exhibit K referenced in Paragraph 32 is a document that speaks for itself.

33. The averments contained in paragraph 33 of Defendants' Statement of Material Facts are denied. Defendants seek summary judgment in their favor against the Plaintiff. It is denied that summary judgment is proper, as there are several outstanding issues of genuine fact.

## II.     Plaintiff's Concise Statement of Material Facts

34. Plaintiff incorporates the above paragraphs as though they were fully set forth below.

35. On the evening of January 3, 2015, Frank J. Smart, Jr., age 39, was arrested on minor charges and subsequently taken to the Allegheny County Jail. **Exhibit 9 at 2-3.**

36. The next day and approximately 12 hours later, Smart was finally processed in the Defendants' intake phase/medical screening. **Exhibit 10 at 1.**

37. During the medical screening, Mr. Smart unequivocally communicated to the Defendants that he had a potentially fatal seizure disorder and required administrations of medication daily. **Exhibit 10 at 1-2**

38. Mr. Smart's seizure disorder and the daily need for medication was acknowledged by Corizon Nurse Rae Ann Green, as she documented both on the intake screening. She also acknowledged that the seizure disorder was severe, citing that Mr. Smart should be placed in Chronic Care Clinic. **Exhibit 10 at 3.**

39. The specific medications Smart discussed are included on the intake assessment form that was completed by Rae Ann Green. **Exhibit 10 at 1.**

40. During the deposition of Rae Ann Green, she testified that a morning medication cart goes through the intake room around 8:00-9:00 a.m. and Mr. Smart missed the cart because he did not arrive until approximately 10:55 a.m. Despite knowing that Mr. Smart needed medication, Ms. Green testified that she did not give him his medication and had no idea whether or not he received a morning dose of the medication. **Exhibit 1 at 23 and 37.**

41. Assistant Director of Nursing, Amie Shank, testified that there is no policy or procedure in place should an inmate miss a morning/evening medication pass. Hence, no attempts were made to ensure that Mr. Smart received his morning dose of medication. **Exhibit 11 at 30-32.**

42. After being processed, Mr. Smart was taken to Cell Block 4A. **Exhibit 13 at 1.**

43. At some point, Mr. Smart was permitted to make a phone call to his girlfriend, Tiona Bennett. According to Ms. Bennett's statement, Mr. Smart indicated that the Defendants did not give him his anti-seizure medication. Ms. Bennett also stated that she contacted the jail to ensure he would receive his medication. Despite Ms. Bennett's phone call to the jail, Mr.

10

Smart still did not receive any medication throughout the day. **Exhibit 14.**

44. According to the medical records, Mr. Smart ultimately received only one administration of his anti-seizure medications. It was administered during the evening medication pass between 6:00 p.m.-9:00 p.m. on the night of January 4, 2015. This dosage was inadequate and not ingested until approximately 24 hours after incarceration. **Exhibit 12.**

45. Significantly, the autopsy and toxicology report confirm that the levels of anti-seizure medication found in Mr. Smart's blood were at near sub-therapeutic levels. **Exhibit 15.**

46. Plaintiff's medical expert has opined that this failure (inadequate amount of medication) led directly to Mr. Smart experiencing a violent grand mal seizure later that evening. **Exhibit 16.**

47. When Mr. Smart began seizing, a medical emergency was called over the intercom. **Exhibit 13 at 2.**

48. Shift Commander/Captain Robert Bytner responded to the situation, entered Mr. Smart's cell and observed that Mr. Smart had blood and saliva coming from his mouth and had soiled himself. Bytner decided that it would be prudent to first photograph Mr. Smart rather than assist with medical care. **Exhibit 17 at 38-40.**

49. Alicia Hollingsworth, an LPN for Corizon, responded to the medical emergency and recognized that Mr. Smart was in a postictal state and that caused him to flail around. **Exhibit 18 at 1.**

50. Alicia Hollingsworth also stated that she left to retrieve medical supplies and when she returned, she witnessed four or five correctional officers lying on top of Mr. Smart and Captain Bytner was holding Smart in a chokehold. She could tell that Mr. Smart was choking and struggling to breath. She also noted that the corrections officers on top of Mr. Smart were

11

putting all of their weight on him and in such a way that their feet were off the floor. **Exhibit 18 at 1-2**

51. Mr. Smart was handcuffed, shackled and forcefully held face down in a prone position, which resulted (as described below) in catastrophic consequences for Mr. Smart. Captain Jeffrey M. Kengerski testified that he could hear Smart saying that he could not breathe. The situation was disturbing. **Exhibit 8 at 45-47.**

52. In all, over 15 corrections officers, including two captains and a sergeant, responded to the situation at different times. All of these jail employees were deposed and the collective substance of their testimony was that during the seizure event, Mr. Smart was handcuffed, shackled and forcefully held stomach down in a prone position, while 4-5 varying corrections officers placed their weight on his body, and, these actions lasted for 20-30 minutes. **Exhibit 16 at 4.**

53. There was a Department of Corrections stated security restraint policy that prohibits inmates from being placed on their stomach while their hands are cuffed behind their back. According to the policy, "An inmate shall not be placed on his/her stomach while hands are cuffed behind his/her back. If an inmate is placed on his/her stomach while handcuffed behind the back, all attempts must be made to move the inmate from this position. The officer(s) shall not apply weight or pressure to an inmate in this position". The policy goes on to describe the phenomena of "positional asphyxia" or "sudden death", which can occur when restraints are used in a prone position, causing an inmate to be unable to breathe. **Exhibit 21.**

54. Incredibly, the restraint policy was never taught to any of the corrections officers or medical staff that were deposed in this case. In fact, Captain Jeffrey Kengerski and Sergeant Michael Brown, both of whom were employed in a supervisory role and responsible for training,

testified that they were unaware of any such policy or the term positional asphyxia/sudden death. **Exhibit 8 at 30-31, Exhibit 22 at 31-32.**

55. Additionally, there were issues in general of having correctional officers attend and receive training. The Warden was aware of the training issues and even attended a couple meetings himself. Captain Kengerski testified that beyond Warden Harper's knowledge of the issue, the Deputy Warden, Monica Long, was also apprised of the issues. Kenerski stated, when discussing Deputy Long's response to the issues, "She just fluffed everything up for you and never got anything done". **Exhibit 8 at 34-36.**

56. On the medical side, Amie Shank, as assistant director of nursing, indicated that the Defendants did not provide any training on this written policy. **Exhibit 11 at 43.**

57. The joint failure on the part of the Defendants to adopt, teach and utilize the restraint policy caused Mr. Smart to be held down in a prone position in his cell for 20-30 minutes. **Exhibit 4 at 25.**

58. More likely than not, the restraint position used was a dangerous action and clearly a major factor in Mr. Smart's respiratory compromise that caused cardiac arrest and death when combined with his seizure and the lorazepam used to interrupt the seizure, a respiratory depressant. **Exhibit 16 at 5.**

59. During the 20-30 minutes of being heldface down, Mr. Smart began experiencing symptoms of positional asphyxia. According to corrections officer Robert Dickson, he was yelling "help" Also, according to Captain Kengerski's testimony, Mr. Smart yelled over and over again in a gasping voice, "I can't breathe, I can't breathe". **Exhibit 4 at 24; Exhibit 8 at 48.**

60. Kengerski further testified that he questioned Captain Bytner and the head nurse, Logan Berger, whether something else could be done. Both Bytner and Berger told him that it was "fine" and "everything was under control". **Exhibit 8 at 45-48.**

61. Eventually, Mr. Smart stopped breathing and a call to 911 was initiated. **Exhibit 18 at 1.**

62. In the early hours of January 5, 2015, Mr. Smart was pronounced dead at UPMC Mercy Hospital. **Exhibit 13 at 2.**

63. An autopsy/toxicology was performed thereafter. It was determined that Mr. Smart had an inadequate amount of anti-seizure medication in his system. The autopsy notes that Mr. Smart died as a result of a seizure disorder and physical restraint in a prone position contributed to his death. **Exhibit 15 at 2.**

64. Defendant Corizon has a history of providing substandard and grossly inadequate medical care to inmates, whose medical needs it was contracted to meet. **Exhibit 23.**

65. Based upon on-going issues with medical care at the jail, the Allegheny County Controller, Chelsa Wagner, ordered an audit to be conducted. The audit was performed in 2014, before Mr. Smart's death, that revealed numerous deficiencies in the care being provided by Corizon at the Allegheny County Jail. These deficiencies mimic the incident that occurred in this case. The audit noted, among other failures, that:

- Corizon did not maintain the required staffing levels;
- Corizon did not comply with reporting requirements;
- Corizon did not keep accurate inmate records;
- Corizon did not conduct intake health assessments; and,
- Corizon failed to provide clinical care. **Exhibit 23.**

66. The Allegheny County Jail and Warden Orlando Harper knew of the Corizon deficiencies prior to this incident and Mr. Smart's death. Particularly, Warden Harper was sent a letter on December 3, 2014 that discussed, in detail, the aforementioned deficiencies. He also received a copy of the audit. **Exhibit 23.**

67. Prior to the audit and nearly a year before Mr. Smart's death, the Defendants knew that Corizon was providing deficient medical care. Robert Orrick, the Regional Director of Corizon, was deposed and asked about a March, 2014 published newspaper article, which stated that Corizon took over management of the infirmary at the Allegheny County Jail on September 1st and, since that time, has been subject of criticism for not delivering medications on time to some patients. In response, Orrick testified that he remembered there being an issue with medication delivery and discussing it with the Warden. **Exhibit 25 at 25-28; Exhibit 26.**

68. Despite being notified of the Corizon deficiencies a month prior, no remedial measures were taken to prevent Mr. Smart's death a month later. **Exhibit 16.**

69. The deposition testimony in this case has made it clear that the Defendants knew their actions, in the custody, care and treatment of Frank Smart, caused his death. A Corizon nurse, Alisha Hollingsworth, testified that she was told, by her superiors, to "keep her mouth shut" when she voiced concerns regarding the incident. Hollingsworth testified that she was so disturbed by what she saw that she couldn't sleep at night. **Exhibit 24 at 2-3.**

70. Captain Kengerski also testified that he too raised concerns about the events and actions that led to Mr. Smart's death. He believes that he was subsequently fired because he raised these concerns. Mr. Kengerski was also told, by his superiors, to "keep his mouth shut" about what he saw and it was conveyed to him, "We don't want another situation where the Warden loses his job". **Exhibit 8 at 52-54, 98.**

71. In addition to Defendants' failure to ensure Mr. Smart received his medication, they also failed to ensure his safety during seizure activity. **Exhibit 16 at 6.**

72. There is no acceptable circumstance where correction personnel or medical personnel can keep an inmate in a prone position during restraint because it causes compromise of respirations. As stated, for over 30 minutes, Mr. Smart was in the prone position. Moreover, he indicated, as noted by the testimony of jail and medical personnel that he was in distress, stating, "I can't breathe" numerous times. **Exhibit 16 at 6.**

73. Simply put, Mr. Smart's respiratory failure could have been anticipated and prevented if the Defendants had properly positioned Mr. Smart. Clearly, their actions contributed to his death, as the autopsy indicates that a contributing factor of Mr. Smart's death was due to being held in a prone position. **Exhibit 16 at 6.**

74. Captain Kengerski testified regarding the Defendants' deliberate indifference to the issues and the incident that occurred. When Kengerski was asked if he spoke to any jail corrections officers about what happened to Smart, he stated, "…there was some joking, you know, guys saying oh, I heard you guys killed that guy upstairs". **Exhibit 8 at 58-59.**

75. Captain Kengerski stated, when asked what bothered him regarding the actions of the Defendants: "When I first arrived, the guy was alive. And when I came back the second time, he was on the floor, basically dead". **Exhibit 8 at 46.**

76. Based upon these events and Frank Smart's death, in July, 2015, Plaintiff filed a wrongful death and survival action under 42 U.S.C. § 1983 seeking damages for pain, suffering, mental anguish, loss of wages, future earning capacity, Estate expenses and any other such damages that are permitted by law. **Exhibit 19.**

77. In March, 2016, Plaintiff filed an Amended Complaint adding state law claims

against Defendant Corizon, Inc. and Corizon Health, Inc. for medical negligence and alleging further damages.  **Exhibit 20.**

78.    In November, 2016, the Plaintiff and Defendants Corizon, Inc. and Corizon Health, Inc. reached a settlement agreement.  Thereafter, a Rule 41 Stipulation was filed and an Order of Partial Dismissal was entered.  **Exhibit 27.**

WHEREFORE, Plaintiff, Tiara Smart, Administratrix of the Estate of Frank J. Smart, Jr., Deceased request that Defendants' Motion for Summary Judgment be denied as genuine issues of material fact exist.

Respectfully Submitted,

*/s/George M. Kontos*_____
George M. Kontos, Esquire
Katie A. Killion, Esquire
Counsel for Plaintiff

Kontos Mengine Law Group
603 Stanwix Street
Two Gateway Center, Suite 1228
Pittsburgh, PA  15222
(412) 709-6162
gkontos@kontosmengine.com
kkillion@kontosmengine.com

## CERTIFICATE OF SERVICE

I certify that on February 13, 2017, a copy of the foregoing **PLAINTIFF'S COUNTER STATEMENT TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AND PLAINTIFFS CONCISE STATEMENT OF MATERIAL FACTS** was filed electronically. Parties may access this filing through the Court's ECF/PACER system.

      __s/George M. Kontos_____
      George M. Kontos, Esquire