# Exhibit "11"

**Excerpts from Amie Shank Deposition**

29

1    Q    That's what you're talking about?
2    A    Yes.
3    Q    Okay.  So would this be something that
4    was taught during your tenure, if you know?
5    A    It was.
6    Q    And would -- you said you added some
7    things to it.  Was there a template and some things
8    you could add on?
9    A    No.
10    Q    Explain that.
11    A    **The more I got comfortable speaking in
12    front of them, I would just let them know that in
13    certain situations patients act differently.  An
14    asthmatic may not have the difficulty breathing,
15    just feel the tightness in their chest.  A chest
16    pain complaint are different between men and women.
17    Men normally feel the chest pain, women usually feel
18    earaches or back pain or neck pain.  They normally
19    don't have the chest pain.  Some people in seizures
20    sleep right after, others become violent.  It just
21    depends on how they come out of their seizures.  So
22    the more I got comfortable talking, the more I would
23    add stuff like that to the lecture.**
24    Q    And you weren't the only -- you weren't
25    doing all of this every single Friday?  Did you have

30

1    other people that were teaching it, or was it always
2    you?
3    A    **It was always me.**
4    Q    So from October of 2014 up until the time
5    that you left, you were the person that was doing
6    medical training for the COs on Fridays from 9 to
7    11?
8    A    **Correct.**
9    Q    What, if anything, would be done in terms
10    of figuring out if the correctional officers that
11    you had trained were comprehending the information?
12    Was there any kind of test or anything like that
13    that related to that two-hour training?
14    A    **Yes.  Each one of the trainings had their
15    own separate quiz at the end of it, that they would
16    take, and we would go over them.**
17    Q    And were those done on written piece of
18    paper, were they done on a computer screen?
19    A    **Paper.**
20    Q    Paper.  Were these like a multiple choice
21    type of situation?
22    A    **Multiple choice, and a couple of true and
23    false, yes.**
24    Q    And you would go over those with the
25    group?

31

1    A    Yes.
2    Q    Was there ever any issue raised with you
3    about staffing on the Corizon end of things as it
4    concerns the training of correctional officers,
5    something along the lines of, you know, we're not
6    getting the requisite amount of people from Corizon
7    to train the correctional officers, or something
8    along those lines?
9    A    **No, that was never brought to my
10    attention.**
11    Q    Anything that -- any issue that you ever
12    raised about the training that was being done to the
13    officers, at least while you were the person that
14    was conducting the training during the time periods
15    that we've talked about?
16    A    **No.**
17    Q    With respect to the policies that Corizon
18    had to ensure that an inmate was receiving
19    medication that they needed, and the appropriate
20    dosage of medication that they needed, somebody like
21    a diabetic or somebody with a seizure disorder, what
22    kind of policies were in place during your tenure
23    that related to that issue?
24    A    **I'm not sure of any specific policies,
25    but I do know that anybody that had maybe a seizure**

32

1    **disorder, if we could verify the fact that they were
2    actually having seizures in the past, we would get
3    the medication list that they were taking.  And we
4    would call our on-call practitioner and give them a
5    little bit of a report, and they would go ahead and
6    order the medication according to what was told to
7    us.**
8    Q    With respect to the situation after the
9    medication was confirmed and then ordered --
10    A    **Yes.**
11    Q    What was the policy or protocol in terms
12    of the administration of medication for somebody
13    that had a medical need that required regular
14    administration of a drug?
15    A    **All but diabetics would get two med
16    passes a day.  We'd start one in the morning around
17    8 a.m.  And then we would do the other one in the
18    evening around 6 p.m.**
19    Q    When you said med passes, I'm taking that
20    to mean that you would actually -- there would be
21    two rounds, and you would administer a -- pass out
22    the drug, or are you talking about something else?
23    A    **No, that's correct.  We had five LPNs
24    scheduled for daylight, and five scheduled for
25    evening shift.  Each LPN would have a block of pods**



41

1  inmate.
2      Q    And this is the p.m. administration,
3  correct?
4      A    Correct.
5      Q    On the 4th?
6      A    Correct.
7      Q    So this would have been sometime between
8  I think 6 and 10:00 p.m.?
9      A    Yes, sir.
10     Q    And can you tell me if, from reviewing
11 the two records that we were just talking about, and
12 any others, whether you can see that Mr. Smart
13 received any Dilantin or Tegretol prior to this
14 administration that we're talking about here at
15 AC-11610?
16     A    No.
17     Q    So as far as you can tell, this is the
18 one and only time that Mr. Smart received his
19 medication?
20     A    Correct.
21     Q    And if you would turn to one of the -- I
22 think the second page, if we're the same there, it's
23 AC11606.
24     A    Yes.
25     Q    I'm just curious, where it says

42

1  prescribed or provided by, there's some information
2  there that's crossed out.  Do you have any idea why
3  that's crossed out or what it says?
4      A    No, I don't know why.  And I cannot read
5  what it states.  I'm not even going to try to take a
6  guess.
7      Q    I had just assumed you had already given
8  up on that.  I just was curious if you could tell.
9  I appreciate your effort, thank you.  Could you tell
10 me from your experience as the Assistant Director of
11 Nursing, when there was a medical treatment that
12 involved a medical emergency or something along
13 those lines, what the policy was about who was in
14 charge of making decisions from both the medical
15 standpoint or the correctional standpoint?
16     A    If it happened to be during my time at
17 the facility, I was responsible for responding to
18 all medical emergencies with the staff.  Usually it
19 was the infirmary nurse and the practitioner that
20 was in-house.  And I would respond to that medical
21 emergency.  Then the practitioner would determine
22 whether the inmate should go to the infirmary, be
23 sent out to the hospital, or was well enough to stay
24 in their cell at that time.
25     Q    What about with a decision concerning

43

1  restraining an inmate with handcuffs or shackles
2  during a medical situation or emergency.  What is
3  your understanding of who would -- the interplay
4  between making a decision to restrain somebody in a
5  situation involving medical issues?
6      A    The training that we were told is that
7  medical does not go into a scene until it is secure
8  by correctional officers.  At that point it depends
9  on who the nurse or practitioner is, when they get
10 there, as to whether or not they need that inmate to
11 be uncuffed, laid flat, sat up against the wall, or
12 stood up.  It was that practitioner's or that
13 nurse's call as to whether or not they should remain
14 in handcuffs.
15     Q    Do you know if there was ever any
16 training with respect to the Corizon employees about
17 something known as positional asphyxiation?
18     A    Not to my recollection, there was
19 nothing.
20     Q    Are you aware of that term?
21     A    Yes, I am.
22     Q    Do you know if there was ever any
23 training provided by Corizon to any of the
24 correctional officers about that, about positional
25 asphyxiation?

44

1      A    From what I taught, no.
2      Q    You're aware of what that is as a medical
3  professional?
4      A    Yes, I am.
5      Q    And would it be fair to say that most
6  anybody who was on the medical side of things for
7  Corizon would also know about that, that phenomenon?
8          MS. KENYON:  Objection to form.  Go
9  ahead.
10     A    I can't answer that for them.  It depends
11 on what their training was prior to their
12 employment.
13     Q    I'm going to show you Exhibit 8.
14         MR. KONTOS:  Do you have them there,
15 Katie?
16         MS. KENYON:  Yes, I have them right here.
17     Q    I don't know if you've ever seen this
18 before.  This is an interview of Darlene Wichryk.
19 And she's been deposed.  And you can certainly
20 review this.  I just want to refer to the last page
21 of that.  I want to ask you a question about her
22 interview relating to these events.
23     A    Okay.
24     Q    In this portion of her interview it
25 states, Wichryk was asked if she would have done

# Exhibit "12"

# Medication Dispensed by Inmate Sheet

Allegheny Correctional Health Service, Inc.
**Medication Dispensed By Inmate**
Start Dt:01/04/2015   End Dt:01/05/2015

Inmate Name   Smart, Frank
Dispensed Date:   01/04/2015

| Cycle | Drug Name | Dose | Dispensed By | Discont Dt Reason | Refuse |
|-------|-----------|------|--------------|-------------------|--------|
| PM | Dilantin 100 MG CAPS PO | 1 | Zaouif,Rabi | | |
| PM | TEGretol 100 MG CHEW PO | 1 | Zaouif,Rabi | | |
| PM | TEGretol 200 MG TABS PO | 1 | Zaouif,Rabi | | |

AC-11610

# Exhibit "13"

**Allegheny County Police Incident Report**

# INITIAL REPORT

|  |  |
|---|---|
| **CCR#:** | **00090-15** |
| **CASE#:** | **H-007-15** |

| | | |
|---|---|---|
| **DETECTIVES** | : | **TODD DOLFI** |
| | | **THOMAS FOLEY** |
| **CASE** | : | **DEATH INVESTIGATION- UNDETERMINED** |
| **VICTIM** | : | **FRANK SMART B/M/39** |
| | | **ACJ INMATE** |
| **LOCATION** | : | **ALLEGHENY COUNTY JAIL-POD 4A-CELL 121** |
| **DATE AND TIME** | | |
| **OF OCCURRENCE** | : | **JANUARY 4, 2015** |
| | | **2254 HOURS** |
| **WEATHER** | : | **30 DEGREES- LIGHT SNOW- INDOOR SCENE** |
| **SUMMARY** | : | |

On January 5, 2015 at approximately 0040 hours Captain Bytner of the Allegheny County Bureau of Corrections requested the investigative assistance of the Allegheny County Police Homicide Unit in reference to a death investigation.

On January 3, 2015 at approximately 2100 hours Frank Smart was arrested by the City of Pittsburgh Police Department (OTN G699712-6). Smart was transported to the ACJ and was accepted into intake at approximately 2209 hours. Smart stayed in intake until he was assigned to POD 4A on January 4, 2015 at approximately 2023 hours. At that time, Smart was lodged on POD 4A cell# 121.

On January 4, 2015 at approximately 2254 hours CO Fleisner who was assigned to POD 4A was making his required rounds on the POD when he heard what he described as a very loud and abnormal "Snoring" sound coming from inside of cell # 121. CO Fleisner then called on inmate Edwin Williams who is the "Suicide Worker" on the POD.

AC-10191

**INITIAL REPORT- FRANK SMART**                    CCR# 00090-15
**PAGE-2**                                          CASE# H-007-15

Williams came to cell #121 and Fleisner looked inside and noticed that Smart had blood coming from the corners of his mouth and was spitting saliva. Williams also said that he observed Smart hit his head on the steps to the bunk beds and then roll of the bed onto the floor striking his head again. CO Fleisner then called for a "Medical" on POD 4A.

Captain Bytner and several other CO's arrived to assist with care along with 4 nurses who were already on scene and assigned to the jail medical division. Captain Bytner stated that Smart was not fighting them, however, he was resisting care and was flailing his arms and legs. CO's restrained Smart with handcuffs and shackles after they received permission from the nurses.

It was Detectives understanding that the nurses administered two 2mg doses of Ativan in the process of care for Smart. At approximately 2325 hours 911 was called to respond to the jail. While awaiting the arrival of paramedics Smart stopped breathing. Nurses and CO's began CPR and attached an AED. CPR was conducted until the arrival of Pittsburgh EMS Medic 7 who then took over care. Smart was transported to Mercy Hospital where he was pronounced dead at 0022 hours by Dr. Tracy Moore.

Captain Bytner secured the cell/scene and kept it locked until the arrival of Detectives. Scientist Stanich of the Allegheny County Medical Examiner's Office along with Detectives Dolfi and Foley processed the scene.

POD 4A is considered a classification POD. Meaning, the inmate will stay on that POD until they are "Classified" and placed on a certain level pertaining to jail guidelines of their classification or they are released from custody. Smart, had just arrived on the POD and had not been classified yet.

On January 5, 2014 a post mortem examination was conducting on Frank Smart by Dr. Arboe and Dr. Luckasevic. Dr. Arboe stated that the results of the examination will be pending Histology and Neurology reports.

The following CO's and Jail Staff completed written reports as to their involvement in this incident. All reports have been turned over to the Allegheny County Police and are located in the file:

Captain Bytner
Captain Kengerski
Sgt. Michael Brown
CO Fleisner
CO Robert Dixon
CO John Mangis
CO Norman Martin
CO Jason Brown

AC-10192

**INITIAL REPORT**                    **CCR# 00090-15**
**PAGE-3**                            **CASE# H-007-15**


CO Michael Istik
CO Ryan Gorham
CO Holland
CO David Foriska
RN Logan Berger
RN Susan Leri
RN Darlene Wichryk
RN Alisia Hollingsworth

AC-10193

# Exhibit "14"

## Statement of Tiona Bennett

**VOLUNTARY STATEMENT**

The following is a voluntary statement of _Tiona Bennett_

given this date _9-29-15_ at _4:56_ A.M./P.M.

Location statement obtained: _704 Anaheim St 15219 (my Home)_

I'm Tiona Benne the girlfriend of the late Frank Smart whom was arrested & taken into custody (Jail) on the night of the foot ball playoffs in January of 2015. During his arrest he contacted me by phone to inform me that he wouldn't be home because he was being held in the ACJ, & to lookout for his phone call by the next morning.

When frank called me he told me they were denying him his medication & that its already his second doze he missed & that he was affraid of waiting until monday (when nurse came in) to receive it. He told me they told him he wouldn't get him medication until the nurse was in on monday. So I called the ACJ & they said thats not true he had to wait & they'll check on it. that was the last i heard from frank.

Signed by: _Tiona Bennett_

Witnessed by: _Ronald M. Gratz_

Ronald M. Gratz, Private Investigator

Page 1 of _1_

# Exhibit "15"

**Autopsy/Toxicology Report**



# COUNTY OF     ALLEGHENY

**RICH FITZGERALD**
COUNTY EXECUTIVE

**FRANK J. SMART**

**JANUARY 05, 2015**

**CASE NO.: 15COR00145**

**FINAL PATHOLOGICAL DIAGNOSES:**

I.      **SEIZURE DISORDER**
   A.   Found in Allegheny County jail cell on 1/4/2015 at 10:54 pm with seizure-like activity
      1.   Originally incarcerated on 1/4/2015 at 9:30 am
      2.   Found lying on back with saliva and blood coming out of mouth area and soiled clothing
      3.   Would not respond to medical personnel or officers and became combative
         a.   Manually restrained at the arms and legs in prone position
         b.   Given shot of Lorazepam
         c.   Spit mask placed
         d.   Handcuffed and ankles shackled
      4.   Given second shot of Lorazepam
      5.   Appeared unresponsive after unknown amount of time and CPR started
      6.   EMS arrived at 11:36 am
      7.   Transferred to UPMC Mercy in cardiac arrest at 12:20 on 1/5/2015
      8.   Pronounced at 12:22 am
   B.   History of seizure disorder
      1.   Multiple emergency department visits and hospitalizations at UPMC for seizures
         a.   5/24/2014: Required admission to the ICU
         b.   6/7/2014: Suboptimal drug levels
         c.   6/8/2014: Transferred to CDU; Noncompliance with prescription medications
         d.   7/13/2014: Tongue laceration
         e.   8/27/2014: Noncompliance with prescription medications
         f.   10/20/2014: Scalp laceration and suboptimal drug levels
      2.   History of noncompliance with medications
      3.   Prescribed home medications
         a.   Carbamazepine 300 mg twice daily
         b.   Levetiracetam 500 mg twice daily

KARL WILLIAMS, MD, MPH, MEDICAL EXAMINER
**OFFICE OF THE MEDICAL EXAMINER**
1520 PENN AVENUE • PITTSBURGH, PA 15222
PHONE (412) 350-4800 • FAX (412) 350-4899
WWW.ALLEGHENYCOUNTY.US

AC-10342

AUTOPSY REPORT

Case No.: 15COR00145

Page 2 of 12

    c. Phenytoin 300 mg at bedtime

C. Neuropathology consultation shows a remote infarct of the left inferior temporal lobe (1.5 cm)

D. Postmortem toxicology is positive for
1. Carbamazepine: 2.2 mcg/mL in the blood (normal: 1.4 to 12 mcg/mL)
    a. Carbamazepine-10,11-Epoxide: 0.21 mcg/mL in the blood (normal: 0.2 to 2.0 mcg/mL)

E. Contusion of the tongue

II. BILATERAL LUNG CONGESTION AND EDEMA
A. Combined lung weight, 1510 grams
B. Areas of alveolar hemorrhage
C. Respiratory bronchiolitis
1. History of smoking

III. CARDIOMEGALY, 520 GRAMS

IV. DIFFUSE THYROID GOITER, 80 GRAMS

V. HISTORY OF REMOTE GUNSHOT WOUND OF THE RIGHT UPPER ARM

VI. OBESITY, BODY MASS INDEX = 37.1

OPINION:

    Frank J. Smart, a 39 year old African-American male, died as a result of a seizure disorder. Physical restraint in a prone position contributed to his death.

MANNER OF DEATH:   Undetermined

_____

Todd Luckasevic, D.O., Associate Medical Examiner
alb

AC-10343

AUTOPSY REPORT

Case No.:   15COR00145

Page 3 of 12

NARRATIVE SUMMARY:

The autopsy was performed on January 05, 2015 at 10:35 A.M.

David Arboe, M.D., Fellow in Forensic Pathology and Todd Luckasevic, D.O., Associate Medical Examiner, Prosectors

Ammena Smith, Autopsy Room Technician

Endia Woods, Photographer

EXTERNAL EXAMINATION:

The body is that of a well-developed, well-nourished, obese African-American male, weighing 244 pounds, measuring 68 inches, and appearing to be consistent with the age of 39 years.

The body is unembalmed.

The body is clad in the following articles of wearing apparel:

1.  Red prison-issued shirt

2.  Red prison-issued pants

3.  White T-shirt

4.  White underwear soiled with urine and stool

5.  White socks

The clothing is intact and dry.

No jewelry, rings or watch are present on the body.

AC-10344

AUTOPSY REPORT

Case No.:   15COR00145

Page 4 of 12

The temperature of the body is cold to the touch. Rigor mortis is well developed and present to an equal extent in all joints. Pink, non-fixed, marked livor mortis is evident over the posterior parts of the body, except in areas exposed to pressure, where it is absent.

The skin is clean, dry and smooth.

The head is normocephalic.

The head and face exhibit no trauma. The head hair is black and of a short length. The eyes are brown with congested conjunctivae. The corneae and lenses are transparent. No petechial hemorrhages are noted in the conjunctivae. The pupils are regular, round, equal, central and measure 0.3 cm in diameter. The external ears and external auditory canals are unremarkable. The skeleton of the nose is intact, and no foreign material is present in the nostrils. No foreign material is present in the oral cavity. The gums are normal. The upper and lower teeth are natural and in a good state of dental repair. The lips and oral mucosa reveal no evidence of trauma. The tongue shows areas of hemorrhage. A black short mustache and beard are present.

The neck is symmetrical and unremarkable. No increased mobility on manipulation is detected.

The shoulders are symmetrical.

The chest is symmetrical and exhibits trauma which will be described below.

The abdomen is bulging and no masses can be palpated through the

AC-10345

AUTOPSY REPORT

Case No.:   15COR00145

Page 5 of 12

abdominal wall.

The back is symmetrical and unremarkable.

The external genitalia and the anus are unremarkable.  The testes are palpable in the scrotum.  No injuries of the upper thighs, perineum or anus are detected.  No foreign bodies or hemorrhages are noted in the anal canal.

The extremities are symmetrical and exhibit trauma which will be described below.  No broken or missing fingernails are noted.  No foreign debris under the fingernails is noted.  The fingernails are regular, dirty, short and unremarkable.  The toenails are clean, short and dystrophic.  Pitting edema is not present in the ankles or legs.  The soles of the feet are clean and unremarkable.

Manipulation of the neck, shoulders, elbows, wrists, fingers, hips, knees and ankles fails to elicit any bony crepitus or abnormal motion.

The body shows the following evidence of recent physical injury:

1.  Pink-purple contusion, left shoulder, 3.0 x 2.0 cm

2.  Red contusion, central chest, 5.0 x 3.0 cm

3.  Anterior fracture of the left 5th rib

4.  Brown contusion, right upper back, 1.6 x 1.5 cm

5.  Brown contusion, left upper arm, 1.5 x 1.0 cm

6.  Area of multiple red abrasions, left elbow, 1.0 x 0.5 cm

7.  Red contusion, left forearm, 1.5 x 1.0 cm

8.  Brown contusion, right forearm, 1.5 x 1.3 cm

AC-10346

AUTOPSY REPORT

Case No.:   15COR00145

Page 6 of 12

9.    Area of multiple red abrasions, right wrist, 2.0 x 0.5 cm

10.  Red abrasion, left knee, 0.3 x 0.3 cm

11.  Red abrasion, left knee, 0.5 x 0.4 cm

12.  Red contusion, left knee, 1.0 x 1.0 cm

13.  Red abrasion, right knee, 0.6 x 0.2 cm

14.  Brown contusion, right lower leg, 3.0 x 2.0 cm

Evidence of recent medical/surgical treatment:

1.    There is an endotracheal tube present, entering the oral cavity.

2.    There is an intraosseous catheter in the left lower leg.

3.    There are disposable defibrillator pads on the body.

4.    There is gauze over the eyes.

Other identifying features:

1.    Tattoo, left upper arm depicting  skulls and "Laugh now cry later"

2.    Tattoo, right upper arm depicting figures

3.    Tattoo, right forearm, depicting a bird and "D-Hawk Rest in peace"

4.    Scar, right upper arm, 1.5 x 0.3 cm

5.    Circular scar, left upper back, 1.0 x 0.3 cm

6.    Circular scar, left lower leg, 0.5 x 0.4 cm

7.    Scar, left ankle, 3.0 x 2.0 cm

An Allegheny County Medical Examiner's identification tag is present around the right wrist.

AC-10347

AUTOPSY REPORT

Case No.:  15COR00145

Page 7 of 12

A hospital identification tag is present around the left wrist.

A prison identification tag is present around the right wrist.

No fresh needle marks or punctiform scars are noted in either antecubital fossa, interphalangeal spaces of the hands or feet or under the tongue.

INTERNAL EXAMINATION:

BODY CAVITIES:

The body is opened by a "Y" shaped incision.  The abdominal fat pad is 5.1 cm thick at the umbilicus.  The muscles of the chest and abdominal wall are normal in color and consistency.  The ribs exhibit the trauma described above.  The sternum and spine exhibit no fractures.  The pleurae are smooth.  Each pleural cavity is moist.  The domes of the diaphragm are normally positioned.  The peritoneum is smooth and thin.  The peritoneal cavity is moist.  The liver and spleen do not extend below the costal margins.  The bladder lies below the symphysis pubis.  The organs of the pleural and peritoneal cavities are in their usual positions in situ.  The mesentery and omentum are unremarkable.  The pulmonary artery is opened in situ and no emboli are seen.

At this time representative samples of blood, bile and eye fluid are taken for toxicological examination.

CARDIOVASCULAR SYSTEM:

The heart weighs 520 grams.  The pericardium is thin, smooth and contains

AC-10348

AUTOPSY REPORT

10 cc of serous liquid.  The epicardial surface is smooth.  There is a moderate amount of epicardial fat.  The external configuration of the heart is unremarkable. The chambers of the heart are dilated.    The right and left ventricles are unremarkable.  The endocardium and valve leaflets are smooth, transparent and exhibit no thrombi, vegetations or fibrosis.  The circumference of the valves are as follows: tricuspid: 13.0 cm; pulmonic: 8.1 cm; mitral: 12.0 cm and aortic: 7.3 cm. The trabeculae carneae and papillary muscles are unremarkable.  The chordae tendineae are usual.  The right ventricle is 0.3 cm thick, and the left ventricle is 1.3 cm thick.  The septum is 1.5 cm thick.  The coronary arteries have their usual distribution with a right predominance.  The right and left coronary ostia are normal in patency.  On sectioning, the coronary arteries display no significant degree of atherosclerosis or other pathological abnormality.  The myocardium is of the usual consistency, red-brown and grossly homogeneous.

The aorta is lined by a smooth, tannish-yellow endothelium and shows fatty streaking.

The bifurcation of the iliacs is patent.

The venae cavae are unremarkable.

RESPIRATORY SYSTEM:

The right lung weighs 880 grams, and the left lung weighs 630 grams.  The tracheal mucosa is unremarkable.  The pleurae are smooth, delicate and glistening. The lungs are not distended and are variegated pink-gray to dark purple.  The lung

AC-10349

AUTOPSY REPORT

Case No.:   15COR00145

Page 9 of 12

parenchyma is of the usual consistency and mottled with a moderate amount of anthracotic pigment.  The lung tissue is moderately congested and edematous.  No purulent exudate is expressed from the parenchyma on compression.  No nodularity and no focal or diffuse lesions are seen.

The extra and intra-pulmonary bronchi are opened longitudinally are patent and unremarkable.  The pulmonary arteries and veins exhibit no pathological change.  The hilar and mediastinal lymph nodes are unremarkable.

HEPATOBILIARY SYSTEM:

The liver weighs 2560 grams.  The capsule of Glisson is transparent.  The external surface is smooth, glistening and brown.  The borders are blunted.  The parenchyma is soft, congested and brown with the usual lobular architecture and no focal or diffuse lesions.

The gallbladder has delicate walls, contains 5 cc of green thin bile and has a smooth mucosa.  No stones are present.

The intra and extra-hepatic biliary ducts are patent.  The hepatic and portal veins and the hepatic artery are unremarkable.

HEMOLYMPHATIC SYSTEM:

The spleen weighs 150 grams and is of the usual consistency.  The capsule is glistening, thin and intact.  The internal architecture is blurred due to congestion. The parenchyma is homogeneous.

There are no enlarged lymph nodes identified.

AC-10350

AUTOPSY REPORT

Case No.:  15COR00145

Page 10 of 12

## GASTROINTESTINAL SYSTEM:

The esophagus is empty and unremarkable.  The stomach is empty.  There are no drug-like residues, pills or capsules in the stomach.  The stomach mucosa is pale with the usual rugal folds.   The remainder of the gastrointestinal system is unremarkable.

The vermiform appendix is identified and contains no obstructions.

The retroperitoneum is unremarkable.

## PANCREAS:

The pancreas weighs 200 grams.   The parenchyma is tan-white and homogeneous.

## UROGENITAL SYSTEM:

The kidneys are in the usual position and without malformation.  The right kidney weighs 180 grams, and the left kidney weighs 190 grams.  The surfaces are slightly granular.  The capsules strip easily, revealing a red-brown surface.  The cortico-medullary junctions are well-defined.  The renal papillae have no hemorrhage or necrosis.  The calyceal and collecting systems are not remarkable.  The renal arteries and veins are unremarkable.

The ureters are not dilated or obstructed.

The bladder is empty.  The bladder exhibits the usual tannish-pink mucosa with no focal lesion.  The ureteral orifices are patent.

The prostate is not enlarged and does not impinge upon the urethra.  The

AUTOPSY REPORT

Case No.:   15COR00145

Page 11 of 12

tissue of the prostate is lobulated, tan and moderately firm.

ADRENALS:

Both adrenals are of the usual size and shape.  The cut surface shows a thin yellow cortex and brown-gray medulla.

MUSCULOSKELETAL SYSTEM:

There are no gross bony deformities.  The muscles are well-developed and of the usual color and consistency.   No fractures, dislocations, compressions or hemorrhages are noted upon examination of the spine.  The vertebral bodies are not remarkable.  No hemorrhages are noted in the paravertebral muscles.  The sternum, ribs and spine exhibit the usual bone density and marrow.

NECK:

The soft tissues of the neck, the thyroid and cricoid cartilages, larynx, and the hyoid bone show no hemorrhages or evidence of traumatic injury.  The thyroid gland weighs 80 grams.  The parenchyma is reddish-brown and homogeneous.   The laryngeal mucosa is smooth with no focal lesions.   There are no paratracheal hemorrhages or masses.  There is no food, vomitus or foreign material in the upper airway.   The epiglottis and vocal cords are unremarkable.   The neck has been examined at the conclusion of the autopsy, after the blood has drained and the tissues are dry.

CENTRAL NERVOUS SYSTEM:

The scalp is reflected from mastoid process to mastoid process, revealing no

AC-10352

AUTOPSY REPORT

Case No.:   15COR00145

Page 12 of 12

trauma.  The calvarium is intact and when removed, there is no evidence of epidural or subdural hemorrhages.  The dura mater is white, smooth and does not exhibit any stains or discolorations.  The leptomeninges are not remarkable.

The brain weighs 1400 grams and is of usual consistency.  The gyri occupy their usual position, and the sulci exhibit a normal depth.  The blood vessels at the base do not reveal any aneurysms or atherosclerosis.  The cerebral and cerebellar hemispheres are symmetrical.  The brain is saved for neuropathology consultation (See neuropathology report for full description).

The dura covering the vault and the base of the cranium is removed.

The basilar skull is intact.

The atlanto-occipital articulation is intact.  The odontoid process shows no fractures or dislocations.  The cervical spine appears to be intact.

<u>MICROSCOPIC EXAMINATION:</u>

The microscopic examination is consistent with the gross findings and the final pathological diagnoses.

AC-10353

RECEIVED
MAY 19 2015

KARL E. WILLIAMS, M.D., M.P.H., MEDICAL EXAMINER

# ALLEGHENY COUNTY OFFICE OF THE MEDICAL EXAMINER

## FORENSIC LABORATORY DIVISION

1520 Penn Avenue, Pittsburgh, PA 15222

| Laboratory Case | 15LAB00148 | Report # | 1 | Pathology Case No: | 15COR00145 | Date | March 02, 2015 |
|---|---|---|---|---|---|---|---|

**Deceased Name: Frank J. Smart**

| Autopsy Prosector: | Todd Luckasevic | Autopsy Technician: | A. Smith | Date of Autopsy: | 01/05/2015 |
|---|---|---|---|---|---|

## Specimen(s) Submitted:

| By: | Donald Kanai | | Received By: | Lona A. Daley |
|---|---|---|---|---|
| Date Submitted: | 01/06/2015 | | Time: | 8:39 am |

| Item | Qty | Type and Packaging | Notes |
|---|---|---|---|
| 1 | 1 | 0-10 mL Gray top tube evidence classified as Heart Blood | 6 mL |
| 2 | 1 | 0-10 mL Gray top tube evidence classified as Heart Blood | 6 mL |
| 3 | 1 | 0-10 mL Gray top tube evidence classified as Heart Blood | 7 mL |
| 4 | 1 | 0-10 mL Gray top tube evidence classified as Heart Blood | 8 mL |
| 5 | 1 | 0-10 mL Gray top tube evidence classified as Heart Blood | 8 mL |
| 6 | 1 | 0-10 mL Gray top tube evidence classified as Femoral Blood | 9 mL |
| 7 | 1 | 0-10 mL Gray top tube evidence classified as Femoral Blood | 8 mL |
| 8 | 1 | 0-10 mL Red top tube evidence classified as Eye Fluid | 1 mL |
| 9 | 1 | 0-10 mL Red top tube evidence classified as Bile | 4 mL |

## Report of Laboratory Findings:

### 1 - Heart Blood

#### ELISA

| | |
|---|---|
| Benzodiazepines | Not Detected |
| Cocaine metabolite | Not Detected |
| Opiates | Not Detected |
| Oxycodone | Not Detected |
| Fentanyl | Not Detected |

#### Colorimetry

| | |
|---|---|
| Salicylates | Not Detected |

### 2 - Heart Blood

#### GC/MS

| | |
|---|---|
| Carbamazepine | Positive |

### 6 - Femoral Blood

#### GC Headspace

| | |
|---|---|
| Whole Blood Alcohol | Not Detected |

#### HPLC

| | |
|---|---|
| Phenytoin | Not Detected |

### 7 - Femoral Blood

Report  Page 1 of 2

AC-10354

KARL E. WILLIAMS, M.D., M.P.H., MEDICAL EXAMINER

# ALLEGHENY COUNTY OFFICE OF THE MEDICAL EXAMINER
## FORENSIC LABORATORY DIVISION
### 1520 Penn Avenue, Pittsburgh, PA 15222

| Laboratory Case | 15LAB00146 | Report # | 1 | Pathology Case No: | 15COR00145 | Date | March 02, 2015 |
|---|---|---|---|---|---|---|---|

**Deceased Name: Frank J. Smart**

| Autopsy Prosector: | Todd Luckasevic | Autopsy Technician: | A. Smith | Date of Autopsy: | 01/05/2015 |
|---|---|---|---|---|---|

**7 - Femoral Blood**

| | |
|---|---|
| Carbamazepine | * Refer to report from NMS |
| Levetiracetam | * Refer to report from NMS |

**8 - Eye Fluid**

**GC Headspace**

| Alcohol | Not Detected |
|---|---|

_Katrina Lindauer_

Katrina M. Lindauer

Scientist

Report  Page 2 of 2

AC-10355

 **COUNTY OF**  **ALLEGHENY**

RICH FITZGERALD
COUNTY EXECUTIVE

# NEUROPATHOLOGY REPORT

**Case Number:** 15COR00145    **Name:** Frank J. Smart    **Date of Autopsy:** 01/05/2015

**Date of NP Dissection:** 01/15/2015    **Attending Pathologist:** Todd Luckasevic

## FINAL NEUROPATHOLOGIC DIAGNOSES

**1410 Gram Fixed Adult Brain and Dura –**
**REMOTE INFARCT, LEFT INFERIOR TEMPORAL LOBE (1.5 CM)**

## NEUROPATHOLOGY NOTE

This lesion may result in late-onset, post-ischemic infarct seizures; however, this cannot be known with certainty.

## GROSS DESCRIPTION

The specimen consists of a 1410 gram formalin-fixed brain and dura.

The brain shows overall symmetry, with normally formed gyral convolutions and no obvious cortical lesions; no hemorrhage, discoloration, softening, edema or other abnormalities are evident. The leptomeninges appear thin, delicate and transparent; no hemorrhage or thickening is seen. The cranial nerves appear unremarkable. The Circle of Willis and branching vessels show a normal distribution; no aneurysms, atherosclerosis or other abnormalities are seen. The cerebellum appears symmetric, with normal foliation and no apparent lesions. The midbrain, pons and medulla also appear of normal size and formation. Dura mater is thin, pliable and tan-white in color; no membranes, discolorations or adherent hemorrhages are seen.

Serial coronal sections of the hemispheres show a distinct, well-circumscribed, cavitary lesion in the inferior left temporal gyrus. The lesion shows slight tan discoloration with a slightly roughened wall. The overlying cortical ribbon is thin and shows brown discoloration. The remainder of the specimen shows a well-defined cortical ribbon with distinct grey-white demarcation. Superficial and deep white matter is of uniform consistency and color; no hemorrhages or other lesions are seen. The basal ganglia and thalami are symmetrically formed, although show poor-fixation artifact. Descending white matter tracts are symmetric and unremarkable. The ventricles are of normal size and symmetric in shape, and contain clear cerebrospinal fluid. The hippocampal formations appear normal. Sagittal sections of the cerebellar hemispheres show well-formed dentate nuclei and a normal pattern of foliation. Axial sections of the midbrain, pons and medulla also show no abnormalities.

## MICROSCOPIC DESCRIPTION

Microscopic findings are compatible with the gross impression and support the final diagnosis.

KARL WILLIAMS, MD, MPH, MEDICAL EXAMINER
**OFFICE OF THE MEDICAL EXAMINER**
1520 PENN AVENUE • PITTSBURGH, PA 15222
PHONE (412) 350-4800 • Fax (412) 350-4899
WWW.ALLEGHENYCOUNTY.US

AC-10356

# NEUROPATHOLOGY REPORT

Case No.:  15COR00145

Page 2 of 2

**Cassette List**

1  Mid-Frontal Cortex (left)
2  Cingulate, Corpus Callosum, Caudate (left)
3  Insular Cortex, Basal Ganglia (left)
4  Hippocampus (left)
5  Hippocampus (right)
6  Medulla
7  Midbrain
8  Pons
9  Left Inferior Temporal Lobe Lesion
10  Cerebellum (left)

**Kenneth Howard Clark, M.D.**
**Associate Medical Examiner, Neuropathologist**



**NMS Labs**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

## Toxicology Report

**Report Issued**    02/09/2015 07:02

To:  **10020**
Allegheny Coroner's Forensic Division Labs.
Attn: Robert Huston
1520 Penn Ave
Pittsburgh, PA  15222

| | |
|---|---|
| **Patient Name** | SMART, FRANK J. |
| **Patient ID** | 15LAB00146 |
| **Chain** | 11771542 |
| **Age** Not Given | **DOB** Not Given |
| **Gender** | Male |
| **Workorder** | 15032761 |

Page 1 of 2

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Carbamazepine-10,11-Epoxide | 0.21 | mcg/mL | 001 - Femoral Blood |
| Carbamazepine | 2.2 | mcg/mL | 001 - Femoral Blood |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 0970B | Carbamazepine and Metabolite, Blood |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Gray Top Tube | 10 mL | Not Given | Femoral Blood | |

All sample volumes/weights are approximations.
Specimens received on 02/04/2015.

v.14

AC-10358

 **NMS**

**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 15032761 |
| **Chain** | 11771542 |
| **Patient ID** | 15LAB00146 |

**Page 2 of 2**

**Detailed Findings:**

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Carbamazepine-10,11-Epoxide | 0.21 | mcg/mL | 0.20 | 001 - Femoral Blood | HPLC |
| Carbamazepine | 2.2 | mcg/mL | 0.20 | 001 - Femoral Blood | HPLC |

Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.

**Reference Comments:**

1.  Carbamazepine (Tegretol®) – Femoral Blood:

    Carbamazepine is a tricyclic anticonvulsant agent. It is also prescribed for the treatment of pain associated with trigeminal neuralgia. It is extensively metabolized to the active Carbamazepine-10,11-Epoxide as well as other metabolites. Dosage should be adjusted to meet individual requirements. Total dosage should generally not exceed 1.2 g daily.

    Following a chronic oral dose of 5-20 mg/Kg (mean, 12 mg/Kg), reported plasma concentrations averaged 6.4 mcg/mL (range, 1.4 to 12 mcg/mL) for carbamazepine and 1.1 mcg/mL (range, 0.2 - 2.0 mcg/mL) for the epoxide.

    Signs and symptoms associated with acute carbamazepine overdose include dizziness, stupor, disorientation, hypo- or hypertension and coma. In a series of non-fatal overdoses, peak plasma concentrations of the parent compound ranged from 12 - 77 mcg/mL whereas the levels of the epoxide ranged from 4 - 34 mcg/mL. In an individual who died after ingesting 50 g of carbamazepine, a plasma level of 120 mcg/mL was reported; cardiorespiratory arrest occurred about 14 hr after hospital admission at which point the carbamazepine plasma concentration was 90 mcg/mL.

2.  Carbamazepine-10,11-Epoxide (Carbamazepine Metabolite) – Femoral Blood:

    Carbamazepine-10,11-Epoxide has anticonvulsant activity similar to the parent drug. The expected range following chronic therapeutic doses (5.3 - 20 mg/kg) of Carbamazepine: 0.2 - 2.0 mcg Carbamazepine-10,11-Epoxide/mL.

Chain of custody documentation has been maintained for the analyses performed by NMS Labs.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded six (6) weeks from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

**Analysis Summary and Reporting Limits:**

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Acode 0970B - Carbamazepine and Metabolite, Blood - Femoral Blood

-Analysis by High Performance Liquid Chromatography (HPLC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Carbamazepine | 0.20 mcg/mL | Carbamazepine-10,11-Epoxide | 0.20 mcg/mL |

v.14

AC-10359

 **NMS**
LABS

**NMS Labs**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900   Fax (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

## Supplemental Report

| | | | |
|---|---|---|---|
| **Report Issued** | 02/20/2015 16:00 | **Patient Name** | SMART, FRANK J. |
| **Last Report Issued** | 02/09/2015 07:02 | **Patient ID** | 15LAB00146 |
| | | **Chain** | 11771542 |

**To:** 10020
Allegheny Coroner's Forensic Division Labs.
Attn: Robert Huston
1520 Penn Ave
Pittsburgh, PA  15222

**Age** Not Given  **DOB** Not Given
**Gender**  Male
**Workorder**  15032761

Page 1 of 3

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Carbamazepine-10,11-Epoxide | 0.21 | mcg/mL | 001 - Femoral Blood |
| Carbamazepine | 2.2 | mcg/mL | 001 - Femoral Blood |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 0970B | Carbamazepine and Metabolite, Blood |
| 2505B | Levetiracetam, Blood |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Gray Top Tube | 10 mL | Not Given | Femoral Blood | |

All sample volumes/weights are approximations.
Specimens received on 02/04/2015.

v.14

AC-10360



**NMS**
LABS

CONFIDENTIAL

| | |
|---|---|
| **Workorder** | 15032761 |
| **Chain** | 11771542 |
| **Patient ID** | 15LAB00146 |

Page 2 of 3

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Carbamazepine-10,11-Epoxide | 0.21 | mcg/mL | 0.20 | 001 - Femoral Blood | HPLC |
| Carbamazepine | 2.2 | mcg/mL | 0.20 | 001 - Femoral Blood | HPLC |

Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.

## Reference Comments:

1. Carbamazepine (Tegretol®) - Femoral Blood:

   Carbamazepine is a tricyclic anticonvulsant agent. It is also prescribed for the treatment of pain associated with trigeminal neuralgia. It is extensively metabolized to the active Carbamazepine-10,11-Epoxide as well as other metabolites. Dosage should be adjusted to meet individual requirements. Total dosage should generally not exceed 1.2 g daily.

   Following a chronic oral dose of 5-20 mg/Kg (mean, 12 mg/Kg), reported plasma concentrations averaged 5.4 mcg/mL (range, 1.4 to 12 mcg/mL) for carbamazepine and 1.1 mcg/mL (range, 0.2 - 2.0 mcg/mL) for the epoxide.

   Signs and symptoms associated with acute carbamazepine overdose include dizziness, stupor, disorientation, hypo- or hypertension and coma. In a series of non-fatal overdoses, peak plasma concentrations of the parent compound ranged from 12 - 77 mcg/mL whereas the levels of the epoxide ranged from 4 - 34 mcg/mL. In an individual who died after ingesting 50 g of carbamazepine, a plasma level of 120 mcg/mL was reported; cardiorespiratory arrest occurred about 14 hr after hospital admission at which point the carbamazepine plasma concentration was 90 mcg/mL.

2. Carbamazepine-10,11-Epoxide (Carbamazepine Metabolite) - Femoral Blood:

   Carbamazepine-10,11-Epoxide has anticonvulsant activity similar to the parent drug. The expected range following chronic therapeutic doses (5.3 - 20 mg/kg) of Carbamazepine: 0.2 - 2.0 mcg Carbamazepine-10,11-Epoxide/mL.

Chain of custody documentation has been maintained for the analyses performed by NMS Labs.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded six (6) weeks from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

## Analysis Summary and Reporting Limits:

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Acode 0970B - Carbamazepine and Metabolite, Blood - Femoral Blood

-Analysis by High Performance Liquid Chromatography (HPLC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Carbamazepine | 0.20 mcg/mL | Carbamazepine-10,11-Epoxide | 0.20 mcg/mL |

Acode 2605B - Levetiracetam, Blood - Femoral Blood

-Analysis by High Performance Liquid Chromatography (HPLC) for:

v. 14

AC-10361

 **NMS**

**CONFIDENTIAL**

| | |
|---|---|
| Workorder | 15032761 |
| Chain | 11771542 |
| Patient ID | 15LAB00146 |

Page 3 of 3

**Analysis Summary and Reporting Limits:**

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Levetiracetam | 2.0 mcg/mL | | |

v. 14

AC-10362

# Exhibit "16"

**Affidavit of John Dunn**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIARA SMART, Administratrix of the | ) | CIVIL DIVISION |
| Estate of FRANK J. SMART, JR., | ) | |
| Deceased, | ) | No. 2:15-cv-00953-CRE |
|          Plaintiff, | ) | |
|          v. | ) | |
| | ) | |
| ALLEGHENY COUNTY d/b/a | ) | |
| ALLEGHENY COUNTY JAIL, and | ) | |
| ORLANDO HARPER, | ) | |
| | ) | |
|          Defendants. | ) | |
| | ) | |

## <u>AFFIDAVIT OF JOHN DALE DUNN, M.D., J.D.</u>

I, JOHN DALE DUNN, M.D., J.D., being duly sworn according to law, do depose and say as follows:

1. I provide this affidavit in support of the plaintiff's claims against the Defendants. I am in good health and have no disabilities that would prevent my execution of this affidavit. My opinions are offered based on my review of the records, my education and experience as a physician that includes emergency medicine as my primary specialty, but corrections medicine as an activity I have engaged in for more than 20 of the last 25 years.

2. I am an emergency physician since 1974, board certified from 1985 until 2024, a family practitioner; board certified from 1976 to 1989 and still occasionally involved in family practice activities. I have been involved in patient safety and peer review consulting on matters of hospital care for many years since I completed my legal education. I was a member of the Medical, Pharmacy, and Nursing School Faculties at Creighton University for a period of years in the 1970s.

3. I am presently a member of the emergency medicine civilian contract faculty at Carl R Darnall Army Medical Center at Fort Hood, Texas, teaching emergency medicine and related subjects in a department that sees more than 60,000 visits per year and serves the community and the Army Post.

4. I am an inactive member of the Texas and Louisiana Bars. I am certified by the Texas Courts as a Mediator.

5. I have served as an outside peer reviewer and outside quality of care consultant

for Texas hospitals for 25 years.

6. I am also an experienced corrections physician for more than 20 years of the past 25 years, including stints as medical director for two prisons and a role as the Medical Officer for the Sheriff of the County of Brown for 19 years of the past 26, as a Medical Officer and Jail primary physician, serving 4 sheriffs.

7. I am familiar with policies and procedures as well as standards of professional conduct for corrections patient care matters for pharmacy and medical care providers as well as corrections officers and corrections facility administrators.

### **Materials reviewed**

8. I have reviewed the following records and exhibits to aid in rendering my expert opinion:

- Pleadings;
- Corizon Audit;
- Corizon follow-up Audit;
- Incident Report/Death Investigation Report;
- Autopsy and Toxicology Reports on Frank Smart;
- Deposition Transcripts;
- Basic Training Course of use of security restraints;
- First Aid Training for Corrections;
- Frank Smart Medical Records from Corizon;
- Photos of Frank Smart;
- Interview of Logan Berger;
- Frank Smart Autopsy/Toxicology;
- Staff Incident Report of Darlene A. Wichryk;
- Interview of Darlene Wichryk, RN;
- Staff Incident Report of Susan Laird;
- Interview of Alisia Hollingsworth;
- 2nd Interview of Alisia Hollingsworth;
- April 1, 2015 email regarding Hollingsworth recollection;
- 2008 Officer Policy Handbook;
- Basic Training Course on Advanced Defensive Tactics and Use of Force;
- AC Bureau of Corrections, Policy #16;
- AC Bureau of Corrections, Policy #20;
- Statement of Raymond Fleisner, CO;
- Interview with Ray Fleisner;
- Interview with Harry Mowry, Jr.;
- Ryan Gorman testing;
- Ryan Gorman Statement;

- Norman Martin testing;
- Norman Martin Statement;
- Michael Istik Statement;
- Michael Istik testing;
- Statement of David Foriska;
- Dayroom drawing by David Foriska;
- 1.4.15 David Holland Statement;
- 1.5.15 David Holland Statement;
- Jaison Brown Statement;
- Jaison Brown testing;
- John Mangis Statement;
- John Mangis Testing;
- Robert Dickson Testing;
- Robert Dickson Statement;
- Robert Bytner Statement;
- Rachel Alexander Phone Records;
- Michael Brown Statement; and
- Annual Security Training for Civilians;
- Allegheny County Controller's 2014 audit of the Corizon contract performance.

I believe I have adequate information to offer an opinion on whether the standards of professional conduct and medical care were met or violated and if those actions pertinent to the compliance with standards had an impact on the death of Mr. Smart.

### Review of the events

9.  On the evening of January 3, 2015, Frank J. Smart, Jr., age 39, was arrested and subsequently incarcerated at the Allegheny County Jail.  The next day, approximately 12 hours later, he was processed and booked and in the intake phase/medical screening Mr. Smart communicated that he had a major and frequently manifest seizure disorder and required two administrations of three separate medications daily.  The medications he discussed are included in the intake assessment form that was completed by Corizon nurse, Rae Ann Green.  During Ms. Green's deposition, she testified that a morning medication cart goes through the intake room around 8:00-9:00 a.m. and Mr. Smart missed the cart because he did not arrive until approximately 11:00 a.m.  Several nurses and the former Assistant Director of Nursing, Amie Shank, testified that there is no policy or procedure in place if an inmate misses a morning or evening medication pass.  Hence, no attempts were made to ensure that Mr. Smart received his morning dose of medication.

10. After being processed, Mr. Smart was taken to Cell Block 4A.  At some point, he was permitted to make a phone call to his girlfriend, Tiona Bennett.  According to

Ms. Bennett's statement, Mr. Smart indicated that the Defendants did not give him his anti-seizure medication. Ms. Bennett also stated that she contacted the jail to ensure he would receive his seizure medications. Despite Ms. Bennett's phone call to the jail, Mr. Smart still did not receive any medication throughout the day.

11. According to the medical records, Mr. Smart ultimately received one administration of his anti-seizure medications. However, this administration was inadequate in terms of the required daily dosage and Mr. Smart was already deficient in his proper dosing. The first dose appears to have been given on the evening medication pass between 6:00 p.m.-9:00 p.m. on the night of January 4, 2015. This dosage, if in fact given to Mr. Smart, was not ingested until approximately 24 hours into his incarceration. The post mortem drug levels on Mr. Smart show what I would expect, sub-therapeutic levels, confirming that he received, at best, and an inadequate dose of medication, too late into his incarceration. ***Significantly, if anti-seizure medications are interrupted for a person who is being maintained on such drugs, it increases the likelihood of a seizure due to the sudden decline in blood levels of medication.***

12. That evening, Mr. Smart suffered a violent, intense and prolonged grand mal seizure. When the seizure activity began a medical emergency was called over the intercom. Shift Commander/Captain Robert Bytner responded to the situation and made the decision to handcuff Mr. Smart. This decision was made with knowledge and clearance by former Corizon Employee, Logan Berger. In addition to this, Mr. Smart was then forcefully held down in a prone position, which, as discussed below, could be expected to result in catastrophic respiratory compromise for a person such as Mr. Smart, who was significantly overweight. Such compromise would have severe, potentially harmful or even fatal consequences for a man of Mr. Smart's body habitus.

13. In all, over 15 corrections officers, including two captains and a sergeant responded to the situation at different times. All of these jail employees were deposed and the collective substance of their testimony was that during the seizure event, Mr. Smart was handcuffed and shackled; forcefully held stomach down, in a prone position, while 4-5 varying corrections officers placed their weight on his body, and; that these actions lasted for 30 minutes or longer.

14. The jail has a stated security restraint policy that prohibits inmates from being placed on their stomach while their hands are cuffed behind their back. According to the policy, **"An inmate shall not be placed on his/her stomach while hands are cuffed behind his/her back. If an inmate is placed on his/her stomach while handcuffed behind the back, all attempts must be made to move the inmate from this position".** The officer(s) shall not apply weight or pressure to an inmate in this position". The policy goes on to describe the phenomena of "positional asphyxia" or "sudden death", which can occur when restraints are used in a prone position, causing an inmate to be unable to breathe.

15. Incredibly, the restraint policy *was never taught to any of the corrections officers or medical staff that were deposed in this case. In fact, Captain Jeffrey Kengerski and Sergeant Michael Brown, both of whom were employed in a supervisory role and responsible for training, testified that there were unaware of any such policy or the term positional asphyxia/sudden death. On the medical side, Amie Shank, as the assistant director of nursing for Defendant Corizon, indicated that the Defendants did not provide any training on this written policy.*

16. The joint failure on the part of the Defendants to adopt, teach and utilize the restraint policy caused Mr. Smart to be held down in a prone position for over 30 minutes. In my opinion, more likely than not, the restraint position used was a dangerous action and clearly a major factor in Mr. Smart's respiratory compromise that caused a cardiac arrest and death when combined with his seizure and the lorazepam used to interrupt the seizure, a respiratory depressant.

17. During the 30 minutes of being face down, Mr. Smart began experiencing symptoms of positional asphyxia. According to corrections officer Robert Dickson, he was yelling "help" Also, according to Captain Kengerski's testimony, Mr. Smart yelled over and over again in a gasping voice, "I can't breathe, I can't breathe". Kengerski further testified that he questioned Captain Bytner and the head nurse, Logan Berger whether something else could be done. Both Bytner and Berger told him that it was "fine" and "everything was under control."

18. Mr. Smart eventually and predictably stopped breathing and became unconscious and unresponsive, and a call to 911 was initiated. In the early hours of January 5, 2015, Mr. Smart was pronounced dead at UPMC Mercy Hospital. An autopsy/toxicology was performed thereafter. It was determined that Mr. Smart had an inadequate amount of anti-seizure medication in his system. The forensic examiner pathologist asserts in his autopsy report that Mr. Smart died as a result of a seizure disorder and the method of physical restraint in a prone position contributed to his death. I would emphasize that seizures are not fatal unless complicated by respiratory compromise or injuries.

19. I am also alarmed that there was conduct by jail staff and administration to attempt to mitigate the culpability that is described above after-the-fact. Evidence of this cover up effort is testimony from employees, and former employees, of both Defendants, regarding attempts to admonish personnel to avoid discovery of the conduct that was clearly negligent, including intimidating witnesses who saw and attempted to report concerns about the actions that contributed to Mr. Smart's death.

20. Corizon nurse, Alisha Hollingsworth, testified that she was told, by her superiors, to "keep her mouth shut" when she voiced concerns regarding the incident. Hollingsworth testified that she raised her concerns about how Mr. Smart was

treated because she was extraordinarily disturbed by what she saw – so much so that she "couldn't sleep at night."

21. Captain Kengerski also testified that he too raised concerns about the events and actions that led to Mr. Smart's death. He testified that he believes he was subsequently fired because he raised these concerns. Mr. Kengerski was also told, by his superiors, to "keep his mouth shut" about what he saw. He stated under oath that it was conveyed to him, "We don't want another situation where the Warden loses his job"… as it concerns what happened to Frank Smart.

22. Defendant Corizon has a history of providing substandard and grossly inadequate medical care to inmates whose medical needs it was contracted to meet.

23. The Allegheny County Office of Controller performed an audit of Corizon care prior to Mr. Smart's death and the aforementioned events. On December 3, 2014, the audit was specifically delivered to Defendant Warden Orlando Harper and the County with an attached letter warning of the Corizon deficiencies and non-compliance. *See Audit attached hereto and marked Exhibit "A".*

24. The Audit revealed numerous deficiencies in the care being provided by Corizon at the Allegheny County Jail. These deficiencies mimic the incident that occurred in this case. Specifically, the audit noted, among other failures, that:

- Corizon did not maintain the required staffing levels;
- Corizon did not comply with reporting requirements;
- Corizon did not keep accurate inmate records;
- Corizon did not conduct intake health assessments; and,
- Corizon failed to provide adequate clinical care.

25. Despite having notice of the Corizon deficiencies, the Defendants did nothing to remedy the problems and, shortly thereafter, the events occurred that led to Mr. Smart's death.

26. In addition to Defendants' failure to ensure Mr. Smart received his medication, they also failed to ensure his safety during seizure activity. In this respect, there is no acceptable circumstance where correction personnel or medical personnel can keep an inmate in a prone position during restraint because it causes compromise of respirations. As stated, for over 30 minutes, Mr. Smart was in the prone position. Moreover, he indicated, as noted by the testimony of jail and medical personnel that he was in distress, stating, "I can't breathe" numerous times. Simply put, Mr. Smart's respiratory failure could have been anticipated and prevented if the Defendants had properly positioned Mr. Smart. Clearly, their actions contributed to his death, as the autopsy indicates that a contributing factor of Mr. Smart's death was due to being held in a prone position.

## Standard of Care

27. It is my opinion that the Defendants had in place inadequate and deficient customs, policies and procedures that led directly to the demise of Frank Smart— all of which represent a clear breach of the applicable standard of care applicable to those charged with assuring that the medical needs of an inmate such as Mr. Smart were met. These deficiencies are as follows:

   - No practice/policy to ensure that immediate anticonvulsant therapy be maintained **upon incarceration**;
   - No practice/policy that ensured that life sustaining anti-seizure, maintenance drugs be stored and maintained on site, or urgently available from local sources at all times;
   - No policy/ procedure to ensure that if an inmate misses a dose of a maintenance drug (as was the case here with failure to administer the needed medication to Mr. Smart) that it be immediately administered and loading dose be provided, if warranted;
   - Failing to instruct, train and/or implement to its own staff measures that would ensure that an inmate who is undergoing or who has suffered a seizure, is appropriately managed....this includes the very significant failure train and follow the stated written (though unfollowed) policy of the jail that an inmate not be placed on his/her stomach while hands are cuffed behind his/her back. If an inmate is placed on his/hers stomach while handcuffed behind the back, all attempts must be made to move the inmate from this position. The officers ("shall not apply weight or pressure to an inmate in this position");
   - Failing to instruct, train and/or implement regarding the policy of "positional asphyxia" or "sudden death", which can occur when restrains are used in a prone position, causing an inmate to be unable to breath;
   - No practice/policy to ensure and require that an inmates prior medical records be accessed at the time of intake, medical screening process and when it is made known that an inmate may have a medical need, including be not limited to the need for medication;
   - Failure to appropriately respond to the repeated stated and verbalized pronouncement by Mr. Smart that he "could not breath";
   - Having in place a policy or custom that sought to cover up, suppress information relating to this incident.
   - Despite having notice, failing to cure the deficiencies contained in the Audit.

## Opinion and Discussion

28. My opinion is that standards of proper procedure and medical management to prevent seizures by maintaining proper levels of anti-seizure medications were violated. The policies that didn't allow for immediate loading doses of seizure medications and depended on an overnight delivery of medications were inappropriate and bound to create a risk for seizures.

29. There were low levels and no levels determined at autopsy of the seizure medications that Mr. Smart was supposed to receive and that there was inadequate and negligent effort to provide him with a loading dose and appropriate continuing doses of medications. For example phenytoin (Dilantin) and carbamazepine (Tegretol) are 24 hour drugs and if a person is behind they need to receive a day's dose to keep up.

30. Mr. Smart had previously been an inmate and was known to have seizures. It is clear that he was on more than one medication and that he didn't receive loading doses and even some routine doses. Lack of seizure medications clearly puts an inmate at risk for a seizure, and Mr. Smart did have a *grand mal* seizure, which occurred in the first 24 hours of his incarceration, when he had not received his normal daily seizure medications on schedule, and the seizure started the sequence that eventually resulted in Mr. Smart's death.

31. So, as might be expected, Mr. Smart had a generalized seizure and had a violent post ictal (post seizure) state, requiring immediate attention and resulting in continued inappropriate restraint. Lorazepam (Ativan), a standard treatment for emergency termination of seizures was administered to prevent further seizures and it may have been indicated for an ongoing seizure, that is clear; however lorazepam is a sedating drug and depresses respirations, and certainly could have contributed to the respiratory arrest and cardiac arrest scenario.

32. During his violent post ictal period Mr. Smart was restrained in the prone position, a bad choice, all medical personnel are familiar with the recovery position, which is what should have been used. It is a side recumbent position to maximize respirations and avoid problems with air way secretions interfering with breathing. It was during the period of time when the recovery position should have been used during the post ictal period, that Mr. Smart became unresponsive and subsequently died of respiratory compromise and inevitable cardiac arrest and death.

33. Seizures can be harmful, even fatal if they are complicated by such things as respiratory compromise, and prevention of seizures is necessary for victims of a seizure disorder to prevent harm. Corrections facilities have a clear obligation to assure continued administration of seizure medications without interruption. Abrupt interruption of seizure medications increases the risk of seizures. In light of that standard there is a need to have same day seizure medication access with either house stocks or immediate access to pharmacy stores.

34. A jail administration and medical care personnel cannot and should not assume that inmates will arrive with their medications and so immediate access to proper seizure meds is essential and the only standard of care acceptable.

35. Initial restraint in the prone position is acceptable for initial safety with a violent

subject, and for safe application of handcuffs, but then the restraint must be tempered and modified by consideration of the circumstances, the body habitus and condition of the patient. Post ictal patients have impaired airway reflexes, aggravated sometimes by the medications administered to stop the seizure, so careful protection of the airway and respirations is the standard of care for the responders. While the prone position is accepted for application of handcuffs, there is no acceptable circumstance where corrections personnel or medical personnel can accept the prone position for continued restraint, since it causes compromise of respirations and is much less satisfactory than other positions, for example the recovery position, which places the subject in a lateral recumbent position.

36. When Mr. Smart's seizure occurred, jail staff, corrections and medical personnel, violated basic standards of care by the continued use of the prone position, and apparently some additional physical restraint, actions that were likely to cause respiratory compromise in a man with decreased level of alertness, and so the problems were exacerbated by the staff, who willfully ignored Mr. Smart's complaint that he could not breathe. Mr. Smart's complaint is not surprising, considering his body habitus and the fact that he was restrained prone with multiple personnel holding him down. His respiratory failure could have been anticipated and prevented by proper positioning in a recovery position (well-known medical and nursing positioning) and less forceful and restrictive restraint procedures.

37. Mr. Smart was morbidly obese, which creates a respiratory (breathing) restriction in any circumstance, so a restraint position that aggravates that respiratory compromise from obesity must be avoided. The patient must also be observed closely to avoid respiratory compromise. Respiratory compromise causes death from cardiac arrhythmia or central nervous system lack of oxygen with cardiac arrest or respiratory arrest as a consequence.

38. I understand that immediate access to seizure medications was compromised by the distance from the pharmacy resources, in another state. Therefore failure to keep stocks locally was a basic failure to meet the standard of care. That was aggravated by a system of administration that apparently resulted in the lack of seizure medications for Mr. Smart not coming to the attention of someone who could provide an intervention. The drug call approach was inadequate to deal with an inmate who was without his meds. Therefore it is my observation that the Defendants failed their basic duty to provide an inmate with an important medication to prevent harm.

39. The forensic autopsy report showed that Mr. Smart did not have significant cardiac disease, so an intervening cardiac arrhythmia from cardiac ischemic heart disease was not the cause of his death. As asserted by the Medical Examiner, his death was due to respiratory compromise from the form of restraint, combined with his body habitus and his compromised post seizure state resulting in hypoxia

(low blood oxygen) that caused brain or cardiac complications.

40. I would point out that the Medical Examiner/Pathologist in charge of the Forensic Autopsy said that death was the result of seizure and the prone restraint position, and I accept that conclusion as the most likely and reasonable cause of death, and I am compelled to agree with it, based on my knowledge, education and experience as an emergency physician.

41. Finally, it is my opinion that the policy deficiencies administrative failings, and negligent personnel actions related to treatment and restraints as set forth above were evidence of negligent and inadequate care rendered to Mr. Smart and caused him to die from what would otherwise have been a non-fatal medical event.

42. As mentioned, I reviewed the audit by the Allegheny County Controller from December 14, 2014 a year before this event that indicated that the provider group Corizon was found to have failed contract obligations. The report found many failures of Corizon, the contractor, to comply with contract obligations but I emphasize that the deficiency 7 on Pharmacy practices includes obligations I have described above in my opinion about the importance of providing timely medications for conditions that are sensitive to timeliness, like seizures.

43. County Jail officials had an obligation to correct the deficiencies of the audit, before the events that resulted in Mr. Smart's death because every time a person requiring timely medications is denied that patient is at risk for complications. In the case of seizure patients the risk is extreme because a sudden interruption in their medications increases their risk of a seizure.

44. Timely provision of medications deemed essential would have been the reasonable County official corrective action for delayed administration of essential medications, and would have resulted in immediate availability of seizure medications and prevented the problem of Mr. Smart's seizure that resulted in the cascade of problems that eventually resulted in his death. Immediate corrective action on the simple problem of making sure seizure medications were administered in appropriate doses to any patient with a seizure disorder could have, and should have been corrected by County Jail Officials as soon as possible after the receipt of the report of December 15, 2014.

45. The training of personnel in restraint of individuals that are violent is the responsibility of the county and there was a clear failure to train personnel to avoid prolonged prone restraints, particularly of a person with the wrong body habitus, obesity being the main concern, because the prone restraint could produce a restriction of breathing. That responsibility was jail official's and neglect of that responsibility is the clear and singular responsibility of Jail Officials and is clear from the record and was instrumental in the demise of Mr. Smart as clearly declared by the autopsy report of the forensic pathologist.

46. Finally, it is my opinion that the policy deficiencies, as set forth above were directly related to the inadequate care rendered to Mr. Smart and directly resulted in his death.

47. The above statements, contained in this affidavit, are within my knowledge and expertise, and they are stated based on my reasonable medical certainty that they are true and correct.

Further affiant sayeth not.

_____2/3/17_____
Date

_____
John Dale Dunn, M.D., J.D.

Sworn to and subscribed
before me this 3rd day
of February , 2017.


Notary Public

AMANDA YONNIE
Notary Public, State of Texas
Comm. Expires 12-09-2018
Notary ID 130048107

11

# Exhibit "17"

**Excerpts from Robert Bytner Deposition**

Case 2:15-cv-00953-DSC   Document 51-3   Filed 02/13/17   Page 47 of 68
Confidential Deposition of Robert F   er
Conducted on March 3, 2016

10 (Pages 37 to 40)

Page 37

1     A   It's a walkie-talkie basically.
2     Q   Okay.  And then what did you do?
3     A   I waited for the elevator to come and get me.
4     Q   And where did you go?
5     A   I went to level 4.  Then to pod 4A, which is
6   the pod that Mr. Smart was housed on.
7     Q   And when you arrived there, did you talk to
8   anybody?
9     A   I talked to an officer that was supervising
10   that pod, and I tried to gather information from him
11   pertaining to what the medical emergency was.
12     Q   And who was the officer that you spoke to?
13     A   I believe it's Officer Fleisner.
14     Q   What information did he give you?
15     A   He told me that during the rounds of
16   observation that he -- first it was an inmate worker,
17   but then he observed that the inmate was on the ground
18   in the cell.
19     Q   Okay.  Did he say anything about the inmate
20   snoring?
21     A   Yes, I believe something that he was making
22   some noise.
23     Q   Right, and that was an observation that both
24   Officer Fleisner and this trustee inmate observed; is
25   that correct?

Page 38

1     A   I believe so.
2     Q   All right.  Did he say anything else at that
3   time?
4     A   Not that I recall.  I believe at that point I
5   went over to the cell and looked into the cell.
6     Q   Was there anybody else besides Officer Fleisner
7   at that time, around the cell?
8     A   Around the cell, no.
9     Q   What about the trustee inmate, was he around?
10     A   Neither one was by the cell.  I believe the
11   trustee was out in our, what we consider our day room
12   area.  That's the general area outside of the cell.
13     Q   Did you talk to him at all?
14     A   I don't recall, I believe I talked mainly to
15   Officer Fleisner.
16     Q   When you went to the cell, and it's cell, I
17   think, 123?
18     A   121.
19     Q   121, excuse me, what did you observe?
20     A   I turned on the light, and I observed the
21   inmate lying by his bunk on the floor.
22     Q   Was anybody else in the cell?
23     A   No.
24     Q   What, if anything, did you do at that point?
25     A   I asked the officer to basically hit the door,

Page 39

1   it's a button that would allow the door to be open
2   through our control panel.  I walked into the cell, I
3   tried to have communication with the inmate.  I noticed
4   physically that he had blood and saliva coming from his
5   mouth and that he also had soiled himself.
6     Q   When you tried to have communication with him,
7   what did you do?  I mean, I think I have an idea, but
8   did you say anything to him, did you shake him, did you
9   say --
10     A   Basically, we don't go up and just shake an
11   inmate for security reasons because we don't know if
12   that inmate is trying to play a game and can attack
13   you.  So I verbally tried to communicate with him.
14     Q   Did you get any response from him?
15     A   No.
16     Q   Did you take any photographs at that time?
17     A   Yes, I did.
18     Q   Around the time period that we're talking
19   about?
20     A   Yes.
21     Q   I'm going to show you what we previously marked
22   as Exhibit 4, and ask if you can identify those four
23   photographs.
24     A   (Witness reviewing exhibits.)
25       The first two pictures --

Page 40

1     Q   Yes.
2     A   -- were taken by me when I first came into the
3   cell after I communicated verbally with Mr. Smart.  The
4   last two pictures were on elevator one after he was
5   given medical treatment and as he was being taken down
6   from level 4 to the intake area to be taken out to the
7   outside hospital.
8     Q   Thank you.
9       Why did you take the first two photographs?
10     A   We started carrying around cameras and videos.
11   Videorecorders, in case different instances took place
12   so that we could have visible pictures of it.  And I
13   thought that under the circumstances that it was wise
14   to take pictures.
15     Q   Okay.  And just for purposes of identification,
16   these are stapled in order, so when we're talking about
17   the first two photographs, those are stamped AC-11688
18   and AC-11689.  And those are the two that the witness
19   testified he took first.
20       And then the other two are stamped AC-11690
21   and AC-11691.  And those are the two photographs that
22   the witness indicated that he took on the elevator.
23       Am I saying that correctly?
24     A   Yes.
25     Q   The first two photos that you took, is that

# Exhibit "18"

# Investigative Report Interview with Alisia Hollingsworth

# INVESTIGATIVE REPORT

|  |  |
| --- | --- |
| **DATE** | **: MARCH 31, 2015** |
| **J#** | **: 056-15** |

**INVESTIGATOR**   : INSPECTOR WILLIAM J. PALMER

**CASE**            : INMATE DEATH- FRANK SMART #51831

**IN REF TO**       : INTERVIEW OF NURSE ALISIA HOLLINGSWORTH

**SUMMARY**        :

On Saturday, March 28th, 2015, Corizon Attorney Katie Kenyon was interviewing nurses about an investigation into Physician's Assistant David Druski. During the interview of Registered Nurse Alisia J. Hollingsworth, Hollingsworth brought up the death of Inmate Frank Smart. Hollingsworth reported seeing Captain Robert Bytner performing a choke hold on Smart during the medical emergency. Hollingsworth was bothered by Bytner's actions that day, and was now reporting it. Attorney Kenyon notified the Assistant Director of Nursing Leslie Travis. Travis reported this to me and to the warden.

On March 31, 2015 at 10:00 a.m., I had the opportunity to interview Nurse Alisia Hollingsworth. The interview was conducted in the Internal Affairs Office at the jail. As to the Frank Smart medical emergency, Hollingsworth stated the following:

Hollingsworth was working in the Infirmary as an LPN. She was there with Logan Berger the R.N. of the infirmary. Logan was busy with a patient with chest pain at the time of the Smart emergency, so Hollingsworth responded by herself at first. When she arrived, Smart was alive but incoherent. She took his blood pressure, and recognized that Smart was in a postictal state. Because of his state, Smart was flailing around. Hollingsworth believed that Smart had already been put in handcuffs. Hollingsworth knew Smart needed Ativan, but there was none on her cart. Hollingsworth then responded to the infirmary to get the Ativan. When she returned, it was decided the medical team needed a glucometer. Hollingsworth responded to the Intake area to retrieve a glucometer. When she returned to Smart's cell, Hollingsworth saw Nurse Logan Berger standing in the back corner of the cell. Four or five correctional officers were lying on top of Smart. The officers were lying perpendicularly to Smart's body. Captain (Robert) Bytner was down on his knees holding Frank Smart in a headlock. Hollingsworth described Bytner holding Smart around the neck, which Hollingsworth could see, was choking Smart. The inmate was struggling to breathe. Hollingsworth observed that Captain Bytner was red of face and sweating. Hollingsworth dropped off the glucometer and was told by Nurse Berger to respond back to the infirmary to be prepared to call for permission to give a second dose of Ativan. Hollingsworth did respond back to the infirmary. There, she called Rachel, who was the person to authorize a second shot of Ativan. Rachel did authorize a second dose. Rachel added to call 911 to have this patient sent to an outside hospital. Hollingsworth did call 911. Hollingsworth then

AC-10205

# Exhibit "19"

# Complaint

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYVLANIA

| | |
|---|---|
| TIARA SMART, Administratrix of the Estate of FRANK J. SMART, JR., Deceased, | CIVIL DIVISION |
| | |
|               Plaintiff, | Case No. |
| | |
| | Code: |
|         v. | |
| | |
| CORIZON, INC.; CORIZON HEALTH, INC.; ALLEGHENY COUNTY d/b/a ALLEGHENY COUNTY JAIL; and ORLANDO HARPER, | **COMPLAINT** |
| | |
| | Filed on behalf of: Plaintiff |
|           Defendants. | |
| | Counsel of record for this party: |
| | |
| | George M. Kontos, Esquire |
| | Pa. I.D. #62712 |
| | gkontos@kontosmengine.com |
| | |
| | Katie A. Killion, Esquire |
| | Pa. I.D. # 205203 |
| | kkillion@kontosmengine.com |
| | |
| | KONTOS MENGINE LAW GROUP |
| | 603 Stanwix Street, |
| | Two Gateway Center, Suite 1228 |
| | Pittsburgh, PA 15222 |
| | |
| | (412) 709-6162 |
| | |
| | **JURY TRIAL DEMANDED** |

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYVLANIA**

TIARA SMART, Administratrix of the Estate of FRANK J. SMART, JR., Deceased,

     Plaintiff,

  v.

CORIZON, INC.; CORIZON HEALTH, INC.; ALLEGHENY COUNTY d/b/a ALLEGHENY COUNTY JAIL; and ORLANDO HARPER,

    Defendants.

CIVIL DIVISION

Case No.

### NOTICE TO DEFEND

  You have been sued in court. If you wish to defend the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claims in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

  YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR PHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.
  THEIR OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. IF YOU CANNOT AFFORD TO HIRE A LAWYER, THER OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEAL SERVICE TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

ALLEGHENY COUNTY LAWYER REFERRAL SERVICE
The Allegheny County Bar Association
11th Floor Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 261-5555

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYVLANIA

TIARA SMART, Administratrix of the Estate
of FRANK J. SMART, JR., Deceased,

                    Plaintiff,

           v.

CORIZON, INC; CORIZON HEALTH, INC.;
ALLEGHENY    COUNTY    d/b/a
ALLEGHENY   COUNTY   JAIL;  and
ORLANDO HARPER,

                Defendants.

CIVIL DIVISION

Case No.

### COMPLAINT IN CIVIL ACTION

AND NOW comes the Plaintiff, TIARA SMART, Administratrix of the Estate of FRANK

J. SMART, JR., deceased, by and through her attorneys, George M. Kontos, Esquire, Katie A.

Killion, and KONTOS MENGINE LAW GROUP, and files the following Complaint in Civil

Action:

    1.     Plaintiff, Tiara Smart, is an adult individual who has been appointed Administratrix

of the Estate of Frank J. Smart, Jr. (hereinafter sometimes referred to as "Mr. Smart"), deceased, by

the Register of Wills of Allegheny County, Pennsylvania. She has an address at 912 Memory

Lane, Pittsburgh, PA 15219.

    2.     Plaintiff's decedent, Frank J. Smart, Jr., was born on August 5, 1975 and died on

January 4, 2015.

    3.     Defendant Corizon Health, Inc. is a Delaware corporation or other business entity

with a principal place of business located at 105 Westpark Drive, Suite 200, Brentwood, Tennessee

37027.

4.     Defendant Corizon, Inc. is a Missouri corporation or other business entity with a principal place of business located at 105 Westpark Drive, Suite 200, Brentwood, Tennessee 37027.

5.     Defendants Corizon, Inc. and Corizon Health, Inc. (hereinafter collectively referred to as "Corizon") are engaged in the business of providing health care and services on a contract basis to Allegheny County and Allegheny County Jail, and at all relevant times hereto did in fact provide such health care services to inmates/detainees at said Jail.

6.     Defendant, Allegheny County, is a municipality and exists pursuant to the laws of the Commonwealth of Pennsylvania.

7.     At all times relevant, Defendant Corizon was doing business, including contracting for the provision of health services and providing health services to inmates of Allegheny County Jail, as agent of the County of Allegheny in Allegheny County, Pennsylvania, which services were wholly or partially paid for by the County of Allegheny.

8.     At all relevant times hereto, and upon information and belief, Plaintiff avers that defendant Orlando Harper was an agent of the County acting in the course and scope of his employment and engaged in the performance of his duties as the Warden for the Allegheny County Jail.

9.     Upon information and belief, the County of Allegheny owned, possessed, was in control of, and/or was responsible for the operation of the Allegheny County Jail.

10.    The right to bring these actions is conferred upon the Plaintiff by virtue of the operation of the following laws:

    (a)    Provisions of the Wrongful Death Act, 42 Pa. C.S.A. §8301, and
           amendments thereto;

4

    (b)    Provisions of the Survival Act, 42 Pa. C.S.A. §8302, and amendments thereto; and,

    (c)    All other applicable Wrongful Death Acts, Survival Acts, Fiduciary Acts, Statutes and Pennsylvania Rules of Civil Procedure.

11.    This action is brought to recover damages for and on behalf of:

    (a)    Kayona Smart, Daughter;

    (b)    Paris Smart, Daughter;

    (c)    Shatera Smart, Daughter (minor);

    (d)    Frank J. Smart, III, Son (minor);

    (e)    Saniya Smart, Daughter (minor);

    (f)    Kamiya Smart, Daughter (minor);

    (g)    Aljaire Smart, Son (minor); and

    (h)    Kyah Dillard, Daughter (minor).

12.    Plaintiff's decedent did not previously bring an action against the Defendants for damages during his life for the injuries which ultimately resulted in his death.

13.    No other actions for wrongful death of Plaintiff's decedent or for damages for the injuries causing Plaintiff's decedent's death have been commenced against Defendants other than this action.

14.    At all relevant times hereto, the Defendants acted through their agents and employees acting within the course and scope of their agency and/or employment.

15.    On or about January 4, 2015, Frank J. Smart, Jr. was arrested and subsequently incarcerated at the Allegheny County Jail.

16.    Frank Smart, Jr. suffered from chronic epileptic seizures for which he took anti-seizure medication approximately twice daily.   This condition was severe enough to be

5

potentially fatal to Mr. Smart.

17.     During a previous incarceration, a medical/intake screening was performed by the Jail. During his previous incarceration, he had received the necessary anti-seizure medication from the jail's medical service provider. As such, Defendants had actual notice as to Mr. Smart's life-threatening condition, as such information would have existed within the Jail's own records.

18.     At the beginning of Mr. Smart's January 4th incarceration, Mr. Smart informed the prison staff that he was in need of medication or else he might suffer a severe grand mal seizure.

19.     The prison staff also has actual notice that if Frank Smart, Jr. suffered a seizure while being physically restrained, he would suffer severe and permanent injuries.

20      Despite the fact that Frank Smart relayed information about his seizure and the need for anti-seizure medication to Corizon and Jail staff, his prior medical records (which were in the possession of both Allegheny County and Corizon) were not accessed, nor was he prescribed anti-seizure medication.

21.     Sometime during the early hours of January 5, 2015, less than a day after being incarcerated, Frank Smart, Jr. suffered a violent grand mal seizure.

22.     During the time that he suffered the seizure, Frank Smart, Jr. was physical restrained in handcuffs and feet shackles.

23.     The severity of the seizure and the physical restraint during the seizure caused Frank Smart, Jr. to suffer catastrophic injuries, for which he was transported to UPMC Mercy Hospital.

24.     Around 12:20 a.m. on January 5, 2015, Mr. Smart was pronounced dead at UPMC Mercy Hospital.

25.     Between his time of incarceration and the fatal seizure on the January 5th, Mr.

6

Smart and others, on his behalf, repeatedly requested that he be given access to his anti-seizure medication, but all of their requests were ignored.

26.     Upon information and belief, the policy of the Jail and/or Corizon in actual existence at the time of Mr. Smart's incarceration was such that an inmate's prior medical history or record was not timely accessed or reviewed during the intake/screening process – or in a timely fashion thereafter – even with inmates who had indicated and/or evidenced serious medical conditions, such as Mr. Smart.

27.     Despite the fact that the Jail and Corizon had prior knowledge, stemming from the previous incarceration, of the fact that Mr. Smart suffered from a serious medical condition which required medication, absolutely no provision was made by Defendants, or any agent or employee thereof, to provide for Mr. Smart's medical needs, including but not limited to the accessing or reviewing of his prior medical history, accessing or reviewing of Mr. Smart's health records from his previous incarceration, or the ordering of testing to determine whether Mr. Smart was in need of medical care relating to his condition, including prescription/administration of anti-seizure medications.

28.     At all relevant times, Corizon had a history of providing substandard and grossly inadequate medical care to inmates whose medical needs it was contracted to meet.

29.     This history is detailed in excerpts from the "Examination report on Corizon Health Inc.'s compliance with contract #153946 with Allegheny County for the period September 1, 2013 through February 28, 2014" (hereinafter referred to as "the Audit," see attached hereto as Exhibit "A").

30.     The Audit revealed numerous deficiencies in the care being provided by Corizon at the Allegheny County Jail. Such deficiencies include, but are not limited to:

    A.     Not maintaining the required staffing levels;

7

B.     Not complying with reporting requirements necessary for the Allegheny County Jail to be accredited by the "National Commission on Correctional Health Care";

C.     Not maintaining complete and accurate inmate medical records, including not implementing the required electronic medical records;

D.     Not conducting intake health assessments for newly-admitted jail inmates;

E.     Not providing inmates with required clinical care;

F.     Not complying with pharmacy management requirements;

G.     Not ensuring the readiness of emergency equipment and supplies;

H.     Not performing the necessary pre-placement health assessments and medical and mental health rounds for inmates in segregation;

I.     Not utilizing the appropriate triage process to prioritize inmate sick call requests;

J.     Not responding to inmate medical grievances in a timely manner; and

K.     Engaging in unfair labor practices.

31.     This recent history reflects systematic violations of inmates' Constitutional rights committed by Corizon, particularly violations of the Fourth, Eighth, and Fourteenth Amendments as further laid out below.

## COUNT I – 42 U.S.C. § 1983

### Tiara Smart, Administratrix of the Estate of Frank J. Smart
#### v.
### Corizon, Inc. and Corizon Health, Inc.

32.     Plaintiff incorporates by reference all proceeding paragraphs as though the same were more fully set forth at length herein.

33.     Having taken Mr. Smart into custody, the Defendant, acting under color of law, entered into a special relationship with him, which imposed affirmative duties of care and protection of Mr. Smart and obligated Defendant not to cause injury or harm while he was in the custody and control of the Defendant.

8

34.   It was the duty of this Defendant, while Mr. Smart was within the care and custody of the County, to provide for his safety and general well-being.

35.   Mr. Smart suffered injuries and damages, as more fully stated below, as a result of defective policies, procedures, practices, customs, directives and/or administrative procedures (hereinafter referred to as "policies") of this Defendant, as follows:

A.   A policy of permitting, encouraging or condoning the inadequate supervision of inmates with serious medical problems such as Frank Smart, Jr. as set forth above;

B.   A policy of failing to require a timely and proper medical examination or care be given to an inmate when an inmate states that they have suffered a serious medical event such as a seizure;

C.   A policy of failing to ensure necessary medications are accessible and given to inmates in a timely fashion.

D.   A policy of failing to ensure procedures are in place to acquire medications immediately in an emergency situation.

E.   A policy of failing to adequately train its agents/employees to detect and properly address medical needs of inmates;

F.   A policy of failing to supervise its agents/employees pertaining to the securing of medical care of inmates;

G.   A policy of failing to require that an inmate's prior medical record be accessed at the time of intake, medical screening process, or when it is made known that an inmate may have an unmet medical need, including but not limited to a need for medication;

H.   A policy of failing to require that inmates receive medical care from competent medical professionals;

I.   A policy of failing to provided adequate training to its agents/employees concerning the proper treatment of inmates with medical emergencies;

J.   A policy of failing to provide an unrestrained safe environment for inmates who suffer seizures while in the jail and/or infirmary.

K.   A policy of failing to be adequately staffed with the sufficient number competent medical professionals, including doctors, to adequately meet and treat inmates' medical needs; and

9

L.      Other defective policies concerning the detention of inmates, which may be
        determined in discovery.

36.     The Defendant's conduct stated above evidences reckless and/or deliberate
indifference to the safety, health and constitutional rights of Plaintiff's decedent in the following
particulars:

A.      Its failure to adequately train, supervise and/or monitor agents and/or
        employees as set forth above;

B.      Its failure to correct (through training, discipline, monitoring, policy
        changes, etc.) its employees' conduct;

C.      Its failure to investigate and determine whether its agents/employees were
        complying with its policies, and/or customs, and/or violating inmates'
        Constitutional rights;

D.      Its failure to correct defective policies and/or training procedures, despite
        being put on notice to these defective policies and/or training procedures by
        recent occurrences similar to the one mentioned above; and

E.      The intentional act of ignoring the stated communications regarding
        Plaintiff's decedent's medical needs and its failure to access its own records
        when the said medical needs were communicated.

37.     The above actions of the Defendant were the direct and proximate cause of the
injuries sustained to Mr. Smart in that they increased the risk of these injuries occurring, including
but not limited to:

A.      Major seizure;

B.      Bodily injury from being physically restrained in a prone position;

B.      Extended pain and suffering; and

C.      Death.

38.     By reason of the aforesaid, Frank Smart, Jr.'s civil rights were violated, including
but not limited to those guaranteed under the Eight and Fourteenth Amendments to the
Constitution of the United States in the following particulars:

A.      Mr. Smart's substantive right to be free from cruel and unusual

10

punishment and to be free from punishment prior to adjudication without due process of law under the Eight and Fourteenth Amendments;

B.      Mr. Smart's rights to procedural due process under the Fourteenth Amendment;

C.      Mr. Smart's substantive constitutional rights guaranteed under the Fourteenth Amendment; and

D.      Mr. Smart's Constitutional rights guaranteed under the Fourth Amendment.

39.     As a result of the above-stated injuries, Mr. Smart suffered the following damages:

A.      Pain, suffering, mental anguish and inconvenience;

B.      Loss of wages, loss of earning capacity.

40.     Plaintiff claims on behalf of the Estate any and all damages to which recovery may be made under § 8301 et al., which include but are not limited to the following:

A.      Decedent's pain, suffering, mental anguish, inconvenience and other such damages that are permitted by law;

B.      Decedent's total estimated future earning capacity;

C.      Decedent's loss of income;

D.      Other financial losses suffered as a result of Decedent's injuries and death;

E.      Any and all expenses incurred by Decedent's Estate.

WHEREFORE, the Plaintiff demands judgment in her favor against Defendants for an amount in excess of the applicable arbitration limit, exclusive of interests and costs.

11

## COUNT II – 42 U.S.C. § 1983

### Tiara Smart, Administratrix of the Estate of Frank J. Smart
v.
### Allegheny County

41.     Plaintiff incorporates by reference all preceding paragraphs as though set forth more fully at length herein.

42.     By taking Frank J. Smart, Jr. into its custody, the Defendant entered into a special relationship with him, which imposed upon Defendant affirmative duties of care and protection of Mr. Smart and obligated said Defendant not to cause injury or harm to Mr. Smart while he was in the custody and control of the Defendant.

43.     Mr. Smart suffered the aforesaid injuries and damages complained of as a result of defective policies, procedures, practices, customs, directives and/or administrative procedures (hereinafter referred to as "policies" or "policy") of the Defendant, Allegheny County, as follows:

    A.     A policy of permitting, encouraging or condoning the inadequate supervision of inmates with serious medical problems such as Plaintiff's Decedent as set forth above;

    B.     A policy of failing to require a timely and proper medical examination when an inmate complains of needing seizure medication;

    C.     A policy of failing to require a timely and proper medical examination or care be given to an inmate when an inmate states that they have suffered a serious medical event such as a seizure;

    D.     A policy of failing to adequately train its correctional officers to detect and address medical needs of inmates;

    E.     A policy of failing to supervise correctional personnel pertaining to the securing of medical care of inmates;

    F.     A policy of failing to require that an inmate's prior medical record be

12

accessed at time of intake, medical screening process, or when it is made known that an inmate may have an unmet medical need, including but not limited to a need for medication;

G.    A policy of failing to require an inmate's prior (or current) medical record be accessed when an inmate is receiving medical care in either a clinic or infirmary setting;

H.    A policy of failing to require that inmate's receive medical care from competent medical professionals;

I.    Upon information and belief, a policy permits or encourages certain correctional officers to withhold or refuse appropriate medical intervention in its custody, by failing to properly supervise, reprimand, discipline certain correctional officers who violate the rights of inmates;

J.    A policy failing to provide adequate training to its officers and employees concerning the proper supervision of inmates with medical needs or health problems;

K.    A policy of failing to train its correctional officers to recognize serious medical conditions or problems;

L.    A policy of failing to provide an unrestrained safe environment for inmates who suffer seizures while in the jail and/or infirmary.

M.    Other defective policies concerning the detention of inmates, which may be determined in discovery.

44.    The Defendant's conduct stated above evidences reckless and/or deliberate indifference to the safety, health and constitutional rights of Plaintiff's decedent in the following particulars:

A.    Its failure to adequately train, supervise, monitor and/or discipline its Officers and/or employees as set forth above to avoid violations of inmates' constitutional rights;

B.    Its failure to correct (through training, discipline, monitoring, policy changes, etc.) its employees' conduct;

C.    Its failure to investigate and determine whether its officers and/or employees were complying with its policies and/or customs, and/or violating inmates' Constitutional rights;

13

D.   Its failure to correct defective policies and/or training procedures, despite being put on notice to these defective policies and/or training procedures by recent occurrences similar to the one mentioned above and the Audit; and

E.   The intentional act of ignoring the stated communications regarding Plaintiff's decedent's medical needs and its failure to access its own records when the said medical needs were communicated

42.   The above actions of the Defendant were the direct and proximate cause of Mr. Smart's injuries and death, in that they increased the risk of harm to Mr. Smart, harm which he did in fact sustain and which ultimately led to his death.

45.   By reason of the aforesaid, Frank J. Smart's civil rights were violated, including but not limited to those guaranteed under the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States in the following particulars:

A.   Mr. Smart's substantive right to be free from cruel and unusual punishment and to be free from punishment prior to adjudication without due process of law under the Eighth and Fourteenth Amendments;

B.   Mr. Smart's rights to procedural due process under the Fourteenth Amendment;

C.   Mr. Smart's substantive constitutional rights guaranteed under the Fourteenth Amendment; and

D.   Mr. Smart's constitutional rights guaranteed under the Fourth Amendment.

46.   As a result of the Defendant's conduct as aforesaid, Mr. Smart sustained the injuries and damages set forth in Count I above, which are incorporated by references as though more fully set forth herein.

WHEREFORE, the Plaintiff demands judgment in her favor against Defendants for an amount in excess of the applicable arbitration limit, exclusive of interests and costs.

14

## COUNT III – 42 U.S.C. § 1983

### Tiara Smart, Administratrix of the Estate of Frank J. Smart
### v.
### Warden Orlando Harper

47.     Plaintiff hereby incorporates by reference all preceding paragraphs as though set forth more fully at length herein.

48.     At all times relevant hereto, Defendant Harper was an agent of the County acting in the course and scope of his employment and engaged in the performance of his duties as the Warden for the Allegheny County Jail.

49.     At all times relevant hereto, Defendant Harper was acting under the color of law pursuant to his authority as an officer of the Defendant, Allegheny County.

50.     As Warden, Defendant Harper was the commanding officer of all other officers working at the jail, and was responsible for the implementation and promulgation of the policies and customs of the Jail, and was further responsible for the, training, conduct and supervision of the officers and employees of the Jail.

51.     As Warden, Defendant Harper was a policy maker for the Allegheny County Jail, and it was therefore his duty, at all times relevant hereto to see that there were in place, laws, ordinances, policies, procedures, practices, customs, directives and/or other administrative procedures which assured that prisoners taken into custody at the Allegheny County Jail were not deprived of their constitutional rights. It was also his duty to see that such laws, ordinances, policies, procedures, customs, directives and/or other administrative procedures were actually followed by all Jail personnel or contractors.

52.     At all times relevant hereto, Defendant Harper had actual and/or constructive knowledge of the policies and customs set forth above, and that said policies and/or customs

15

deprived and/or violated the constitutional rights of inmates such as the Plaintiff herein, which in effect constituted a ratification of said conduct by Defendant Harper.

53.   It was the duty of Warden Harper, while Mr. Smart was under his supervision and in his custody, to assume responsibility for his safety and general well-being.  Notwithstanding the aforesaid duty, the Defendant's wrongful acts consisted of the following:

> A.   In failing to adequately train, supervise, monitor or discipline officers where the need for more or different training, supervision, monitoring or discipline was obvious;

> B.   In failing to correct (through training, discipline, monitoring, policy changes, etc.) Jail employees' conduct; and

> C.   In failing to investigate whether the Jail's officers and/or employees were complying with its policies and/or customs, and whether said policies or customs in place were adequate.

54.   The Defendant's conduct constitutes reckless and/or deliberate indifference to the safety, health and constitutional rights of Plaintiff's decedent in the following particulars:

> A.   His failure to adequately train, supervise, monitor and/or discipline its officers and/or employees as set forth above to avoid violations of inmates' constitutional rights;

> B.   His failure to correct (through training, discipline, monitoring, policy changes, etc.) his employees' conduct;

> C.   His failure to investigate and determine whether his officers and/or employees were complying with the policies and/or customs, and/or violating inmates' Constitutional rights; and

> D.   The intentional act of ignoring the stated communication regarding Plaintiff's decedent's medical needs and his failure to access the jail's own records when the said medical needs were communicated.

55.   The above actions of the Defendant were the direct and proximate cause of Mr. Smart's injuries and death, in that they increased the risk of harm to Mr. Smart, harm which he did in fact sustain and which ultimately led to his death.

56.   By reason of the aforesaid, Frank J. Smart's civil rights were violated, including but

16

not limited to those guaranteed under the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States in the following particulars:

A.   Mr. Smart's substantive right to be free from cruel and unusual punishment and to be free from punishment prior to adjudication without due process of law under the Eighth and Fourteenth Amendments;

B.   Mr. Smart's rights to procedural due process under the Fourteenth Amendment;

C.   Mr. Smart's substantive constitutional rights guaranteed under the Fourteenth Amendment; and,

D.   Mr. Smart's Constitutional rights guaranteed under the Fourth Amendment.

57. As a result of the Defendant's conduct as aforesaid, Mr. Smart sustained the injuries and damages set forth in Count I above, which are incorporated by references as though more fully set forth herein.

WHEREFORE, the Plaintiff demands judgment in her favor against Defendants for an amount in excess of the applicable arbitration limit, exclusive of interests and costs.

Respectfully submitted,

KONTOS MENGINE LAW GROUP

George M. Kontos, Esquire
Attorney for Plaintiff

17

## VERIFICATION

THE UNDERSIGNED, TIARA SMART, Administratrix of the Estate of FRANK J. SMART, JR., avers that the statements of fact contained in the foregoing Complaint are true and correct to the best of her knowledge, information and belief, and are made subject to the penalties of 18 Pa. Cons. Stat. Ann. §4904 relating to unsworn falsification to authorities.

Date: **05·04·15**

Tiara Smart,
**Administratrix of the Estate of
Frank J. Smart, Jr.**

17